## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO

GUY CLARK; LINDA CORWIN;
CRAIG CORWIN; WESLEY HANCHETT;
RICHARD JONES; MICHAEL WRIGHT; and
SAN JUAN AGRICULTURAL WATER USERS ASSOCIATION,

     *Plaintiffs*,

v.                                 No.

DEB HAALAND, in her official capacity as Secretary of the Interior;
CAMILLE C. TOUTON, in her official capacity as
Deputy Commissioner, United States Bureau of Reclamation;
MARTHA WILLIAMS, in her official capacity as
Principal Deputy Director, U.S. Fish & Wildlife Service;
DR. RUDY SHEBALA, in his official capacity as
Executive Director, Navajo Nation Division of Natural Resources;
DAVID ZELLER, in his official capacity as
head of Navajo Indian Agricultural Products Industries;
JOHN D'ANTONIO, in his official capacity as
State Engineer of the State of New Mexico; and
ROLF SCHMIDT-PETERSEN, in his official capacity as
Director of the New Mexico Interstate Stream Commission,

     *Defendants*.

## COMPLAINT FOR DECLARATORY JUDGMENT

## I. INTRODUCTION

1.     This complaint seeks declaratory judgments concerning the federal laws that govern water in the arid region of the United States. *Inter alia*, this complaint seeks declaratory judgments that Navajo Dam and the Navajo Indian Irrigation Project (NIIP) are Bureau of Reclamation projects subject to the Reclamation Act of 1902, Pub. L. No. 57-161, 32 Stat. 390 (Jun. 17, 1902), 43 U.S.C. § 372; that Navajo Dam and NIIP are subject to section 8 of the Reclamation Act; that Navajo Dam and NIIP are subject to the practicably irrigable

acreage (PIA) standard set forth in *Arizona v. California* 373 U.S. 546 (1963) and 460 U.S. 605 (1983); and that, when adjudicating claims to an interstate river, the courts must consider endangered species, global warming, drought, scarcity of water, obligations under existing water compacts, claims by private parties and government, and federal reserved water rights.

## II.  JURISDICTION AND PARTIES

2.      Jurisdiction exists under 28 U.S.C. § 1331 (federal question) because this case arises under federal law, including but not limited to:  the Reclamation Act of 1902; the Colorado River Storage Act; the Navajo Indian Irrigation Project Act; the Endangered Species Act of 1973; the Omnibus Public Land Management Act of 2009; the McCarran Amendment; the Colorado River Compact of 1922; the Upper Basin Compact of 1948; the National Environmental Policy Act of 1969; the Constitution of the United States, including the Supremacy Clause, the Compact Clause, the Due Process Clause, the First Amendment, the Equal Protection Clause, the Fourteenth Amendment, clause 3; the Federal Civil Rights Acts, 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, and 1988; and federal case law, including the decisions by the Supreme Court of the United States and the Tenth Circuit Court of Appeals set forth in this complaint.

3.      This complaint seeks relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, along with other relief under 28 U.S.C. § 2202.

4.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2).

5.      Defendant Deb Haaland is the Secretary of the Interior.

6.      Defendant Camille C. Touton is a Deputy Commissioner of the United States Bureau of Reclamation (BOR).  She has been nominated but not yet confirmed to be the Commissioner of the Bureau of Reclamation. The BOR was created to carry out the Reclamation Act of 1902.  The BOR constructs and operates projects throughout New Mexico and the western United States, including Navajo Dam and NIIP.  The BOR is a division within the Department of the Interior.

7.      Defendant Martha Williams is the Principal Deputy Director of the U.S. Fish & Wildlife Service, a division of the Department of the Interior.

8.      Defendant Dr. Rudy Shebala is the Executive Director, Navajo Nation Division of Natural Resources.

9.       Defendant David Zeller is the current head of Navajo Agricultural Products Industries (NAPI), an agency, instrumentality, or enterprise of the Navajo Nation.  NAPI uses water from Navajo Dam and NIIP.

10.      Defendant John D'Antonio is currently the State Engineer of New Mexico.  He was appointed to that post in 2019 by Governor Lujan Grisham.  Mr. D'Antonio was previously appointed State Engineer by Governor Bill Richardson, serving from 2003 to 2011.  Mr. D'Antonio has announced that he would resign at the end of 2021 because of inadequate funding for the Office of State Engineer (OSE).  See paragraph 93 below.

11.      Defendant Rolf Schmidt-Petersen is the Director of the New Mexico Interstate Stream Commission.

12.      All of the named defendants are sued in their official capacities only.

13.     Plaintiff Guy Clark resides in Corrales, New Mexico, in Sandoval County.  For his home Dr. Clark relies on water from a well in the Rio Grande bosque.  His domestic well is recharged by river water that seeps into the alluvial flood plain along the Rio Grande.

14.     Plaintiffs Linda and Craig Corwin live in Bloomfield, New Mexico, in San Juan County.  At their home they use domestic treated water from the San Juan River which is supplied by the City of Bloomfield.  For their lawn and vegetable garden, the Corwins use irrigation water from the San Juan River which is supplied by the Bloomfield Irrigation District.

15.     Plaintiff Wesley Hanchett lives in Albuquerque, New Mexico, in Bernalillo County. The water for his home is supplied by the Albuquerque Bernalillo County Water Utility Authority.

16.     Plaintiff Richard Jones lives in Albuquerque, New Mexico, in Bernalillo County. The water for his home is supplied by the Albuquerque Bernalillo County Water Utility Authority.

17.     Plaintiff Michael Wright lives in San Juan County near Aztec, New Mexico.  He irrigates about 3 acres using water from the Animas River (a tributary of the San Juan River) supplied by the Stacey Ditch.

18.     Plaintiff San Juan Agricultural Water Users Association is an association of acequias which use water from the rivers in the San Juan River Basin.  Acequias, also known as community ditches, are authorized by statute to construct and operate acequias, and "to take water for said acequias from wherever they can."  NMSA 1978, § 73-2-1 *et seq.*

4

## III.  OVERVIEW OF FEDERAL LAW APPLICABLE TO NAVAJO DAM, NIIP, NAVAJO RESERVOIR, THE SAN JUAN RIVER, AND THE SAN JUAN-CHAMA PROJECT

### A. The Reclamation Act of 1902 and its Beneficial Use Requirement

19.     In 1902 the federal government enacted the Reclamation Act for the development of water resources in the arid western regions of the United States.  To deal with the extreme scarcity of water in the West, the federal government included a provision requiring the conservation of water:

> Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof:  *Provided*, That the right of the use of water acquired under the provisions of this act shall be appurtenant to the land irrigated, and **beneficial use shall be the basis, the measure, and the limit of the right**.

Pub. L. No. 57-161, § 8, 32 Stat. 388, 390 (Jun. 17, 1902), codified in 43 U.S.C. § 372, 383.

[All emphases are added, except where noted.]

20.     The strict requirement of beneficial use in the 1902 Reclamation Act is one of earliest environmental statutes enacted by the federal government.  The law of beneficial use was enacted to cope with the arid environment in the western states.  In *Jicarilla Apache Tribe v. United States*, 657 F.2d 1126 (10th Cir. 1981), the Tenth Circuit explained the beneficial use concept at length, starting with the 1902 Reclamation Act.  The Tenth Circuit relied upon the Reclamation Act and New Mexico cases concerning the beneficial use doctrine:

"Our entire state has only enough water to supply its most urgent needs.
Water conservation and preservation is of utmost importance.  Its utilization
for maximum benefits is a requirement second to none, not only for progress
but for survival."  [Citation omitted.]  Maximum utilization then is a
fundamental requirement which prevents waste of water.

657 F.2d at 1133 (quoting *Kaiser Steel v. W.S. Ranch Co.*, 1970-NMSC-043, ¶ 15).

"[I]t is important to observe that, no matter how early a person's priority of
appropriation may be, he is not entitled to receive more water than is
necessary for his actual use.  An excessive diversion of water, through waste,
cannot be regarded as a diversion to beneficial use, within the meaning of the
Constitution.  Article 16, §§ 1, 2 and 3, and [N.M.S.A. 72-1-2 (1978)). Water,
in this state, is too scarce, and consequently too precious, to admit waste."
. . . .
". . . Water is too valuable to be wasted, either through an extravagant
application for the purpose appropriated or by waste by misapplication which
can be avoided by the exercise of a reasonable degree of care to prevent loss,
or loss of a volume which is greatly disproportionate to that actually
consumed."
. . . .
". . . Whatever right one has, even in his own, is subject to that established
principle that his use shall not be injurious to the rights of others, or of the
general public. . . . Nor can an appropriator take more water than he can
beneficially use."

657 F.2d at 1134 (quoting *State ex rel. Erickson v. McLean*, 1957-NMSC-012, ¶¶ 20, 21, 29).

21.     In *Jicarilla,* the Tenth Circuit reviewed the Reclamation Act, the Colorado River

Storage Project Act, the Colorado River compacts, and the statutes for NIIP and the San

Juan-Chama Project.  43 U.S.C. § 615ii.  Based on these statutes and the beneficial use

requirement, the Tenth Circuit held that federal, state, and local agencies have no legal

authority to authorize a non-beneficial use, whether by permit or contract or otherwise.  *Id.*,

Part II, 1136-44.  Under federal law, agreements between governments cannot create a

beneficial use, and cannot authorize a wasteful use.

6

22.     The beneficial use requirement was carried over almost verbatim into New Mexico's 1907 water code, NMSA 1978, § 72-1-2.  Subsequently, the beneficial use requirement was elevated to constitutional status in the New Mexico Constitution of 1912.  N.M. Const. art. XVI, § 3 ("Beneficial use shall be the basis, the measure and the limit of the right to the use of water.").

23.     In the deserts of New Mexico and the western United States, water conservation is not only a federal law, but also a law of survival.  The arid environments in the American West cannot sustain significant populations unless everyone conserves water.  So the laws of the United States and New Mexico do not allow anyone to waste water – not irrigators, not municipalities, not homeowners, not the State of New Mexico, not Indian tribes, and not the United States.

**B. The Practicably Irrigable Acreage (PIA) Standard for Irrigation Projects**

24.     When the general requirement for beneficial use of water is applied specifically to irrigation projects, it is known as the practicably irrigable acreage standard (PIA).

25.     The Supreme Court has confirmed practicably irrigable acreage (PIA) as the standard on at least three occasions – in 1963, 1983, and 1989:

(1)     *Arizona v. California*, 373 U.S. 546 (1963):

26.     In 1963, the Supreme Court quantified and awarded water from the Colorado River system (of which the San Juan River is a part) for several Indian reservations in Arizona, California and Nevada.  The Supreme Court reviewed prior appropriation and beneficial use under Western water law, the Colorado River compacts, and the implied reservation of

water for Indian tribes under *Winters v. United States*, 207 U.S. 564 (1908).  The Supreme

Court adhered to the universal requirement of beneficial use, the cornerstone of water law in

the West.  The Court defined "[b]eneficial consumptive use" to mean "consumptive use

measured by diversions less return flows, for a beneficial (nonwasteful) purpose."  373 U.S.

at 557 n.23.

27.     The Supreme Court ruled that the amount of water reserved under *Winters* must be

measured by the practicably irrigable acreage on the reservations:

> We also agree with the Master's conclusion as to the quantity of water
> intended to be reserved.  He found that the water was intended to satisfy the
> future as well as the present needs of the Indian Reservations, and ruled that
> enough water was reserved to irrigate all the practicably irrigable acreage on
> the reservations.  Arizona, on the other hand, contends that the quantity of
> water reserved should be measured by the Indians' "reasonably foreseeable
> needs," which, in fact, means by the number of Indians.  How many Indians
> there will be and what their future needs will be can only be guessed.  **We
> have concluded, as did the Master, that the only feasible and fair way by
> which reserved water for the reservations can be measured is irrigable
> acreage.**

373 U.S. at 600-01.

(2)     *Arizona v. California*, 460 U.S. 605 (1983):

28.     After the first decision in *Arizona v. California*, some advocates and commentators

criticized the PIA method from both sides, either as too generous or not generous enough.

The Supreme Court was not swayed.  In 1983 the Court returned to the issue and

emphatically reaffirmed the PIA standard as "the only feasible and fair way by which

reserved water for the reservations can be measured."  460 U.S. at 615-28.

29.     The Supreme Court explained once again, in greater detail, why PIA is the only standard for quantifying reserved water rights under *Winters*.  The Court stressed the certainty of the PIA standard, versus the guesswork inherent in other methods:

> The standard for quantifying the reserved water rights was also hotly contested by the States, who argued that the Master adapted a much too liberal measure.  Our decision to rely upon the amount of practicably irrigable acreage contained within the Reservation constituted a rejection of Arizona's proposal that the quantity of water reserved should be measured by the Indian's "reasonably foreseeable needs," *i.e.*, by number of Indians.  **The practicably-irrigable-acreage standard was preferable because how many Indians there will be and what their future needs will be could "only be guessed,"** *id*. **373 U.S. at 601.  By contrast, the irrigable-acreage standard allowed a present water allocation that would be appropriate for future water needs**.  *Id.* 373 U.S. at 600-01.  Therefore, with respect to the question of reserved rights for the reservations, and the measurement of those rights, the Indians, as represented by the United States, won what can be described only as a complete victory.  A victory, it should be stressed, that was in part attributable to the Court's interest in a *fixed* calculation of future water needs.  **Applying the irrigable-acreage standard, we found that the Master's determination as to the amount of practicably irrigable acreage, an issue also subject to adversary proceedings, was reasonable.**
>
> * * *
>
> **Certainty of rights is particularly important with respect to water rights in the Western United States**.  The development of that area of the United States would not have been possible without adequate water supplies in an otherwise water-scarce part of the country.  *Colorado River Water Cons. District v. United States*, 424 U.S. 800, 804 (1976).  **The doctrine of prior appropriation, the prevailing law in the western states, is itself largely a product of the compelling need for certainty in the holding and use of water rights**.
>
> Recalculating the amount of practicably irrigable acreage runs directly counter to the strong interest in finality in this case.  A major purpose of this litigation, from its inception to the present day, has been to provide the necessary assurance to States of the Southwest and to various private interests, of the amount of water they can anticipate to receive from the Colorado River system.

> **"In the arid parts of the West . . . claims to water for use on federal reservations inescapably vie with other public and private claims for the limited quantities to be found in the rivers and streams."** *United States v. New Mexico*, **438 U.S. 696, 699 (1978).  If there is no surplus of water in the Colorado River, an increase in federal reserved water rights will require a "gallon-for-gallon reduction in the amount of water available for water-needy state and private appropriators."** *Id.*, **438 U.S. at 705**.
>
> * * *
>
> We also fear that the urge to relitigate, once loosed, will not be easily cabined. The States have already indicated, if the issue were reopened, that the irrigable- acreage standard itself should be reconsidered in light of our decisions in *United States v. New Mexico*, 438 U.S. 696 (1978), and *Washington v. Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U.S. 658 (1979), and we are not persuaded that a defensible line can be drawn between the reasons for reopening this litigation advanced by the Tribes and the United States, on the one hand and the States on the other.

460 U.S. at 617, 620-21, 625.

(3)     *Wyoming v. United States*, 492 U.S. 406 (1989) (*aff'g In re General Adjudication of All Rights To Use Water in the Big Horn River System*, 753 P.2d 76 (Wyo. 1988))

30.     An equally divided Supreme Court reaffirmed the use of the PIA standard to quantify Indian reserved water rights.

## C.  The Minimum Needs Doctrine

31.     In a series of cases, the United States Supreme Court has created the "minimum needs" doctrine for quantifying all federal reserved water rights, including tribal rights.  The Supreme Court has limited the amount of federal reserved rights to the minimum needed to accomplish the purpose of the reservation.  *United States v. New Mexico*  438 U.S. 696, 700-01:

> While many of the contours of what has come to be called the "implied-reservation-of-water doctrine" remain unspecified, the Court has repeatedly emphasized that **Congress reserved "only**

**that amount of water necessary to fulfill the purpose of the reservation, no more."** *Cappaert v. United States*, 426 U.S. 128, 141, 96 S. Ct. 2062, 2071 (1976). *See Arizona v. California*, 373 U.S. 546, 600-01, 83 S. Ct. 1468, 1497-98 (1963); *United States v. District Court for Eagle County*, 401 U.S. 520, 523, 91 S. Ct. 998, 1001 (1971). Each time this Court has applied the "implied-reservation-of-water doctrine," it has carefully examined both the asserted water right and the specific purposes for which the land was reserved, and concluded that without the water the purposes of the reservation would be entirely defeated.

This careful examination is required both because the reservation is implied, rather than expressed, and because of the history of congressional intent in the field of federal-state jurisdiction with respect to allocation of water. Where Congress has expressly addressed the question of whether federal entities must abide by state water law, it has almost invariably deferred to the state law. *See California v. United States,* 438 U.S. 645, 653-70, 678-79, 98 S. Ct. 2985, 2990-98, 3002-03 (1978). Where water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude, even in the face of Congress' express deference to state water law in other areas, that the United States intended to reserve the necessary water. **Where water is only valuable for a secondary use of the reservation, however, there arises the contrary inference that Congress intended, consistent with its other views, that the United States would acquire water in the same manner as any other public or private appropriator.**

## D.  The Colorado River Compacts

32.    The waters of the Colorado River are shared by the states of New Mexico, Colorado, Wyoming, Utah, Arizona, and California. See map, EXHIBIT 1.

33.    The waters of the Colorado River basin are allocated by the Colorado River Compact of 1922 and the Upper Colorado River Basin Compact of 1948. Compacts are agreements between states, or between states and tribes. To become effective, compacts

must be enacted as identical statutes by Congress, and also by the legislatures of each state

and tribe.  The Colorado River Compact was enacted by Congress as An Act of August 19,

1921, ch. 42, 42 Stat. 171 and by New Mexico in 1923 as NMSA 1978, § 72-15-5.  The

Upper Basin Compact was enacted by Congress as An Act of April 6, 1949, ch. 48, 63 Stat.

31 and by New Mexico in 1949 as NMSA 1978, § 72-15-26.

34.     As the map in EXHIBIT 1 shows, the waters in the San Juan River flow downstream

from New Mexico into Lake Powell, where the San Juan joins with the main stem of the

Colorado River.  The Colorado River then flows into Lake Meade and downstream

between Arizona and California. The map shows that other states have already built

infrastructure to capture any San Juan water that flows downstream from New Mexico,

such as:  the Central Arizona Project, which supplies the Phoenix area and Tucson; the

Colorado River Aqueduct, which supplies Los Angeles and San Diego; and the All

American Canal, which supplies the Imperial Valley.

35.     In short, Albuquerque is competing with Las Vegas, Beverly Hills, Phoenix, and Los

Angeles for a dwindling supply of water.  The water authorities in every other state are

acutely aware of this fact, as are Native American tribes.  But the government in New

Mexico is oblivious to this reality.

36.     In the competition for the disappearing water from the San Juan-Colorado system,

the other states have 78 Representatives and 12 Senators in Congress, while New Mexico

has only 3 Representatives and 2 Senators.  As a result, the Interior Department and the

BOR are under heavy political pressure not to enforce federal water laws.

**E.  The McCarran Amendment and Federal Deference to State Water Law**

37.     The last clause of section 8 of the Reclamation Act enacts a federal policy of water conservation, while the first clause in section 8 enacts a policy of federal deference to state water laws and regulations.  See the text quoted above.

38.     This federal policy of deference to state water laws was reinforced and expanded by the McCarran Amendment, 43 U.S.C. § 666.  The McCarran Amendment waives the sovereign immunity of the United States and Indian tribes and consents to the adjudication and administration of water rights by the respective states.

39.     In *United States v. District Ct. for Eagle County*, 401 U.S. 520 (1971), the Supreme Court ruled that state courts have the jurisdiction and authority to adjudicate the water rights of the federal government, including the rights of Native American tribes.

**F.  Navajo Dam, Navajo Reservoir, and NIIP**

40.     Under the Reclamation Act of 1902, the Bureau of Reclamation has constructed many projects throughout the West, beginning with the Elephant Butte Dam and Reservoir in New Mexico, https://www.usbr.gov/projects/index.php?id=94.

41.     In 1956 Congress authorized the construction of several new Reclamation Act projects in the Colorado River Storage Act, Pub. L. No. 84-485, 70 Stat. 105 (Apr. 11, 1956), including the Glen Canyon Dam in Utah, the Flaming Gorge Dam in Wyoming, and Navajo Dam in New Mexico.  Section 4 of the Colorado River Storage Act states that the participating projects shall be governed by the Reclamation Act of 1902.

42.     In 1962 Congress authorized the construction of the Navajo Indian Irrigation Project, which uses water impounded by Navajo Dam in Navajo Reservoir.  Navajo Indian Irrigation Project Act, Pub. L. No. 87-483, 76 Stat. 96 (Jun. 13, 1962).  The NIIP Act authorized the design and construction of waterworks and canals with an engineering design capacity to irrigate up to 110,630 acres.  However, NIIP proved to be uneconomic, so Congress refused to appropriate the funds necessary to complete the project to the full 110,630 acres.  As actually constructed, the NIIP waterworks cannot supply 110,630 acres, even if it were practicable to build, operate, repair, and maintain the project.  It is not.  The costs of the NIIP project have always exceeded its revenues.

43.     The NIIP Act authorized the construction of waterworks, not the creation of water rights.  The NIIP Act expressly states that it does not create any water rights:

> (c) **No right or claim of right to the use of the waters of the Colorado River system shall be aided or prejudiced by this Act . . . .**

NIIP Act, § 13(c), 76 Stat. at 101.  Congress intended "that the United States would acquire water in the same manner as any other public or private appropriator."  *United States v. New Mexico*, 438 U.S. 696, 702 (1978), that is, by diverting water <u>and</u> putting it to beneficial use.

44.     Navajo Dam and the Navajo Indian Irrigation Project are governed by the beneficial use limitations in the Reclamation Act of 1902.

45.     Navajo Dam and the Navajo Indian Irrigation Project are governed by the practicably irrigable acreage (PIA) requirement established by the Supreme Court of the United States.  The PIA standard applies to <u>all</u> irrigation projects in the West, whether the projects are operated by governmental agencies, tribal agencies, or private parties.

14

**G.  The San Juan-Chama Project**

46.    The San Juan-Chama Project is another BOR project under the Reclamation Act. Pub. L. No. 87-483, §§ 8-10, 76 Stat. at 97-99.  The project collects water from the basin of the San Juan River and diverts it through a series of tunnels to the Rio Grande Basin.  See map, EXHIBIT 1. The water transported by the San Juan-Chama Project is allocated to users up and down the Rio Grande:

| User | Share (acre-feet per year)(minimum) |
| --- | --- |
| Albuquerque | 48,200 |
| Middle Rio Grande Conservancy District | 20,900 |
| Jicarilla Apache Tribe | 6,500 |
| Santa Fe County | 5,605 |
| Los Alamos County | 1,200 |
| Pojoaque Valley Irrigation District | 1,030 |
| Espanola | 1,000 |
| Belen | 500 |
| Los Lunas | 400 |
| Taos | 400 |
| Town of Bernalillo | 400 |
| Red River | 60 |
| Twining Water and Sanitation District | 15 |

**H.  The Animas-La Plata Project**

47.    The Animas-La Plata Project is another BOR project under the Reclamation Act. Congress began initial planning for the Animas-La Plata project in the 1960s.  During the ensuing decades, the project went through many different concepts.  Environmentalists opposed the project, along with many residents in Northwest New Mexico and Southwest Colorado.  The project was also opposed on economic and budgetary grounds.  Ultimately the project was drastically downsized from its original grandiose conceptions.  See Jonathan Thompson, *The Water Project That Wouldn't Die*, High Country News, Nov. 14, 2012.

48.    As built, the project consists mainly of a pumping station on the Animas River at Durango.  The plant uses electricity to pump water more than 500 vertical feet to the Ridges Dam and Reservoir, also known as Lake Nighthorse.

49.    The purpose of this facility was to release water back into the Animas River during times of water shortage.  However, there have never been any releases from the reservoir, except for two small tests.  The reservoir has no other outlet.  The pumped water just sits in Lake Nighthorse and evaporates.

50.    If water were ever released back into the Animas River, it could not reach its intended recipients, because the water would be reabsorbed into the stream bed or used by water owners with higher priority dates.

**I.  The Omnibus Public Land Management Act of 2009**

51.    In 2009 Congress bundled dozens of pieces of legislation into the Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, 123 Stat. 991 (Mar. 30, 2009).  The bill

created or expanded more than 34 wilderness areas, wilderness study areas, national

monuments, and scenic areas.  The 2009 omnibus legislation did not repeal the beneficial

use requirement or the PIA standard.  To the contrary, the 2009 legislation expressly

required the Secretary to comply with all federal laws which protect the environment.

SEC. 10303. COMPLIANCE WITH ENVIRONMENTAL LAWS.

* * *

(b) COMPLIANCE WITH ENVIRONMENTAL LAWS.—In carrying out
this subtitle, the Secretary shall comply with each law of the Federal
Government relating to the protection of the environment, including—(1) the
National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.); and (2)
the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.).

## J.  The Endangered Species Act

52.     The Endangered Species Act (16 U.S.C. §1531 et seq.) applies to the San Juan River.

The River provides habitat for several endangered species, including the Colorado

pikeminnow (*Ptychocheilus lucius*), the razorback sucker (*Xyrauchen texanus*), the humpback

chub (*Gila cypha*); the bonytail chub or bonytail (*Gila elegans*); and the southwestern willow

flycatcher (*Empidonax trailli extimus*).

53.     Every year, the BOR releases several hundred thousand acre-feet of water from

Navajo Dam for endangered species habitat.  According to the BOR, this water is not

available for use in New Mexico because it must be delivered downstream below Bluff,

Utah. See map, EXHIBIT 1.

17

**K. Other Federal Laws for the Protection of the Environment**

54.     (a) The Reclamation Act of 1902 is one of the very first statutes enacted by Congress to protect the environment.  To protect the fragile environment in the western states, section 8 requires beneficial use of water, and prohibits any waste of water by anyone.

55.     (b) The Clean Water Act, Pub. L. No. 92-500, 86 Stat. 816 (Oct. 18. 1972).

56.     (c) The Safe Drinking Water Act, Pub. L. No.93-523, 88 Stat. 1660 (Dec. 16, 1974).

57.     (d)  The National Environmental Policy Act, 42 U.S.C. § 4321 et seq.

**IV.  WHY A FEDERAL DECLARATORY JUDGMENT ACTION IS NECESSARY**

58.     The defendants have not complied with or enforced these laws.

59.     The defendants are under strong political pressures not to enforce these laws. Federal statutes and case law set very clear rules, summarized above, to govern the Bureau of Reclamation, Navajo Dam, NIIP, other irrigation projects, and the quantification of water rights for tribes.  However, it would be impolitic and stressful for defendants to enforce these laws.

60.     This lawsuit can be resolved very quickly if the defendants will simply admit the well-established rules of law set forth in this complaint.  However, it is anticipated that defendants will use a wide variety of litigation tactics, and the ample resources of three governments, to avoid giving straight answers to the pure questions of federal law posed by this case.  Accordingly plaintiffs respectfully ask the court to keep in mind that plaintiffs have very limited resources to litigate this case, and that declaratory judgment actions are

designed "to provide an immediate forum for the adjudication of rights and obligations . . .

with expediency and economy." *Duggins v. Hunt*, 323 F.2d 746, 748 (10th Cir. 1963).

61.    There are 23 tribes and pueblos in New Mexico.  The water rights of other tribes and

pueblos are being jeopardized by the ongoing failure to enforce the laws.  The tribes and

pueblos have been forced into a cruel fight for survival, where success depends on who hires

the most lawyers, who cuts inside deals with the bureaucracy, and who gets favors from

politicians.  Plaintiffs acknowledge that tribes and pueblos have rights to significant amounts

of water, which need to be quantified as soon as possible.  The water rights of <u>all</u> tribes and

pueblos in New Mexico must be adjudicated promptly, in accordance with the laws, in a

comprehensive and consistent manner.

62.    This lawsuit is made necessary by the defendants' long and continuing record of

noncompliance with the law.  The present controversy arises in part because of certain state

court rulings, including *State ex rel. State Engineer v. United States*, 2018-NMCA-053, 425 P.3d

723.  That opinion holds, *inter alia*, that NIIP is not a BOR project, ¶ 18; that NIIP is not

subject to the beneficial use requirement, or the PIA standard, ¶¶ 24-26, 30; that Congress

created water rights by authorizing the construction of NIIP, ¶ 32; that the state's water laws

and regulations are pre-empted by federal law, ¶¶ 10, 13, 14, 16; and that a state court can

adjudicate water rights in interstate rivers without considering global warming, lack of

available water, endangered species, or other federal reserved water rights, ¶ 40.

63.    The foregoing rulings are plain errors of federal law.  They contradict the first

principles of federal water law set by the federal statutes and decisions described in this

complaint. An irreconcilable conflict between state and federal law now exists, and plaintiffs therefore ask the court to issue declaratory judgments to resolve the conflicts.

64.   For example, Judge Wechsler refused to consider the dire and growing shortages of water in the Colorado River system caused by global warming and prolonged drought. Retired Judge Black affirmed that refusal.

65.   As another example, Judge Wechsler refused to consider the water which is used to protect the species which have been declared endangered pursuant to the Endangered Species Act. Retired Judge Black affirmed that ruling. The Black-Wechsler rulings conflict with the Endangered Species Act and create chaos in the treatment of endangered species in New Mexico. On the Rio Grande, there has been extended litigation in federal court over releases of water for the silvery minnow, an endangered species. See *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096 (10th Cir. 2010). By contrast, in state court, water for the Colorado pikeminnow is a legal non-issue.

66.   These legally incorrect rulings adversely affect water users in the San Juan Basin. Beyond that, these incorrect rulings also injure water users on the Rio Grande, including the plaintiffs who depend on the Rio Grande for their water. These people were not served with process, not parties to the case, and they had no opportunity to litigate the issues on their merits, and therefore they are not bound as a matter of res judicata or collateral estoppel.

67.   Furthermore, the rulings in cause No. AB-07-1 (Navajo Nation Inter Se) were made concerning a settlement via summary judgment, so they have no preclusive effect. *State ex*

*rel. Martinez v. Kerr-McGee Corp.*, 1995-NMCA- 041, ¶¶ 13-15, 120 N.M. 118, 898 P.2d 1256;

*Pope v. The Gap*, 1998-NMCA-103, ¶¶ 24, 27, 33, 125 N.M. 376, 961 P.2d 1283.

68.     These state court rulings overthrow the first principles of federal water law, so they must be corrected by the federal courts, which have the ability to issue authoritative decisions on questions of federal law.  This declaratory judgment action is necessary to reaffirm and enforce the federal laws which defendants must obey, and to carry out the Supremacy Clause of the federal Constitution.

69.     This complaint asks the Court to issue declaratory judgments on the straightforward points of federal law which apply to the defendants.  These points include but are not limited to the following:

- Navajo Dam, Navajo Reservoir, NIIP, the San Juan-Chama Project, and the Animas-La Plata Project are BOR projects subject to the beneficial use requirement set forth in section 8 of the Reclamation Act and *Jicarilla Apache Tribe v. United States*;

- The PIA standard applies to NIIP and all other irrigation projects;

- PIA is the measure of *Winters* rights for the Navajo Nation;

- The minimum needs doctrine applies to federal reserved rights claimed for the Navajo Nation.

- The Colorado River Storage Act and the NIIP Act do not create water rights.  They simply authorize the construction of waterworks like dams, irrigation projects, canals, and reservoirs;

- Federal law does not follow the homeland theory espoused in *In re General Adjudication of All Rights To Use Water in Gila River System & Source (Gila V)*, 35 P.3d 68 (Ariz. 2001); and

- State and federal courts cannot ignore federal environmental laws when they adjudicate rivers.

**Pueblo of Santa Ana and State ex rel. Clark**

70.    In *State ex rel. Clark v. Johnson*, 1995-NMSC-048, 120 N.M. 562, 904 P.2d 11, the New Mexico Supreme Court held that a governor has no power to bind the state to a compact with a tribe or another state unless the Legislature enacts the agreement as a statute.

71.    A compact is a tripartite agreement between a state, the United States, and another state or tribe.  For a compact to become effective, the compact must be enacted at least three times: as a statute by the United States; as a statute by each affected state; and as a statute by each affected tribe, if tribes are involved.

72.    In *Pueblo of Santa Ana v. Kelly*, 932 F. Supp. 1284 (D.N.M. 1996), 104 F.3d 1546 (10th Cir. 1997), the federal district court and the Tenth Circuit upheld *Clark v. Johnson*.  The federal courts held that state law determines the procedure for executing valid compacts with tribes or other states; approval by the federal government does not bind the state if the state has not enacted the agreement as a statute.

73.    In December 2010, about two weeks before he left office, Governor Bill Richardson signed an agreement with the Navajo Nation on water rights.  The Richardson-Navajo

agreement is a proposed water compact between the State of New Mexico and the Navajo

Nation, but it has never been enacted as a statute by the New Mexico Legislature.

74.     In addition, the Richardson-Navajo agreement on its face violates the requirements

which the Legislature has set for proposed water compacts with tribes.  Section 72-1-1(C)

provides that a proposed water compact must settle all of the tribe's water claims.  The

Richardson-Navajo agreement does not settle the water claims of the Navajo Nation in the

Rio Grande Basin, where Albuquerque and Santa Fe are located.  Nor does it settle Navajo

water claims in the basin of the Little Colorado River, where Gallup is located.  The Navajo

Nation will assert very large water claims against the Rio Grande and Little Colorado, on

top of its huge claims against the San Juan.

75.     So the water supply to Albuquerque and Santa Fe is facing many threats at once,

including:

        - drought and climate change;

        - reductions in supply from the San Juan-Chama Project;

        - unresolved water claims by tribes and pueblos in the Rio Grande Basin;

        - the legal chaos in water law created by the New Mexico Court of Appeals opinion;

and

        - New Mexico's obligation to deliver water down the Rio Grande to Texas and

Mexico.

***Tarrant Regional Water Dist. v. Herrmann*, 569 U.S. 614 (2013)**

76.      In *Tarrant*, the United States Supreme Court held that a federally approved water compact does not pre-empt the Oklahoma water statutes.  Speaking for a unanimous court, Justice Sotomayor upheld "the well-established principle that States do not easily cede their sovereign powers, including their control over waters within their own territories."  569 U.S. at 631.

## V.  CHRONOLOGY

77.      **March 13, 1975.**  The State of New Mexico files suit against the United States to adjudicate the water rights of the U.S. "on its own behalf and on behalf of its wards, to wit, the Jicarilla Apache Tribe of Indians, the Navajo Tribe of Indians, and the Ute Mountain Tribe of Indians," in a general stream adjudication of the San Juan River Basin within New Mexico, as authorized by the McCarran Amendment.  Case No. CV-75-184 ("the main case"), which is now renumbered as D-1116-CV-7500184.

78.      **September 2, 2009.**  Case No. AB-07-1 ("the Navajo Inter Se") is commenced as a separate proceeding (sometimes called a "subfile") within the general stream adjudication to adjudicate the water rights of the Navajo Nation relative to other water owners.  Some service of process is made on local water owners, limited to the subfile Case No. AB-07-1.

79.      **November 10, 2009.**  Judge James J. Wechsler, a judge of the New Mexico Court of Appeals, is specially assigned to Case No. CV-75-184 and Case No. AB-07-1, to act as the trial judge in the district court.  The selection of Judge Wechsler does not follow the usual practice for the assignment of judges in the district courts.

80.   **February 15, 2013.**  Judge Wechsler refuses to allow counterclaims asserted by local

water owners, even though Rule 1-013(A) NMRA makes these counterclaims mandatory.

81.   **June 1 & 2, 2013.**  Judge Wechsler hears oral arguments by attorneys.

82.   **July 12, 2013.**  Judge Wechsler informs all parties that no evidentiary hearing is

necessary.

83.   **August 16, 2013.**  Judge Wechsler issues an opinion granting summary judgment.

He rules that there are no disputed issues of material fact, and that as a matter of law the

Navajo Nation is entitled to an award of approximately 635,000 acre-feet per year in

perpetuity, to satisfy its *Winters* claims within the San Juan River Basin within New Mexico.

635,000 acre-feet is roughly 6 times as much water as is used by the Albuquerque/Bernalillo

County metropolitan area, and roughly twice as much as used by the city of Phoenix.

84.   **November 1, 2013.**  Judge Wechsler issues his Partial Final Judgments and Decrees.

85.   **February 14, 2017.**  Retired Judge Bruce D. Black is specially appointed to hear the

appeals in the N.M. Court of Appeals.  He served on the New Mexico Court of Appeals

from 1991 to 1996, alongside Judge Wechsler.  Judge Black then retired from the state

bench to become a federal district judge in New Mexico from 1996 to 2017.

86.   **April 3, 2018.**  Without hearing oral argument, the New Mexico Court of Appeals

issues an opinion affirming all of Judge Wechsler's rulings.  The opinion is written by

Retired Judge Black.

87.   **May and June, 2018.**  Most of the parties except for the Navajo Nation and United

States challenge the COA opinion by seeking certiorari in the New Mexico Supreme Court.

88.  **August 12, 2018.**  The New Mexico Supreme Court grants certiorari and consolidates the petitions into one proceeding.  No. S-1-SC-37068, Consolidated with Nos. S-1-SC-37065, -37070, and -37076.

89.  **March 29, 2021.**  The New Mexico Supreme Court unexpectedly issues an order quashing certiorari as improvidently granted, without explanation.

90.  **April, 2021.**  The New Mexico State Engineer, the Albuquerque Bernalillo County Water Utility Authority, and the City of Gallup file motions asking the Supreme Court to reconsider its order quashing certiorari.  The State Engineer correctly points out that the COA opinion contradicts federal law and due process.

> The [COA] Opinion instead relies *sua sponte* on a misplaced application of federal law to supersede the due process specifically provided by this Court for statutory stream system adjudications in New Mexico.  This reasoning undermines both the authority of the state courts to adjudicate water rights and the State Engineer's authority to administer the waters of the State.

91.  At the present time, Retired Judge Black's opinion affirming Judge Wechsler is the law throughout New Mexico, at least in state courts.  See Rule 12-405(C) NMRA.  However, Retired Judge Black's opinion contradicts, nullifies, and abrogates federal laws on water as set forth in federal statutes and the decisions of the United States Supreme Court.  The Supremacy Clause of the Constitution does not allow that to happen, so this lawsuit has become necessary.  U.S. Const. art. VI, paragraph 2.

## VI.  OTHER VIOLATIONS OF FEDERAL LAW

### A.  Due process right to be heard at a meaningful time and in a meaningful manner

92.    Plaintiffs are being subjected to ongoing deprivations of their fundamental rights of due process under the federal Constitution, "Due process requires prompt notice with 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Sandia v. Rivera*, 2002-NMCA-057, ¶¶ 12 and 17, 132 N.M. 201, 46 P.3d 310 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

93.    The San Juan adjudication has already been pending for more than 46 years, without giving local water owners the opportunity to prove and protect their water rights.  In October 2017 the OSE informed Judge Wechsler that it would take 200 [two hundred] more years to complete the adjudication.  EXHIBIT 2.  This is a denial of the right to be heard at a meaningful time in a meaningful manner.  The OSE admits that it does not have the funding or staff to carry out its duties under the law.

94.    Most local water owners in San Juan County have water rights that were adjudicated in the Echo Ditch Decree of 1948.  Their water rights are being impaired and diminished by the claims of the U.S. and the Tribes, because any increase in federal reserved rights will result in a  "gallon-for-gallon reduction in the amount of water available for water-needy state and private appropriators."  *United States v. New Mexico* and *Arizona v. California*, *supra*.

### B.  Due process right to adequate service of process

95.    To advance the water rights of the Navajo Nation at the expense of other water owners, the three governments (federal, state, tribal) worked together to create a so-called

Expedited Inter Se, Case No. AB-07-1, as a vehicle for impairing defendants' due process

rights.  The service of process and notice for the Navajo Inter Se was constitutionally

inadequate under *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950);

*Mennonite Bd. of Missions v. Adams*, 462 U.S. 791 (1983); *Macaron v. Associates Capital Services*

*Corp.*, 1987-NMCA-005, 105 N.M. 380, 733 P.2d 11; and *Patrick v. Rice*, 1991-NMCA-063,

112 N.M. 285, 814 P.2d 463.  The three governments deliberately refused to use the best

available sources of information to identify current water owners.

96.     In order to determine the amounts of water rights and their relative priorities in a

stream system adjudication, NMSA 1978, § 72-4-15 requires the state engineer to complete a

hydrographic survey of "all rights to the use of the waters of such system, together with all

other data in his [the state engineer's] possession for such determination."  Section 72-4-17

reiterates this requirement:

> In any suit for the determination of a right to use the waters of any stream
> system, all those whose claim to the use of such waters are of record and all
> other claimants, so far as they can be ascertained with reasonable diligence,
> shall be made parties.

97.     In New Mexico, a current hydrographic survey must be performed in the field to

identify current water owners, because water rights owners are not required to file

declarations with the State Engineer.  NMSA 1978, § 72-1-3 (owner may file declaration); §

72-5-2 (existing community ditches not required to file applications).  A cadastral survey is

required because field work is the only way to identify the people who are currently using

water.  The last hydrographic survey was performed before the 1948 Echo Ditch Decree, so

it is too out of date to satisfy due process. *Echo Ditch Co. v. McDermott Ditch Co.*, No. 01690 (1st Jud. Dist. Ct. Oct. 4, 1937).

98.    The State Engineer worked in concert with the Navajo Nation and the United States to nullify these statutory and constitutional requirements.  Instead of a genuine hydrographic survey, they agreed to file a purported "hydrographic survey" which did not meet constitutional or statutory standards.  Their spurious survey excluded all current water users outside of the Navajo Reservation.  As a result, many current water owners were never identified and made parties to Case No. AB-07-1.

99.    On October 31, 2011, water owners filed a "notice of constitutional defect in service list."  EXHIBIT 3.  In response Special Master Steven Snyder sent an email to Celina Jones of the Administrative Office of the Courts, a staffer who was working on the Navajo subfile with Special Master Snyder and Judge Wechsler.  EXHIBIT 4.

100.    Exhibit 4 shows actual bias, prejudgment, and a lack of impartiality with regard to local water owners.  When the defendants asserted their constitutional rights to adequate service of process, the Special Master rejected these rights as nothing more than "dilatory tactics."  After his email became known to local water owners, Special Master Snyder did the right thing and disqualified himself from the litigation.  EXHIBIT 5.  However Judge Wechsler and Celina Jones continued on the case, although they should have also disqualified themselves.  See the due process right to impartial judges, below.

**C. Due process – denial of right to file answer and counterclaim**

101.    In February 2013 Judge Wechsler refused to allow local water owners to file an answer and counterclaim to assert and defend their water rights as against the Navajo Nation and the United States.  Order Striking Community Ditch Defendants' Answer and Counterclaim (Feb. 15, 2013).  His ruling denied local owners a meaningful opportunity to present and prove their side of the case at a meaningful time.

102.    As this court knows, answers and counterclaims are mandatory in state and federal courts in New Mexico.  Rules 1-007(A), 1-008, 1-012, 1-013(A) (compulsory counterclaim) NMRA; Fed. R. Civ. P. 7(a), 8, 12, 13(a).

**D.  Due process – property rights and constitutional rights**

103.    In New Mexico, the right to take and use water is so essential that it is recognized as a constitutional right.

> The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, is hereby declared to belong to the public and to be subject to appropriation for beneficial use, in accordance with the laws of the state.  Priority of appropriation shall give the better right.

N.M. Const. art. XVI, § 2.

104.    Water rights are also property rights.  When water is captured from a natural stream, it becomes personal property.  *Hagerman Irrigation Co. v. McMurry*, 1911-NMSC-021, ¶¶ 4-5, 16 N.M. 172, 113 P. 823; *Snow v. Abalos*, 1914-NMSC-022, ¶¶ 13-15, 18 N.M. 681, 140 P. 1044.  Because water rights are constitutional rights and property rights, water rights are entitled to the highest degree of judicial protection and due process.

**E.  Due process right to impartial judges; right to disclosure of actual or potential conflicts;** *Liljeberg, Caperton, Williams*

105.   All litigants in state and federal courts have a federal constitutional right to impartial judges as established in *Liljeberg v. Health Serv. Corp.*, 486 U.S. 847 (1988); *Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868 (2009); and *Williams v. Pennsylvania*, ____ U.S. ____, 136 S. Ct. 1899 (2016).  This constitutional right has been denied to the defendants in the San Juan litigation.

106.   **Judge James J. Wechsler worked for the Navajo Tribe as a lawyer.**  At the time of his special appointment to the San Juan cases in 2009, Judge Wechsler made no disclosures whatsoever about actual or potential conflicts of interest.  Such disclosures are required by the Supreme Court's decision in *Liljeberg*, and by Rule 21-211 NMRA of New Mexico's Code of Judicial Conduct.

> A judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification, even if the judge believes there is no basis for disqualification.

Committee commentary [8] to Rule 21-211 NMRA.

107.   At no time did Judge Wechsler disclose that he had worked as a lawyer at DNA Legal Services (DNA).  At the time James Wechsler worked for DNA as an attorney, from November 1970 to July 1973, DNA was an agency or instrumentality of the Navajo Tribe. DNA was organized, funded, and run by the Navajo Tribe.

108.   Judge Wechsler's prior employment as an attorney by the Navajo Tribe created an irreconcilable conflict of interest.  There is a plain conflict of duties between his duties of

loyalty to his former employer and clients, and his duty of absolute impartiality as a judge.

Lawyers owe duties of loyalty and confidentiality to former clients and employers, and

those are continuing duties which survive the termination of the earlier relationship.  New

Mexico Rules of Professional Conduct, Rule 16-109 (duties to former clients); *Roy D. Mercer,*

*LLC v. Reynolds*, 2013-NMSC-002, ¶ 1, 292 P.3d 466; *Living Cross Ambulance Serv., Inc. v. New*

*Mexico PRC*, 2014-NMSC-036, 338 P.3d 1258.  On the other hand, judges have duties to act

with absolute impartiality to all parties, Rule 21-202 NMRA, and to avoid conflicts of

interest and even the appearance of impropriety, Rule 21-211 NMRA.

109.    The Navajo Tribe, now called the Navajo Nation, is a party in Case No. AB-07-1,

and the water rights of tribal members are being quantified and adjudicated in that case.

When he worked as a DNA attorney, James Wechsler personally worked as the lawyer for

hundreds of Navajo tribal members.  Years later, Judge Wechsler awarded water for the use

of his former clients.

110.    It must be emphasized that it is admirable that Mr. Wechsler worked as an advocate

for the Navajo people, because providing legal services to underserved segments of the

population is one of the highest traditions of the bar.  However, having served as a lawyer-

advocate for the interests of the Navajo people, Judge Wechsler cannot claim to be impartial

as to the water rights of the Navajo people.  He owes continuing duties of loyalty to the

people he once served, and those duties conflict with the judicial duty of impartiality.

111.    When Judge Wechsler was specially assigned to the case, the attorneys for the three

governments knew that he had worked as an attorney for DNA, but they said nothing.  By

remaining silent, they breached their ethical duties, and the defendants' constitutional right

to an impartial judge.  When an attorney discovers a possible ethical violation concerning a

matter before a court, he is not only authorized but is in fact obligated to bring the problem

to that court's attention.  *In re Gopman,* 531 F.2d 262, 265 (5th Cir. 1976) (citing *Estates*

*Theatres, Inc. v. Columbia Pictures Indus., Inc.,* 345 F. Supp. 93, 98 (S.D.N.Y. 1972)).

112.    By contrast, the defendants and their attorneys knew nothing about these

circumstances.  If Judge Wechsler or the government attorneys had made the required

disclosures, the defendants would have promptly moved to recuse him.

113.    While the case was pending in the state Court of Appeals, rumors began to circulate

about a possible connection between Judge Wechsler and the Navajo Tribe.  After

investigation, counsel for the acequias filed a motion in the Court of Appeals, raising the

issue of possible disqualification, and asking for a remand to the district court for the limited

purpose of discovering all the facts relevant to recusal.  Motion filed February 26, 2018.  The

Court of Appeals panel (including Retired Judge Black) denied the motion, and referred the

acequias' attorney to the disciplinary board for raising the issue.

114.    **While Judge Wechsler worked as a DNA lawyer, DNA provided written**

**litigation advice to the Navajo Tribe concerning the subject matter of Case AB-07-1:**

**Navajo claims to the San Juan River.**  In September 2019 Stanley Pollack, water counsel

for the Tribe, produced a DNA legal memo which he had kept in his files for years.

EXHIBIT 6 ("the DNA water litigation memo").  This is a legal memorandum which DNA

researched and sent to the Navajo Tribal Council in February 1971, when Judge Wechsler

was working as an attorney at DNA.   DNA gave legal advice and counsel to Navajo tribal

officials about the subject matter of the present case:  Navajo claims to the Colorado River

system.

115.    By acting as a judge in this matter, Judge Wechsler violated a very specific rule on

judicial impartiality. Under Rule 21-211(A)(5)(a), recusal is mandatory when:

> (5) The judge:
>     (a)  served as a lawyer in the matter in controversy, <u>or was associated
> with a lawyer who participated substantially as a lawyer in the matter during
> such association</u>;

This is also a violation of the federal due process rights which the Supreme Court

established in *Liljeberg*, *Capperton*, and *Williams*.

116.    **While Judge Wechsler was deciding this case, in which the State of New Mexico

was a party, the State was paying his son's law firm millions of dollars for legal services

on water cases.**  Recent requests under the Inspection of Public Records Act, NMSA 1978,

§§ 14-2-1 through -12, have revealed that the State Engineer and the Interstate Stream

Commission have paid several million dollars for legal services by Jeffrey Wechsler (Judge

Wechsler's son) and his law firm, for work on water cases.  The amount paid exceeds two

million dollars, by how many more millions is unclear.  A small sample of payments is

attached as EXHIBIT 7.

117.    The exact amount is not yet known because the State Engineer and the Interstate

Stream Commission have not yet produced all the payment records which have been

requested under the Inspection of Public Records Act (IPRA).

118.   In 2019 the State entered into a contract, number 21998, signed by Jeffrey Wechsler, for his firm to provide legal services on water issues.  In 2020 Jeffrey Wechsler signed an amendment increasing the amount of this contract to $3,060,000 through 2023.  EXHIBIT 8.

119.   **Retired Judge Bruce Black was not authorized by the New Mexico Constitution to act as a judge in the Court of Appeals.**  Retired Judge Black was not constitutionally eligible for his extraordinary appointment to the Court of Appeals for the Navajo case.  The New Mexico Constitution allows the appointment of retired state judges to hear cases in the district courts, but not the Court of Appeals or the Supreme Court.  N.M. Const. art. VI, § 15(C).

120.   The unusual appointment of Retired Judge Black in 2017 was recommended by one of Judge Wechsler's colleagues on the Court of Appeals.  EXHIBIT 9.  The selection of Judge Black did not follow the normal procedures for assignment of judges in the Court of Appeals.

121.   **While he was acting as a judge in the Navajo case, Judge Black was working  as a lawyer and investigator for the State of New Mexico, one of the parties to the case.** EXHIBIT 10.  It is a violation of due process for a judge to work as a lawyer for a party, or to accept compensation from a party.  Judge Black did not disclose his employment or his compensation, contrary to *Liljeberg* and Rule 21-211.

122.   In February 2017, shortly after he agreed to sit on the Navajo case, Retired Judge Black agreed to work confidentially as an attorney and investigator for the University of

35

New Mexico.  UNM is an institution of the State of New Mexico, a party to the Navajo

litigation.  Retired Judge Black did not disclose this to local water owners in the Navajo

case.

123.    In 2017 and 2018, Retired Judge Black agreed to another special assignment as a

lawyer and investigator for UNM, concerning football Coach Bob Davie.  Retired Judge

Black also did not disclose this attorney-client relationship to the local water owners in the

Navajo case.

124.    UNM has been actively involved in the San Juan adjudication.  The Utton Center at

UNM law school provided a so-called "ombudsman" to assist San Juan water owners in

signing agreements with the State Engineer.  The "ombudsman" title was deceptive, because

the so-called "ombudsman" was not neutral at all.  The "ombudsman" influenced water

owners to sign contracts of adhesion with the OSE, and many of them did, without getting

independent legal advice.

125.    By agreeing to act as a lawyer for a party, Retired Judge Black created an

irreconcilable conflict of interest.  He created a conflict of duties, where his duties as a

lawyer are contrary to his duties as a judge.  His duties to a current client under Rules 16-

107 and 16-108 clash with his duties as a judge.

126.    Retired Judge Black lists himself for employment at www.fedarb.com.  See

https://www.fedarb.com/professionals/judge-bruce-d-black-retired/.  Those employments,

whatever they are, might create conflicts, but there is no way of knowing because fedarb is

wrapped in "confidentiality".

127.    Furthermore, it appears that Retired Judge Black might not have complied with Rule 16-112 (former judge); Rule 16-204; Rule 21-310 (practice of law); Rule 21-311 (financial or business activities); Rule 21-312 (compensation for extrajudicial activities); Rule 21-315 (extrajudicial compensation, expense reimbursement, and reporting); Rule 21-401 (campaign contributions).

128.    Because judges and staff have not made the required conflict disclosures, the foregoing information is incomplete.  Plaintiffs are currently in the process of acquiring additional evidence which will be presented to the court after it is evaluated.

129.    The New Mexico Court of Appeals and Supreme Court have no established procedures for identifying, disclosing, and preventing conflicts of interest among judges and staff.  Upon information and belief, the appellate courts do not have a computerized system for conflict checks.  Compliance is spotty because it is left to each individual.

**F.  First Amendment rights; right to speak to the press; right to ask for justice**

130.    In February 2017 the acequias issued a statement to the press to explain the motion which they had filed about Judge Wechsler's conflicts.  EXHIBIT 10.  The press statement quoted Mike Sullivan, the Chairman of the Association:  "All we have ever asked for was honesty and fairness through the judicial system," said Mike Sullivan, chairman of the San Juan Agricultural Water Users Association.  "How could this have happened?"

131.    On April 3, 2018 the Court of Appeals issued Judge Black's opinion on water rights, 2018-NMCA-053, 425 P.3d 723, and simultaneously entered an order referring the

Association's attorney to the disciplinary process for raising the question of Judge

Wechsler's recusal.

132.    During the disciplinary process, disciplinary counsel incorrectly attributed Mike

Sullivan's statement to the Association's attorney, even though it was Mike Sullivan who

made the statement and asked the question quoted above.  Disciplinary counsel convinced

the disciplinary authorities that the Association's attorney had defamed Judge Wechsler "by

inference" when Mike Sullivan asked for fairness and honesty in the judicial system.  The

Disciplinary Board has recommended that the Association's attorney should be suspended

indefinitely for statements to the press.

133.    Every litigant in every court has a right to ask for fairness and honesty in the judicial

process, because fairness and honesty are essential elements of due process.  Yet the water

owners are being punished because they asked for justice.  This is an ongoing infringement

of the water owners First Amendment right to speak in court, to speak through their

lawyers, and to speak to the press.  Water owners are being subjected to government

retaliation for exercising their free speech rights.  See *inter alia, Gentile v. State Bar of Nevada,*

501 U.S. 1030 (1991); *In re Sawyer,* 360 U.S. 622 (1959); and *Bose Corp. v. Consumers Union of*

*United States, Inc.*, 466 U.S. 485 (1984); *Helena Chemical Co. v. Uribe*, 2013-NMCA-017, 293

P.3d 888; Rule 16-306 NMRA (extrajudicial or out of forum statements are permitted).

**G.  Due process – the ban on "after acquired evidence"**

134.    The disciplinary process selectively banned what it deemed "after-acquired

evidence."  For example, after Mr. Pollack belatedly produced DNA's water litigation

memo, EXHIBIT 6, the Disciplinary Board refused to consider it, because it was characterized as "after-acquired evidence."  That is an outright repudiation of due process, because the main purpose of the judicial process is to gather evidence after the fact.  In the United States, there is an entire branch of government – the judicial branch –  that devotes itself to gathering and processing "after-acquired evidence."

**H.  Due process – ex parte contacts.**

135.    The Office of the State Engineer has engaged in ex parte contacts with Judge Wechsler, but no one has disclosed those contacts so that other parties can respond.  Judge Wechsler takes the erroneous position that he is not required to disclose his ex parte communications with the OSE.

**I.  Equal protection**

136.    Water owners are being denied the equal protection of the laws, because one water claimant – the Navajo Tribe – has been given favorable and expedited treatment, the so-called "Expedited Inter Se," at the expense of water owners who hold valid water rights.  The "Expedited Inter Se" denies equal protection to local water owners by barring them from presenting their side of the case to contest the Navajo claims.  The "Expedited Inter Se" denies equal protection to local water owners by granting water rights to parties who are favored by the State Engineer, using a hasty, expedited, and summary process, while denying other water owners the right to be heard at a meaningful time in a meaningful manner.

**J.  Substantive due process**

137.    Water owners have been, and continue to be, subjected to violations of substantive due process.  They will not be heard in a reasonably foreseeable time.  In another 200 years, all of the local water owners will be dead.

138.    The three governments have infringed the due process rights stated above for invidious purposes.  The three governments have worked together for the following invidious purposes:

>    to prevent local water owners from ever being heard;

>    to evade and violate all of the water laws set forth above; and

>    to nullify the Colorado Compacts by allowing the Navajo Nation to export San Juan River water from New Mexico to other states, while charging New Mexico's compact share for water that is actually used in other states.  There is no conceivable way that 635,000 acre-feet can be put to beneficial use on the Navajo Reservation within New Mexico.

139.    As described in this complaint, water owners are being treated arbitrarily and in bad faith.

**VII.  REMEDIES**

140.    The water supply to each of the Plaintiffs is being jeopardized and impaired by the matters described in this complaint.  Unless the Court takes prompt action, the Plaintiffs will be injured by reductions in water supply, restrictions on water use, and increased costs for water.  These injuries have already started to occur.

141.    New Mexico is experiencing the first stages of ecologic and economic disaster.  The signs are everywhere:

142.     Elephant Butte Reservoir on the Rio Grande is only 5.9% full as of October 31, 2021.

143.    Navajo Reservoir on the San Juan River is holding only 26% of its active storage capacity, as of October 11, 2021.

144.    The water level behind Glen Canyon Dam in Lake Powell has dropped to an elevation of 3543.91 feet, as of November 6, 2021.  At this level, the reservoir is holding less than 29% of its maximum capacity, the lowest since the reservoir was filled.

145.    The water level behind Boulder Dam in Lake Mead has dropped to an elevation of 1,066.07 feet, as of November 6, 2021.  This is less than 34% of its maximum capacity, the lowest since the reservoir was filled.

146.    The low water levels in Lake Powell and Lake Mead have reduced the amount of hydroelectric power that can be generated by Glen Canyon Dam and Boulder Dam.  If water levels drop much further, it will become impossible for the turbines to generate any power at all.

147.    Glen Canyon Dam supplies electric power at very low rates to pump water uphill at NIIP.  So in essence the federal government is wasting electricity in order to waste water at NIIP.

148.    In August 2021 the BOR declared a water shortage on the Colorado River and began cutbacks in water supplies.

149.    Yet, in the face of this growing environmental and societal catastrophe, it is the official position of the New Mexico courts that water shortages and drought do not matter. COA opinion ¶ 40.  The United States and the Navajo Nation agree with the COA opinion that water shortages, global warming, endangered species, and drought can be ignored.  The United States and the Navajo Nation assert that the COA opinion is correct in all respects, even though the opinion flatly violates all of the federal laws set forth in this complaint.

150.    Plaintiffs respectfully submit that the pure questions of law in Parts III and IV should be the first priority for decision, while the parties move forward towards a later resolution of the questions in Part VI.  The questions of law posed in Parts III and IV can be answered by a straightforward reading of the federal laws and cases cited in this complaint.

151.    At the present time this complaint does not seek money damages, but this complaint does seek an award of costs and attorneys fees under applicable laws such as the Civil Rights Acts, the Endangered Species Act, and the National Environmental Policy Act.

152.    Plaintiffs reserve all of the their procedural and substantive rights, including the right to amend this complaint, or to file other lawsuits.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray the court:

(A) to issue declaratory judgments on the points of federal law set forth in Parts III and IV;

(B) to issue declaratory judgments on other related issues of federal law as appropriate, including the issues of federal law in Part VI;

(C) to issue injunctive and other relief pursuant to 28 U.S.C. § 2202 to implement and enforce the Court's declaratory judgments;

(D) to issue the relief to which each party is entitled even if the party has not demanded that relief in pleadings, as required by Fed. R. Civ. P. 54(c); and

(E) to grant such other and further relief as may be appropriate, including costs and attorneys fees under applicable law.

Dated: November 12, 2021.

Respectfully submitted,

VICTOR R. MARSHALL & ASSOCIATES, P.C.


By  /s/ Victor R. Marshall
        Victor R. Marshall
        Attorneys for Plaintiffs
        12509 Oakland NE
        Albuquerque, New Mexico 87122
        505-332-9400
        victor@vrmarshall.com

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO

GUY CLARK, et al.,
> *Plaintiffs,*

v.                                                                No.

DEB HAALAND, et al.,
> *Defendants.*

## EXHIBITS TO COMPLAINT

1.   Map of Colorado River Basin, San Juan River, and Rio Grande.

2.   State's schedule for completing the San Juan adjudication, filed February 14, 2017.

3.   Notice of constitutional defect in service list AB-07-1, filed October 31, 2011.

4.   Email by Special Master Steve Snyder, October 31, 2011.

5.   Notice of withdrawal by Special Master Steve Snyder on his own motion, filed November 2, 2011.

6.   DNA litigation memo sent to Navajo Tribal Council about the Tribe's water rights in the Colorado River Basin, dated February 4, 1971.

7.   Partial records of payments by OSE and ISC to the law firm of Judge Wechsler's son.

8.   Contract signed by Judge Wechsler's son for legal work through 2023, for a total contract amount of $3,060,000.

9.   Email from Court of Appeals Judge Linda Vanzi requesting special appointment of retired Judge Bruce Black to San Juan appeals, February 2, 2017.

10.  Press release by acequias, February 27, 2018.


[Highlighting is added for ease of reference only.]

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO

GUY CLARK, et al.,
    *Plaintiffs,*

v.                                                      No.

DEB HAALAND, et al.,
    *Defendants.*

## EXHIBITS TO COMPLAINT

1.    Map of Colorado River Basin, San Juan River, and Rio Grande.

2.    State's schedule for completing the San Juan adjudication, filed February 14, 2017.

3.    Notice of constitutional defect in service list AB-07-1, filed October 31, 2011.

4.    Email by Special Master Steve Snyder, October 31, 2011.

5.    Notice of withdrawal by Special Master Steve Snyder on his own motion, filed November 2, 2011.

6.    DNA litigation memo sent to Navajo Tribal Council about the Tribe's water rights in the Colorado River Basin, dated February 4, 1971.

7.    Partial records of payments by OSE and ISC to the law firm of Judge Wechsler's son.

8.    Contract signed by Judge Wechsler's son for legal work through 2023, for a total contract amount of $3,060,000.

9.    Email from Court of Appeals Judge Linda Vanzi requesting special appointment of retired Judge Bruce Black to San Juan appeals, February 2, 2017.

10.   Press release by acequias, February 27, 2018.


[Highlighting is added for ease of reference only.]



COLORADO RIVER WATER SUPPLY AND DEMAND STUDY
U.S. Department of Interior and Bureau of Reclamation
released December 12, 2012

EXHIBIT
1

**STATE OF NEW MEXICO**
**SAN JUAN COUNTY**
**ELEVENTH JUDICIAL DISTRICT COURT**

STATE OF NEW MEXICO, *ex rel*.
STATE ENGINEER,

                                    Plaintiff,

v.

THE UNITED STATES OF AMERICA

*et al.*,
Defendants,

vs.

THE JICARILLA APACHE TRIBE and the
NAVAJO NATION,

Defendant-Intervenors.

_____

CV-75-184
Hon. James J. Wechsler
Presiding Judge

SAN JUAN RIVER STREAM SYSTEM
ADJUDICATION

LA PLATA RIVER SECTION

**STATUS REPORT ON COMPLETING THE SAN JUAN RIVER STREAM SYSTEM
ADJUDICATION**

        Pursuant to the Court's October 18, 2016 *Order Regarding Proposal for Proceeding in
the Adjudication,* and February 8, 2017 *Order Denying Motion for Extension of Time to File
Status Report on Completing the Adjudication of the San Juan River Stream System
Adjudication,* Plaintiff State of New Mexico, ("State")  provides this Report on its plan for the
completion of the remaining sections of the San Juan River Stream System Adjudication.

        In the State's FY 2016 Rule 1-071.3 Report, the State identified the tasks that have been
completed in the San Juan adjudication, those that are in process, and those to be completed.  *See
Notice of Filing Rule 1.071.3 Report* (September 29, 2016).  In the face of possibly permanent
reductions to its budget, the State's priority is to finish adjudicating those claims that are already

EXHIBIT
**2**

pending before the Court instead of beginning a new section.  This means that the State's priorities are completing the adjudication of surface water rights in the La Plata section, defending the Court's orders adjudicating the Navajo Nation's water rights in pending appeals, and resuming the already scheduled proceeding on the Ute Mountain Ute's water rights claims. Under the Preliminary Scheduling Order for the Adjudication of the Water Rights of the Ute Mountain Ute Tribe entered on August 4, 2009, the parties must file a joint motion for a proposed procedural order on March 30 2020, and begin preparing expert reports.  This proceeding will require significant attorney and technical resources from the State.

The State is also required to allocate resources to the appeal of the Navajo Nation's water rights, currently pending before the Court of Appeals, that will likely continue before the New Mexico Supreme Court.  These appeals also require participation by the State, and the allocation of resources.

As the State reported in its *Motion for Extension of Time*, there is a very real possibility that a reduction in appropriations may force the State to suspend prosecution of some ongoing adjudications, including further sections of the San Juan River Adjudication.   It would not be an efficient use of the State's resources to begin the hydrographic survey work for a new section in the face of significant uncertainty of sufficient resources being available to complete the survey, which would grow stale over time.  However, to address the Court's request, the State has estimated the time required to adjudicate the remaining sections of the San Juan Basin, which are the (1) Animas, (2) San Juan main stem, (3) Los Pinos and Navajo Rivers, and (4) the lands and water rights within Hammond Conservancy District, based upon the time that has been required to adjudicate surface water rights in the La Plata section.  *See Scheduling Order Governing Adjudication of Irrigation Water Rights in the La Plata River Section* (filed February, 2006).

A review of the time it has taken the State to adjudicate approximately 430 irrigation subfiles in the La Plata section, with varying levels of resources, shows that it took approximately two years to prepare the hydrographic survey section, twelve years to adjudicate 430 irrigation subfiles, and will take an additional two to three years to complete *inter se* and enter a judgment and decree.   There are approximately 8,600 water rights remaining in the San Juan Basin, for an estimated 30,800 acres.  The hydrographic survey of that many acres would require a minimum of 8 years.  If the State were able to adjudicate the subfiles at the same rate as in La Plata, which is an average of 36 subfiles per year, it could take over two hundred years to re-adjudicate the remaining surface water rights  in the San Juan.  The inter se proceeding for each of the remaining four sections would also require an additional eight to ten years.

The chart below captures the tasks for completing the next section of the adjudication, the San Juan section surface water rights.

| Category | Task |
|---|---|
| A.  Evaluation of  Surface Water Uses in the San Juan Section | |
| | 1.  Identify claimants and existing surface rights, including field visits, evaluation of county records to gather information and prepare proposed subfile orders |
| | 2. Preparation of hydrographic survey maps and report  depicting surface water rights |
| | 3.  Publication and filing of hydrographic survey maps and report |
| | 4.  Motions for entry of procedural order to govern adjudication process |
| | 5.   Joinder of all known claimants and service of packet with pertinent documents, including proposed consent order |
| | 6.  Publication of notice to serve known but not located claimants |
| | 7.  Publication of notice of deadline for unknown claimants of interest to file water rights claims |
| | 8.  Consultation period, public |

| | |
|---|---|
| | meetings, and field visits with claimants regarding proposed consent orders |
| | 9.  Litigation with claimants who file answers objecting to proposed consent orders |
| | 10.  File motions for default judgment against unknown claimants of interest and other who do not respond to publication notice and/or motions for judgment on any remaining subfiles |
| | 11.  Orders entered on all subfiles |
| B.  Preparation of Maps and Appendices for *Inter Se* on Surface Water Rights | |
| | 1.  Preparation of draft final judgment and decree, including technical and administrative work to compile description of water rights and mailing list |
| | 2. Review of all orders to reconcile State's internal database and maps |
| | 3.  File motions to amend/correct subfile orders, if necessary |
| C.  *Inter se* proceedings and entry of Final Decree on Surface Water Rights | |
| | 1.  Filing of motion for procedural order for *inter se* and entry of final judgment and decree |
| | 2.  Briefing on motion for procedural order and entry of procedural order |
| | 3.  State files motion to enter FJD |
| | 4.  State makes FJD available for public inspection, including addendum summarizing all water rights and forms for objection Notice and mailing of notice of draft final judgment and decree and *inter se* process |
| | 5.  State files updated service list |
| | 6.  State mails and publishes notice of *inter se* proceeding; files Proof of Publication of Notice and certificate of service |
| | 7.  Deadline for filing *inter se* objections |
| | 8.  State files and posts report summarizing *inter se* objections and mails objections to water right owners |
| | 9.  Mandatory scheduling conferences on *inter se* objections |

| | |
|---|---|
| | 10.  Court conducts proceedings on *inter se* objections |
| | 11.  Entry of order resolving  *inter se* objections |
| | 12.  Briefing on Motion to Enter FJD |
| | 13.  Court enters Final Judgment and Decree on Surface Water Rights in the San Juan section |

Given the limited resources of the State and the projected length of time required to

continue the adjudication under existing procedures, the State's priority is to devote its available

resources to evaluating alternative approaches to streamline the adjudication process, rather than

to commence planning under currently required approaches.

Respectfully submitted,

 /s/ Arianne Singer
Arianne Singer
Kelly Brooks Smith
Gary Storm
Special Assistant Attorneys General
Office of the State Engineer
P. O. Box 25102
Santa Fe, NM  87504-5102
505/827-6150; 505/827-3887 (fax)

**CERTIFICATE OF SERVICE**

I certify that I have caused a copy of the above to be served by E-mail to all Counsel on
the Electronic Service List for D-1116-CV-7500184, and to wrnavajointerse@nmcourts.gov, on
February 14, 2017.

/s/ Kelly Brooks Smith
Kelly Brooks Smith

5

DISTRICT COURT
SAN JUAN COUNTY NM
FILED

2011 OCT 31  PM 12 53

STATE OF NEW MEXICO
COUNTY OF SAN JUAN

STATE OF NEW MEXICO, ex rel.
THE STATE ENGINEER,

          Plaintiff,

vs.

THE UNITED STATES OF AMERICA, et al.,

          Defendants,

**AB-07-1**
No. CV 75-184
Honorable James J. Wechsler
Presiding Judge

Before Special Master
**Stephen E. Snyder**

### NOTICE OF CONSTITUTIONAL DEFECT IN SERVICE LIST

Defendants hereby give notice that there is a constitutional defect in the service list which was prepared by the Settling Parties and used by the Court. Many water users in the San Juan Basin have reported that they did not receive a mailing from the Court notifying them of this proceeding, even though they are listed on County records as the owners of irrigated property, or shown on ditch membership lists. Other evidence also establishes that the Settling Parties provided the Court with a mailing list which does not meet the requirements of:

(A) the United States Constitution;

(B) the New Mexico Constitution;

(C) the New Mexico Rules of Civil Procedure, including Rules 1-071.1, 1-071.2, and 1-004; and

(D) the orders of the Court and the Special Master.

Beginning in the latter part of 2010, the undersigned defendants made numerous attempts over period of months to assist the Settling Parties in assembling the best possible mailing list from a variety of sources, including ditch membership lists. The defendants'

**EXHIBIT**
**3**

efforts were rebuffed by the Settling Parties, and in particular the OSE.  Despite numerous

requests, the Settling Parties even refused to provide a copy of their mailing list to

defendants so that it could be improved.  *See* the live and written testimony of Shirley A.

Meridith on October 26, 2011, including defendants' Exhibit 1.

In addition, the testimony of Arianne Singer during the hearing on July 19, 2011

establishes that the current OSE and the Settling Parties do not know how the mailing list

was assembled, or how it was processed, or what original sources were used, or the dates of

the source materials.  The bulk of the information in the mailing list was more than a year

old, but the Settling Parties made no effort to update it before they made their mailing in

May 2011, even though the defendants repeatedly offered to help them obtain more current

and accurate ditch membership lists.

These defects could have been cured with reasonable effort before the mailing was

made, but the Settling Parties made no effort to do so.  Their mailing list does not comply

with the requirements of the Constitutions of the United States and the State of New

Mexico, and the other authorities listed above.  Under the law, the Settling Parties as

plaintiffs were required to use the best available sources to assemble the mailing list, and

they did not do so.  Although it may not be feasible to prepare a mailing list that is

absolutely perfect, the law requires the Settling Parties to do much more than they did.  The

problem is compounded by the absence of the mandatory hydrographic survey required by

NMSA 1978, §§ 72-4-13 through -17.  A real hydrographic survey would have identified the

current owners of all the irrigated tracts in the San Juan Basin, but the OSE and the Settling

Parties did not do one.

2

RP 0007543

10/31/2011  11:27   505-332-3793          VICTOR R MARSHALL                    PAGE  04/05

The problem of a grossly defective mailing list is not solved by publication, because notice by publication is in addition to, not a substitute for, preparation of a service list from the best available sources.

This constitutional defect is somewhat reduced, but not solved, by the entries of appearances and notices of intent to participate filed on September 15, 2011 by the undersigned law firm on behalf of 10,025 named defendants. If the Court recognizes those entries and notices of intent as listed, subject to amendment, then those listed persons would have little basis for a challenge based on inadequacy of notice, since they have been given the opportunity to participate through counsel. If not, then the constitutional problem grows much bigger.

Regardless of the September 15 entries of appearance, the defendants have no way of curing the constitutional defect with respect to the persons who are not on the September 15 lists, and who did not receive notice. There are many such persons, given the gross inadequacy of the mailing list which the Settling Parties provided.

Accordingly, the current adjudication efforts of the Court, the Special Master, and all the litigants are subject to a very real risk that this proceeding, whatever its outcome, can be nullified by persons who did not get notice. The Navajo *inter se* is off to a false start, constitutionally speaking.

The Court can cure this constitutional defect right now, by ordering the Settling Parties to actually do what they were already ordered to do: prepare a comprehensive mailing list from the best available current sources. One of those available sources is the ditch membership lists filed on September 15, 2011. There are other sources which the Settling Parties can obtain by diligent effort. Through a merge/purge process, the new

3

RP 0007544

mailing list can be compared to the old mailing list, so that the Settling Parties are only mailing to the people they missed the first time around.

This is a notice, not a motion by the undersigned defendants. The defendants have already wasted too much time and money trying to reduce this problem. The defendants do not have the power to cure this constitutional defect; only the Court does. And it is the Settling Parties' duty and burden to prepare an adequate service list, not the defendants' burden.

This problem should be addressed by the Court, and also by the incoming State Engineer, whoever that might be.

Respectfully submitted,

VICTOR R. MARSHALL & ASSOCIATES, P.C.

By

Victor R. Marshall
12509 Oakland NE
Albuquerque, NM 87122
505-332-9400 / 505-332-3793  FAX

CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of October, 2011, a true and correct copy of the foregoing was served on the parties and claimants by attaching a copy of said document to an email sent to the following list server: wrnavajointerse@nmcourts.gov.

Victor R. Marshall, Esq.

4

RP 0007545

**Victor Archive**

| | |
|---|---|
| **From:** | Steve Snyder <sesnyder@q.com> |
| **Sent:** | Monday, October 31, 2011 2:37 PM |
| **To:** | 'Victor Marshall' |
| **Subject:** | RE: SAN JUAN RIVER BASIN ADJUDICATION - General Stream Litigation- MAIN Case No. CV-75-184 |

Celina:

More dilatory tactics by Marshall.  To what extent were these issues raised at the hearing before Judge Wechsler  last week.  The filing of a notice is not a request for relief so I am not sure what to make of this filing.   Is this something Judge Wechsler can (and wants to) addresses in his order re last weeks' hearing?

Steve Snyder
4 Manzano Road
Corrales NM 87048
(505) 890-7550
sesnyder@q.com

**From:** owner-wrattorney@11thjdc.com [mailto:owner-wrattorney@11thjdc.com] **On Behalf Of** Victor Marshall
**Sent:** Monday, October 31, 2011 12:36 PM
**To:** wrlaplata@11thjdc.com; wrattorney@11thjdc.com; Victor Marshall; Shirley Meridith; Sheri Heying
**Subject:** SAN JUAN RIVER BASIN ADJUDICATION - General Stream Litigation- MAIN Case No. CV-75-184

Dear Counsel:

Please find attached the following document, fax-filed with the Court today: <u>Notice of Constitutional Defect in Service List</u>

Sincerely,

Sheri Heying for
Victor R. Marshall, Esq.
505-332-9400
505-332-3793 Fax

victor@vrmarshall.com
sheri@vrmarshall.com

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2014.0.4592 / Virus Database: 3950/7521 - Release Date: 05/19/14


EXHIBIT
4

DISTRICT COURT
SAN JUAN COUNTY NM
FILED

2011 NOV -2  AM 11: 54

**STATE OF NEW MEXICO**
**COUNTY OF SAN JUAN**
**ELEVENTH JUDICIAL DISTRICT**

STATE OF NEW MEXICO, *ex rel.*
STATE ENGINEER,

           **Plaintiff,**

v.

**THE UNITED STATES OF AMERICA,**
*et al.,*

           **Defendants,**

CV-75-184

**HON. JAMES J. WECHSLER**
**PRESIDING JUDGE**

**SAN JUAN RIVER**
**ADJUDICATION**

**Claims of Navajo Nation**
**Case No: AB-07-1**

**NOTICE OF SPECIAL MASTER'S WITHDRAWAL FROM NAVAJO INTER SE**

    THIS MATTER comes before the Special Master on his own motion.

    The Special Master hereby gives notice that, as of the filing of this notice, he is

withdrawing from the Navajo *Inter Se*.   All matters pending before the Special Master

are now scheduled before the Presiding Judge.

Stephen E. Snyder
4 Manzano Road
Corrales NM 87048
(505) 890-7550

1

**EXHIBIT**
**5**

LAW OFFICES OF

# DINEBEIINA NAHIILNA BE AGADITAHE

D N A – A LEGAL SERVICES PROGRAM

POST OFFICE BOX THREE HUNDRED SIX

WINDOW ROCK, ARIZONA 86515

TELEPHONE [602] 871-4151

LEO HAVEN
DIRECTOR

PETERSON ZAH
DEPUTY DIRECTOR

~~XXXXXXXXXX~~
DIRECTOR, NAVAJO LAW
DEVELOPMENT UNIT

~~XXXXXXXXXXXXX~~
ATTORNEY

RECEIVED

February 4, 1971          APR  9 1971

THE NAVAJO TRIBE
LEGAL DEPARTMENT

The Honorable Peter MacDonald
Chairman of the Navajo Tribal Council
The Navajo Tribe
Window Rock, Arizona  86515

Dear Chairman MacDonald:

Enclosed is a copy of DNA's research on the Navajo
Tribe's Water Rights in the Colorado River basin which
was prepared sometime during the latter part of 1968
and early months of 1969.  This report has been revised
once, but most of the contents are the same with very
little changes.

No further action as been made on the water rights case
recently.

This is for your information regarding the Navajo
Tribe's Water Rights.

Sincerely,

Leo Haven
Director

LH/lam

Enclosure

EXHIBIT
6

# THE NAVAJO TRIBE'S WATER RIGHTS IN THE COLORADO RIVER BASIN

## Table of Contents

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Legal Questions . . . . . . . . . . . . . . . . . . . . . .4

Conclusions . . . . . . . . . . . . . . . . . . . . . . . .5

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .6

1. The Reserved Rights Doctrine and the Navajo Tribe . 6

2. The Measure of the Navajos' Claim . . . . . . . . .16

3. The Interpretation of the December 11, 1968
   Tribal Council Resolution (CD-108-68) . . . . . . .20

4. The Significance of the Tribe's Waiver of its
   Reserved Water Rights Claim . . . . . . . . . . . .30

   A. The Value of the Tribe's Water Rights . . . . .30

   B. The Consideration for the Waiver . . . . . . . 33

5. H. R. 10354 - The Antelope Point Bill . . . . . . .36

6. The Interpretation of the Resolution Introduced
   May 28, 1969 and the Resolution Introduced and
   Enacted June 3, 1969. . . . . . . . . . . . . . . .39

7. Remedies . . . . . . . . . . . . . . . . . . . . . 43

8. Conclusion . . . . . . . . . . . . . . . . . . . . 46

THE NAVAJO TRIBE'S WATER RIGHTS IN THE
COLORADO RIVER BASIN

Facts:

By Treaty of June 1, 1868,[1] the United States created
a Reservation for the Navajo Indians.  The territory reserved
consisted of a relatively small tract in eastern Arizona and
western New Mexico which had been part of the Navajos' much
larger ancestral lands.[2]  By later executive and legislative
actions the Reservation in Arizona, New Mexico and Utah was en-
larged.  The last additions were made on June 14, 1934 when
Congress enacted a law conveying tracts K, M, and O (See Map)
to the Tribe.

The entire Navajo Reservation lies within the Colorado
River Basin (Figure 2).  This area is the geographic region from
which all water drains into the Colorado River on its way to
Mexico and the Gulf of California.  Portions of the Colorado and
San Juan Rivers form the northern and western boundaries on the
Reservation.  The Little Colorado River flows into the Colorado
from the southwestern parts of the Reservation.

The Colorado River system drains 242,000 square miles
of land in the United States (and an additional 2,000 square miles
in Mexico).  The river itself is some 1,300 miles long.  Average
flow in the main channel of the Colorado River.

_____

1  15 Stat. 667.

2  See Map (Figure 1) showing the creation and later additions to
   the Navajo Reservation.

Average flow in the main channel of the Colorado River at Lee Ferry, the dividing point between the Upper and Lower Colorado River Basins, for the period 1911-1960 averaged 13,017 acre-feet a year.[3]

Most of the land within the 25,000 square mile Navajo Reservation is arid.  There are no water sources within the Reservation sufficient to sustain agricultural, industrial or other development.  Moreover, the groundwater supply is quite likely inadequate to meet foreseeable domestic needs of the burgeoning Navajo Reservation population.  Hence, the only source of substantial water supply is the mainstream of the Colorado River and its tributaries - the San Juan and Little Colorado Rivers.

Water has been a major issue in the Southwest ever since man began to occupy the largely arid or semi-arid area.  Scarcity of water forced the Hohokam Indians as long ago as 2,000 years to erect irrigation canals from distant rivers to their homes near present-day Phoenix, Arizona.[4]

With the rapid increase in population in the 20th century, the states of the Colorado River Basin have argued with each other, sometimes bitterly, over the distribution of the water supply.  The fear of the Upper Basin states that the more rapid Lower Basin

---

3   Meyers, Charles J., The Colorado River, Stanford Law Review, Vol. 19, Nos. 1 & 2, Nov. 1966 - Jan. 1967, pp. 1-2.  An acre-foot of water is that amount necessary to cover one acre one foot in depth. It is equal to 325,850 gallons.  Black's Law Dictionary 42 (4th ed. 1951).

4   Arizona v. California, 373 U. S. 546, 552 (1963).

development would eventually deprive them of all Colorado River water, led to the 1922 Colorado River Compact in which the states apportioned the Basin's waters between the Upper Basin States (Colorado, Utah, Wyoming, New Mexico and Arizona) and the lower Basin states (Nevada, California and Arizona).[5]   In 1948 the Upper Basin states reached agreement as to the apportionment among themselves of the Upper Basin's waters.   Under the terms of the Upper Colorado River Compact,[6] each of the states except Arizona is entitled to a certain percentage of the consumptive use of water legally available, while Arizona, primarily a Lower Basin state, gets the fixed amount of 50,000 acre-feet of water per year.

At the same time it pursued its Colorado River Basin claims, Arizona devised a massive project for use of the water once acquired.   The project, called the Central Arizona Project (CAP), has been authorized by Congress[7] but appropriation of the federal monies required for the huge water works and systems is still pending.

The core of the CAP is a series of pipes and canals from Lake Havasu on the Lower Basin to the Phoenix and Tucson areas.   Since Parker's elevation is lower than Phoenix's the water will have to be pumped electrically all the way.   Arizona's plan is to construct a coal-fueled steam generating power plant at Page

---

5   A.R.S. §45-571
6   A.R.S. §45 -581; also found at 63 Stat. 31 (1949).
7   82 Stat. 885, 43 U.S.C.A. §§1501 et. seq. (Supp. 1969).

on the Upper Basin and transmit the electricity to Parker to pump
the water from Lake Havasu to Central Arizona.  Arizona intends to
use its 50,000 annual acre-feet of Upper Basin water to help produce
the power while it uses all of its Lower  Basin water, some 2.8
million annual acre-feet, for farming or other productive purposes
in central Arizona.

On December 11, 1968, the Navajo Tribal Council enacted
Resolution No. CD-108-68, which is attached as Exhibit 1.  The
Resolution marked Exhibit 2 was introduced on May 28, 1969 and tabled
on May 29.  On June 3, 1969, the Resolution marked Exhibit 3 was
introduced, amended on the floor, and adopted.  The purpose of
this memorandum is to analyze those Resolutions in light of
existing law defining the water rights of the Navajo Indian Tribe.

Legal Questions:

1.  Does the Navajo Tribe of Indians have a claim to the
waters of the Colorado River, the San Juan River, the Little
Colorado River and their tributaries?

2.  If so, what is the measure of the extent of the Tribe'
claim?

3.  If the Tribe does have a claim, what is the effect
of the December 11, 1968 Resolution (CD-108-68) of the Tribal Council
entitled "Approving the allocation of 34,100 acre-feet of water from
the Upper Colorado River Basin and promising to limit the Navajo
Tribe's claim for water from the Upper Colorado River Basin to
50,000 acre-feet per year"?

4

4.   Has the Tribe, by its Resolution of June 3, 1969, successfully remedied any adverse effect of Resolution CD-108-68?

5.   If the effect of CD-108-68 is adverse and if the Resolution of June 3, 1969 did not remedy that adverse effect, what can the Tribe do to protect its claim?

————————————————

Conclusions:

1.   Yes.  The Navajo Tribe of Indians has a claim to the waters of the Colorado River, the San Juan River, the Little Colorado River and their tributaries under the "Reserved Rights" doctrine announced in <u>Winters v. United States</u>, 207 U. S. 564 (1908), and most recently applied in <u>Arizona v. California</u>, 373 U. S. 546 (1963).

2.   The measure of the extent of the Tribe's claim is the amount of water needed to irrigate all the "practicably irrigable acreage on the [Reservation]."  <u>Arizona v. California</u>, 373 U. S. 546, at 600 (1963).  However, consumptive use of the water is not limited to agriculture.

3.   The Resolution of December 11, 1968 (CD-108-68) by its working and context waives the Tribe's claim to all water of the Upper Basin which includes the Colorado River, the San Juan River, and their tributaries.

4.   The Tribe, by its Resolution of June 3, 1969, has not remedied the waiver effects of Resolution CD-108-68, but has

5

made that waiver of indefinite rather than limited duration.

5.   The Tribe's legal recourse is a quiet title action against all parties claiming waters from the Colorado River system to have the Tribe's rights fixed by court decree.

Discussion:

1.   The Reserved Rights Doctrine and the Navajo Tribe:

The water rights of Indians living on federally-created reservations are extensive.  Already the tiny Lower Colorado River Basin tribes have been awarded 895,496 annual acre-feet of main channel Colorado River water while the entire State of Arizona was awarded only 2.8 million annual acre-feet in the same action.[8]

Indians' claims to water rest primarily on rights attaching to the reservation lands they occupy.  These are not restricted to waters flowing through or contiguous to the reservations, but extend to the sources of the waters as well.  This means that Indian reservations have priority of the use of waters in watersheds adjacent to their reservations and can thus deprive upstream and downstream users including states of all waters except the surplus after Indian needs are fulfilled.

Moreover, water rights are property rights which cannot be appropriated without just compensation under the Fifth and

---

8  Arizona v. California, 376 U. S. 340, 342, 344-45, (1964)
    (decree).

Fourteenth Amendments to the U. S. Constitution.[9]  Finally, the

rights to water attach as well to portions of reservations created

by Executive Orders as to those created by Treaty or Congressional

Act.[10]

---

9   Contra, Meyers, _supra_.  note, at 47:

> Is a consumptive water right in a navigable stream,
> whether the right is perfected or unperfected, con-
> stitutionally compensable when taken in the exercise
> of the navigation power?  As yet this question has
> not been answered by the Supreme Court, but the exist-
> ing authority would clearly permit a negative answer.
> The existing authority cited by Meyers is _United
> States v. Twin City Power Co._, 350 U. S. 222 (1956).
> That case held that
> the United States, in a condemnation proceeding, is
> not by force of the Fifth Amendment required to pay
> the former owner of the land the value of that land
> as a site for future hydroelectric power operations.
> The Court held:  "...water power in a navigable
> stream is not by force of the Fifth Amendment a
> compensable interest when the United States asserts
> its easement of navigation..."  _Ibid_ at 228.  _But
> see_ United States v. 5,677.94 Acres of Land, 162 F.
> Supp. 108 (D. Mont. 1958), where it was held, in a
> similar condemnation proceeding, that no such ease-
> ment existed when the use of waters of a navigable
> stream was reserved to an Indian Tribe and, there-
> fore, that the water-power value of the condemned
> land should be included in the compensation award.

10  Arizona v. California, 373 U. S. 546, 598 (1963) (opinion)

As summed up by Charles J. Meyers, reserved water rights of Indians on Reservations include these additional aspects:

1. The priority date is the date the reservation is created. State-created water rights in existence before this date are superior; those arising thereafter are subordinate.

2. The reserved right, unlike state-created appropriative rights, does not depend upon diversion from the stream and application to beneficial use. The reserved right arises when the reservation is established even though the water right is not exercised for decades thereafter. In this respect the right is like a riparian right. In time of shortage, however, it is unlike a riparian right, for it does not share the available supply pro rata but rather takes its place on the priority schedule and receives water ahead of all rights of later date.

3. As may be inferred from the statement above, the federal reserved right need not be created or exercised in accordance with state law. Not only does its creation not depend on diversion of water and application of it to beneficial use, but the right does not depend upon a filing with the state water agency or upon recording of the claim. And it is not subject to state laws on forfeiture and abandonment.

4. The quantity of water to be enjoyed under a reserved right is measured by the quantity necessary to fulfill the purposes of the reservation, both at the present time and in the future. _Arizona v. California_ quantified this amount for the Indian reservations as the amount of water necessary to irrigate all the irrigable land on each reservation. This quantity represents for those reservations the amount of water they are entitled to for all time unless, of course, the reservations are enlarged by additional withdrawals. For five Indian Reservations and two wildlife refuges, reserved water rights aggregated just under one million acre-feet in diversions.[11]

---

11  Meyers, _supra_, note 3, at 65-66.

8

The legal theory on which the grant of such enormous and valuable rights is based derives from the "Reserved Rights" Doctrine first declared in Winters v. United States,[12] and most recently applied in Arizona v. California.[13] These cases hold that water as well as land was reserved for the Indians when their reservations were established or enlarged because of the Indians' need for great quantities of water to develop their reservations in the peaceful and pastoral manner intended by the Government.

In the Winters case the United States, on behalf of the Indians of the Fort Belknap Indian Reservation, brought suit to enjoin upstream users from interfering with the flow of the Milk River to the reservation.  The Supreme Court held that, when the Indians gave up their rights to their former lands in exchange for the arid, unirrigated land of the reservation, sufficient water was reserved from the Milk River to enable the Indians "to become a pastoral and civilized people."  The Court further held that the Indians' rights to the use of this water could not be diminished by any subsequently-created rights under state water law.  The lower court decree granting the requested injunction was affirmed.

---

12  207 U.S. 564 (1908).
13  373 U.S. 546 (1963).

In <u>Arizona v. California</u> the Supreme Court, referring
to the situation of the Lower Colorado River tribes, further
elaborated on the rationale behind the Reserved Rights doctrine:

> Most of the land in these reservations is and
> always has been arid.  If the water necessary
> to sustain life is to be had, it must come from
> the Colorado River or its tributaries.  It can
> be said without overstatement that when the Indians
> were put on these reservations they were not
> considered to be located in the most desirable
> area of the Nation.  It is impossible to believe
> that when Congress created the great Colorado
> River Indian Reservation and when the Executive
> Department of this Nation created the other
> reservations they were unaware that most of the
> lands were of the desert kind - hot, scorching
> sands-and that water from the river would be
> essential to the life of the Indian people and
> to the animals they hunted and the crops they
> raised.[14]

As interpreted by the courts and articulated by a legal
scholar and water expert, Charles J. Meyers, "The reserved rights
doctrine holds that, upon the creation of a federal reservation
on the public domain-whether by treaty, legislation, or executive
order-the reservation has appurtenant to it the right to divert
as much water from the streams within or bordering upon it as
necessary to serve the purposes for which the reservation was
created."[15]

The Reserved Rights doctrine has been interpreted in
two somewhat differing ways.  As enunciated in the <u>Winters</u> case,

---

14  <u>Ibid</u> at 598-99
15  Meyers, <u>supra</u> note 3, at 65

10

the doctrine stands for the proposition that, on making a treaty with the United States government, the Indians themselves reserved for their own use sufficient water to make their reservations productive.  Thus, "when the Indians made the treaty granting rights to the United States, they reserved the right to use the waters of Milk River, at least to an extent reasonably necessary to irrigate their lands.  The right so reserved continues to exist against the United States and its grantees, as well as against the state and to grantees."[16]

The second interpretation of the Reserved Rights doctrine holds that when the United States created the various Indian reservations, it reserved the necessary water from the adjacent rivers and streams for those reservations.  Thus, in <u>Arizona v. California</u>, " [t]he Master found both as a matter of fact and law that when the United States created these reservations or added to them, it reserved not only land but also the use of enough water from the Colorado to irrigate the irrigable portions of the reserved lands."[17]  The Supreme Court went on to hold that "[w]e have no doubt about the power of the United States... to reserve water rights for its reservations and its property."[18]

The original construction of the Reserved Rights doctrine gives greater recognition to tribal sovereignty.  Under this

---

16   <u>Winters v. United States</u>, 143 Fed. 740 749 (9th Cir. 1906),
     affirmed, 207 U. S. 564 (1908).
17   373 U. S. at 596
18   <u>Ibid</u> at 598.

11

interpretation, the reserved water rights may be seen as property rights vested in the Indians, which may be defended against all comers, including the United States.  The second interpretation could derive from either of two theories.  The first of these derives from the trusteeship relation between the United States and the Indian tribes, wherein the United States holds title to Indian lands and waters in trust for the Indians.  Under this theory, the United States is reserving water to which it has title for lands to which it has title.[19]  This theory is not incompatible with the original interpretation of the Reserved Rights doctrine, as long as it is recognized that the water is held in trust for the Indians.

An alternative theory underlying the second interpretation of the Reserved Rights doctrine is based in the Federal government's plenary control over the public domain.  When the Federal government removes land from the public domain for federal uses - including Indian reservations -, it has the power to also reserve sufficient water from the public domain for use on these lands.  This theory underlies the Supreme Court's opinion in Arizona v. California.[20]

---

19  See United States v. McIntire, 101 F2d 650 (9th Cir. 1939).

20  See 373 U. S. at 595-601.  See also Report of the Special Master in Arizona v. California 259 (1960) [hereinafter Master's Report] "In the Winters case the United States exercised its power to reserve water by treaty; but the power itself stems from the United States' property rights in the water, not from the treaty power."

While the original <u>Winters</u> construction of the Reserved Rights doctrine is more compatible with vested Indian property rights in the reserved water, the second interpretation is more easily reconciliable with the protection of Indian water rights on reservations that were created not by treaty but by act of Congress or executive order.[21]

Regardless of which construction is placed upon the Reserved Rights doctrine, however, it is clear that Indian reservations - no matter how created - have the right to use sufficient water from included and adjacent streams and rivers to make those reservations productive, and that that right is superior to all subsequently-created state water rights.

Reserved rights attach to reservations whether or not the instruments creating them mention water rights.  Water rights were not mentioned in the treaty involved in the <u>Winters</u> case nor in the act of Congress and executive orders creating the Indian reservations involved in <u>Arizona v. California</u>.  In both cases, the Supreme court held that an implied reservation of water rights was made at the time the Indian reservations were created.[22]

—————————————

21   This interpretation, of course, is also more amenable to the reservation of water rights by the federal government for other federal lands—national parks, wildlife refuges, military reservations, and the like.

22   <u>Winters v. United States</u>, 207 U. S. 564, 575-77 (1908); <u>Arizona v. California</u>, 373 U. S. 546, 598-600 (1963).

Reserved rights to water therefore belong to the Navajo Tribe for whom, as for the Lower Colorado River tribes and the Yakimas, water is a necessity for economic development. For them, as for the other tribes, significant quantities of water are crucial to fulfillment of the purposes for which their Reservation was created and later expanded, the pursuit of a civilized means of existence.

Most of the Navajo claims originated <u>before</u> Arizona became a state (1912) and thus have priority over all claims of the State of Arizona. Areas "C", "H", "K", "M", and "O" (See Figure 1) were added to the Reservation by executive order after Arizona was admitted to the Union. While this does not affect the priority of the Navajo claim to the waters of the Colorado River system, it does affect the measure of that claim. This will be discussed in the following section.

The priorities to the waters of the Colorado River system are determined by the dates (1) that various portions of the Reservation were created or added, and (2) the dates the various states claiming waters from the system were admitted to the Union. The relevant priority dates are (again referring to the areas of the Reservation as designated in figure I):

| | |
|---|---|
| California | 1850 |
| Nevada | 1864 |
| Area "G" | 1868 |
| Colorado | 1876 |

| Area "F" | 1878 |
|---|---|
| Area "J" | 1880 |
| Area "E" | 1882 |
| Area "A" | 1884 |
| Area "I" | 1886 |
| Wyoming | 1890 |
| Utah | 1896 |
| Area "D" | 1900 |
| Area "L" | 1901 |
| Area "B" | 1905 and 1933 |
| Area "N" | 1907 and 1908 |
| Arizona | 1912 |
| New Mexico | 1912 |
| Area "H" | 1913 |
| Area "K" | 1918, 1930 and 1934 |
| Area "C" | 1930 |
| Area "M" | 1934 |

While some of the states' claims have priority over certain areas of the Reservation, the state claims are dependent upon the beneficial use which was made of the water at the time the various segments of the Reservation were created. Thus, if in 1868 when the Navajo Reservation was first created, California was benefici- ally using 1,500 acre-feet of water from the Colorado River system, California would only take precedence over Area "G" (the original reservation) to the extent of 1,500 acre-feet. Area "G" would have a claim superior to that of California for all system water beyond that 1,500 acre-feet.

The Navajos' claim to water under the Winters Doctrine therefore extends to the Colorado River and its tributaries, the San Juan River and its tributaries, and the Little Colorado River and its tributaries. Because the greater part of the Reservation was created before the various states beneficially used large

15

amounts of water, the Navajo's claim is not significantly diminished because certain of the states in the Colorado River Basin were admitted to the Union before certain areas were added to the Reservation.

The Navajos' specific claim to reserved water rights in the Colorado River Basin were created originally in 1868 by establishment of the Reservation in Area "G" (See Figure 1) with the San Juan River passing through its northeast corner, was later extended by Executive Order of May 17, 1884 to area "A" on the map at which time the Colorado River itself, as well as the San Juan River, became the Reservation's boundary.  Previous executive orders had increased the Reservation by addition of Areas "J", "F" and "E".  In 1900 Area "D", partially bounded by the Little Colorado River, was added to the Reservation.

     2.   <u>The Measure of the Navajos' Claim</u>:

The Winters opinion contains no distinct rule by which to measure the Indians' reserved water rights except as can be gleaned from the reasoning of the court in initially establishing a valid claim.  As much water was reserved in that case as would fulfill the intentions of the Treaty makers.  The Indians on the Fort Belknap Reservation thus reserved as much water as needed to make agricultural pursuits "valuable and adequate."

Since the Treaty of 1868 with the Navajos also expresses pastoral purposes, it reasonably follows that like the Fort Belknap.

Reservation, the Navajo Reservation is entitled to as much water from its contiguous and enclosed waterways as will make the land valuable and adequate for agricultural and stock-raising, which along with farming, are frequently alluded to in the Treaty as a legitimate Navajo occupations. And by reason of <u>Arizona v.</u> <u>California, supra</u>, these rights extend to the later executive and congressional additions to the Navajo Reservation.

In Cases following <u>Winters</u>, courts have struggled with the problem of reconciling the changing Indian need for water with the non-Indian need for a definite allocation to permit development of the off-reservation lands sharing the same watershed with the Indians. Thus, in <u>Conrad Inv. Co. v. United States</u>[23] decided shortly after the Supreme Court decision in <u>Winters</u>, the Ninth Circuit Court of Appeals held:

> It is further objected that the decree of the
> Circuit Court provides that, whenever the needs
> and requirements of the complainant [Indians] for
> the use of the waters of Birch Creek for irrigating
> and other useful purposes upon the reservation
> exceed the amount of water reserved by the decree
> for that purpose, the complainant may apply to the
> court for a modification of the decree. This is
> entirely in accord with complainant's rights as
> adjudged by the decree. Having determined that
> the Indians on the reservation have a paramount
> right to the waters of Birch Creek, it follows
> that the permission given to the defendant to have

---

23  161 Fed. 829 (1908)

17

the excess over the amount of water specified in
the decree should be subject to modification, should
the conditions on the reservation at any time require
much modification.[24]

But in 1939 the Ninth Circuit reversed itself. In U. S. v. Walker

River Irrigation District,[25] the court permanently fixed that

reservation's entitlement by making a determination of the popu-

lation of the tribe over a period of 70 years, the number of acres

cultivated, the quantity of water in the area, and the needs for

domestic, stock watering and power-generating purposes.

In United States v. Ahtanum Irrigations District,[26] the

court rejected any notion that the amount of water reserved to an

Indian reservation was to be measured by the Indians' needs at the

time the reservation was created:

It is plain from our decision in the Conrad Inv. Co.
case...that the paramount right of the Indians to
the waters of Ahtanum Creek was not limited to the
use of the Indians at any given date but this right
extended to the  ultimate needs of the Indians as
those needs and requirements should grow to keep
pace with the development of Indian agriculture upon
the reservation.[27]

---

24  Ibid at 835.
25  104 F. 2d 334.
266 236 F. 2d 321 (9th Cir. 1956).
27  Ibid at 327.

18

The most recent, and apparently current, statement of the measure of Indian reserved water rights is by the Supreme Court in Arizona v. California.  There the Court sought an explicit reconciliation between the ultimate Indian need for water and the need of other users for a definite allocation for its planning purposes.  Like the Ahtanum Irrigation District case, the Supreme Court rejected any measure of Indian need based on the amount of water used at the time the Treaty was signed.  Instead the court fixed the measure of water from the Lower Colorado River Basin reserved for the Indian tribes along the river as "enough water... to irrigate the practicably irrigable acreage on the reservations."[2] The court went on, "We have concluded...that the only feasible and fair way by whibh reserved water for the reservations can be measured is irrigable acreage."[29]  So the rule remains.

Of note is the Arizona v. California Master's finding, that "quantification of the Indian water on the basis of irrigable acreage was not intended to limit the use of the water to agriculture.  He [the Master] also suggested that nothing in his proposed decree forbade the transfer of the land and water together or the water right alone."[30]

---

28   373 U. S. at 600.

29   Ibid at 601.

30   Meyers, supra note 3, at 71.

19

Alienability of the right to use the water produces an optimal allocation of resources, since that user who is willing to pay the most for the right (and to whom the right is most valuable) will be able to purchase and use the water right.[31]  Thus, Indians have rights of use to a fixed quantity of water beyond the amount used at the signing of the Treaty or at the time of the federal grant of land creating their reservation, and may also have the right to alienate those water rights.

   3.   The Interpretation of the December 11, 1968 Tribal
        Council Resolution (CD-108-68):

      By enacting Resolution CD-108-68, the Navajo Tribe has waived, for fifty years, its reserved rights claims to water in the Upper Basin of the Colorado River.  It may, in addition, have estopped itself from making any future claims in excess of Arizona's 50,000 acre-feet allocation under the Upper Colorado River Basin Compact.

------------------

31   Ibid.  See United States ex. rel. Ray v. Hibner, 27 F. 2d 909,
     912 (E. D. Idaho 1928):

          The right of the Indians to occupy, use and sell
          both their lands and water is now recognized.. and,
          such being the case, a purchaser of such land and
          water right acquires, as under other sales, the title
          and rights held by the Indians, and that there should
          be awarded to such purchaser the same character of
          water right with equal priority as those of the
          Indians.  [Emphasis added]

     See also United States v. Powers, 305 U. S. 527 (1939).

                              20

The first resolve clause of the Resolution states:

"...[T]he Navajo Tribe of Indians agrees that they will not make demands upon the 50,000 acre-feet of water per year allocated to the State of Arizona, pursuant to the Upper Colorado River Basin Compact, in excess of 50,000 acre-feet per year, of which 34,100 acre-feet of water per year shall be used by the coal-fuel power plant to be located on the Navajo Reservation near Page, Arizona.

Thus, the Navajo Tribe is agreeing to limit its claim to Upper Basin waters to the 50,000 acre-feet allocated to the State of Arizona by the Upper Colorado River Basin Compact. This is done despite the fact that the Tribe's reserved rights to Upper Basin waters may be many times that allocation. In effect, the Tribe is agreeing to be bound by the Upper Colorado River Basin Compact, an instrument to which it is not a party and which, if applied to the Navajo Reservation, seriously restricts the possibilities for future development on the Reservation.[32]

_____

32  Note pages 300-02 of the Master's Report, supra note 20, where the Master concludes that "United States" uses in each state are limited by the apportionment to the state in which the uses occur." He notes, however, that those federal uses which constitute "present perfected rights" are an exception to the rule. "Perfected rights" include federally - reserved water rights. "Present perfected rights" are those perfected rights existing as of the effective date of the apportionment. Thus, Indian reserved water rights to the Lower Colorado Basin created before June 25, 1929, the effective date of the Boulder Canyon Project Act, are not limited by the apportion- ment of water made by that Act (as construed in Arizona v. California, 373 U. S. 546 (1963). Similarly, Indian reserved water rights to the Upper Colorado Basin created before the effective date of the Upper Colorado River Basin Compact would not be limited by the apportionment made by that compact. Therefore, the Upper Colorado River Basin Compact should have
[Continued on page 22]

[32 Continued]

no effect whatsoever on Navajo reserved water rights while the Boulder Canyon Project Act would affect only those reserved rights created after the Act was passed, *i.e.* those reserved rights appurtenant to Areas "C", "M", "O", and parts of Areas "B" and "K" (See Figure I).

As if the waiver was not clear enough, it is repeated in resolve clause 3:

It shall be understood that the <u>Navajo Tribe's promise to limit its claim to 50,000 acre-feet of water per year</u> shall only be for the term of the lifetime of the proposed power plant, or for 50 years, whichever shall occur first.... [Emphasis Added].

The language of the preamble further reinforces this interpretation of the Resolution.  After discussing the proposed coal-fuel power plant at Page and Arizona's need for a constant and uninterrupted water supply of 34,100 acre-feet per year to run it, the Council, in whereas clause 6 says:

Because the 34,100 acre-feet of water per year must come from the 50,000 acre-feet of water allocated to the State of Arizona by the terms of the Upper Colorado River Basin Compact, the Salt River Project Agricultural Improvement and Power District must be assured that the Navajo Tribe will not assert, for the lifetime of the proposed coal-fuel power plant, or for the next 50 years, or whichever occurs first, claims for water in excess of 50,000 acre-feet per year...[Emphasis Added].

This resolution, which has the Navajo Tribe of Indians waiving its reserved rights water claim to the San Juan and Colorado River water, is exceedingly misleading. Its deceptive nature is not only attributable to the fact that there is absolutely no mention of the Navajo Tribe's extensive rights under existing water law, but is inherent in the apparent assumption that the Navajo Tribe is governed by the 50,000 annual acre-feet allotted to the State of Arizona under the Upper Colorado River Basin Compact. It is necessary to paraphrase the logic of the Resolution to show its deception:

1. The Navajo Tribe has "the right" to the 50,000 annual acre-feet which was allocated to the State of Arizona under the Upper Colorado River Compact.

2. That right was affirmed by the Secretary of Interior.[33]

3. The limit of the Navajo Tribe's claim to Upper Basin water is 50,000 annual acre-feet.

4. In order for the Salt River Project Agricultural Improvement and Power District to use 34,100 annual acre-feet for

[33] See Tribal Council Resolution CJY-95-66 of July 28, 1966, whereas clause No. 10.

23

the proposed power plant, it must secure approval of the Navajo Tribe of Indians.

5. Since, in the Upper Basin, the present need of the Navajo Tribe is for only 13,000 annual acre-feet and its needs during the foreseeable future "will never exceed 17,000" annual acre-feet, its agreement to allocate 34,100 annual acre-feet to the power plant leaves it almost enough (15,900 annual acre-feet) to meet its foreseeable needs.

6. Hence, the Navajo Tribe retains enough of its 50,000 annual acre-feet to meet its foreseeable future needs and gains significant value in exchange.

There are several fallacies in this logic. First, the Navajo Tribe of Indians never did and does not now have, under the terms of the Upper Colorado River Compact, any "right" to share in the use of Arizona's 50,000 annual acre-feet allocation. Second, the Tribe's potential claim to water of the Colorado and San Juan is entirely unrelated to the Upper Basin Compact, and, at least, potentially, far exceeds the amount of 50,000 annual acre feet. Third, Salt River Project could construct the power plant on state land at Page, Arizona, or in the triangle of state land in the upper basin formed by the Colorado and Pariah and the Arizona-Utah border.[34]

---

34  The Little Colorado River drains into the Lower Colorado Basin rather than the upper basin.

Under the terms of the Upper Basin Compact, the state can use either 34,100 annual acre-feet of water or any amount up to the total of Arizona's allocation of 50,000 annual acre-feet without ever obtaining the consent of the Navajo Tribe. Moreover, it would appear that Salt River Project could even construct the power plant on the Navajo Reservation and use Arizona's 50,000 acre-feet allocation at the plant without the Tribe's consent.[35]

Fourth, whatever the Tribe's present consumptive use may be, to state its future needs to be 17,000 annual acre-feet is to utterly ignore the aridity of the Reservation and limit the Reservation to its present state of economic development, because any agricultural, economic and population growth depends heavily upon the availability of water. Moreover, water to which the Tribe could acquire title, may be salable. In other words, the Tribe's foreseeable future water needs are inestimable, but

---

35   "If any thermal generating plant referred to in subsection (b) of this section is located in Arizona, and if it is served by water diverted from the drainage area of the Colorado River system above Lee Ferry, other provisions of existing law to the contrary notwithstanding, such consumptive use of water shall be a part of the fifty thousand acre-feet per annum apportioned to the State of Arizona by Article III (a) of the Upper Colorado River Basin Compact (63 Stat. 31." Colorado River Basin Project Act §3039d), 43 U.S.C.A. §1523 (Supp. 1969).

certainly far more than 17,000 annual acre-feet.[36]  In a very real sense, the Tribe "needs" all the water it can obtain.

The motivation to obtain the Tribe's waiver of its reserved water rights claim, and the reason for the misleading use of the 50,000 acre-feet terminology can be supposed with some degree of certainty, especially when it is known (as it is) that the Resolution was drafted by the Department of Interior and Salt River Project and that its passage was promoted by both, with the assistance of the Executive Director of the Upper Basin Commission.[37]

All of the water of the Colorado River System has been allocated, first, as between the Upper and Lower Basins and Mexico and, second, among the states of each Basin.[38]  Both the

---

36  The presence in whereas clause 8, of the phrase "...during the foreseeable future the yearly usage of the water on the Navajo Reservation will never exceed 17,000 acre-feet..." is reminiscent of Arizona's contention in Arizona v. California, at pp. 600-601, that the proper measure of Indian water rights should be "reasonably foreseeable needs."  The Court, however, approved the Master's more liberal formula based upon practicably irrigable acreage, whether in fact the land was being irrigated or not.

37  More difficult to understand, is the motivation of the General Counsel of the Navajo Tribe.  The same Interior Department attorney referred to in Footnote 45., infra., said that the tribal General Counsel gave his full concurrence because, like Interior, he could not see that the Tribe had use for more than 13,300 acre-feet.

38  In fact, the allocations made exceed the amount of water normally available in the Colorado River system.  H. Rep. No. 1312, 1968 U.S. Code Cong. & Admin. News 3666, 3669-70.

26

Colorado River [39] and Upper Colorado River[40] Compacts explicitly decline to affect Indian water claims.   The Navajo Tribe's reserved water claim casts a cloud upon the water titles of every state.  If the Tribe were to assert its claim, it would eclipse Arizona's 50,000 acre-feet allocation, and, worse, from the point of view of all the Colorado River Basin states, would place a large Navajo claim prior to the states', requiring curtailment of every state's allocation.[41]

Concerning Arizona's 50,000 Upper Basin Allocation, Article VII of the Upper Colorado River Compact provides:

> "The consumptive use of water by the United States
> of America or any of its agencies, instrumentalities
> or wards shall be charged as a use by the State in
> which the use is made..."[42]

---

39   A.R.S. §45-571, Article VII.

40   A.R.S. §45-581, Article XIX.

41   §13(b) of the Boulder Canyon Project Act (43 U.S.C. §617 L.
     (b)) provides:
         The rights of the United States in or to waters of
         The Colorado River and its tributaries howsoever
         claimed or acquired, as well as the rights of those
         claiming under the United States, shall be subject
         to and controlled by said Colorado River Compact.

   However, the Colorado River Compact, in Article VII, states:
   "Nothing in this compact shall be construed as affecting the
   obligations of the United States of America to Indian Tribes."

42   A.R.S. §45-581.  The Navajo Tribe is a "ward" of the United
     States.  United States v. Kagama, 118 U. S. 375, 383-84
     (1886); Cherokee Nation v. Georgia, 30 U. S. (5 Pet.) 1,17.

27

Article XIX provides, in relevant part, "Nothing in this Compact shall be construed as "(a) affecting the obligations of the United States of America to Indian Tribes..."[43]   By virtue of <u>Winters</u> and the modern reserved water rights doctrine, the Navajo Tribe has a special claim to Colorado and San Juan River water, wholly apart from and parallel to the states' claims, with priority dates of 1868 and 1884.  But Arizona, as a signatory to the Upper Colorado River Basin Compact, has agreed that any Navajo Indian water use will proportionately reduce its Compact allocation of 50,000 annual acre-feet.  In other words, Arizona has agreed to charge Navajo water use against its own upper basin allocation.  It has not, and could not have, agreed that Navajo water rights in the upper basin would be limited by that alloca-tion.[44]

We have been told that Rep. Wayne Aspinall (D-Colo.), Chairman of the House Committee on the Interior and Insular Affairs, has made it clear to the Department of Interior and Salt River Project that, unless a waiver of the Navajo Tribe's Upper Basin water claim is obtained, he will have the CAP legislation killed.[45]  Mr. Aspinall, of course, is exceedingly concerned about protecting the Upper Basin allocations.  The average annual main channel flow at Lee Ferry is about 13,000,000

---

43  A.R.S. §45-581
44  <u>See</u> note 32 <u>supra</u>.
45  Conversation with Interior Department Attorney, May 13, 1969.

acre-feet.[46]  By the terms of the Colorado River Compact, the
Upper Basin is obligated to deliver an average of 7.5 million
acre-feet to the Lower Basin at Lee Ferry.[47]  Each of the Upper
Basin states has water resource projects in planning to use its
allocation.  If the Navajo Tribe were to perfect any substantial
claim to Upper Basin Water, it would proportionately reduce the
allocations of all Upper Basin state allocations and jeopardize
all Upper Basin water use projects.

Thus, Arizona and the other Colorado River Basin states
have a very great interest in having the Navajo Tribe waive its
reserved water rights claim in exchange for the enumerated con-
sideration:  the construction of the power plant on Reservation
property, Navajo employment, the purchase of Navajo coal, elec-
trical power sales, and $125,000 to the Navajo Community College.
With the existence and significance of the waiver concealed and
the consideration (while indefinite in ways later to be dis-
cussed) shown in bas relief, the erroneous impression is conveyed
that the Tribe is giving up little or nothing to obtain great
economic benefits, when exactly the opposite is quite likely to
be true.

---

46  Meyers, supra note 3, at 2.
47  Article III (d).

29

IV.   THE SIGNIFICANCE OF THE TRIBE'S WAIVER OF ITS RESERVED
      WATER RIGHTS CLAIM.

    A.   The value of the Tribe's Water Rights:

    The precise value of the Tribe's water rights is
difficult to determine, primarily because a soil inventory of
the Reservation has never been made.   The reason a soil inven-
tory has never been made is that absent an available water supply,
no one goes to the expense of making such a study.   The Arizona
v. California formula for determining the extent of Indian water
rights is as follows:

> The Tribe is entitled to that amount of water
> which is necessary to make practicably irrigable
> land productive.[48]

    First, the amount of irrigable acreage is determined
by an irrigation feasibility study.   The factors taken into
account are at least:  1) climate (rainfall and length of grow-
ing season), 2) chemical analysis of soil to determine capability
to support agriculture, 3) depth of soil to bedrock or other
underlay.  Second, the amount of water needed to make the irri-
gable land productive, the "consumptive use rate," is calculated.
In fixing the consumptive use rate, the following major factors
are relevant:  1) climate, 2) soil texture and drainage
characteristics, 3) anticipated crop pattern (i.e., the type of
crops to produce), 4) irrigation efficiency rate (i.e., the
percentage of the water delivered at the supply point of the

---

48 See 373 U. S. 600

irrigation project which, given the efficiency of the irriga-
tion system, will actually reach the plant stems.)

The amount of Indian water entitlement then can be
expressed in terms of acre-feet of water per acre of irrigable
land.  It should be emphasized here that the quantum of water
entitlement is <u>at the supply point of the irrigation project</u>.
Diversion from the water source of a larger quantity of water
is necessary (to allow for evaporation, for example) to deliver
the entitlement.  In <u>Arizona v. California</u>, the Court found that
there were 136,636 irrigable acres on five Indian Reservations
along the Colorado River.  The Reservation land was charac-
terized as arid.  The Court awarded a diversion of 895,496
annual acre-feet of water to irrigate the 136,636 acres, for an
average consumptive use rate of 6.5 acre-feet of water per acre.[49]

Of note is the inclination of the Court to liberally
determine and allot water to the Indian tribes.  The estimates
of irrigable acreage and consumptive use rates were clearly on
the high side.  There is no reason to think that the Court
would do otherwise in the Navajo case.

For example, if it is assumed (and it may be realis-
tically) that the Navajo Reservation contains only 2,000,000

---

[49]  For the Colorado River Indian Reservation alone, the Court
      awarded a consumptive use rate of 6.7 acre-feet per acre
      for 107,588 acres.  376 U.S. at 344-45.  By comparison, the
      farmers in Central Arizona were allowed a maximum of 3 acre-
      feet by the Salt River Project during the years 1952-55.
      Master's Report, <u>supra</u> note 20, at 46.

irrigable acres out of its total 16,000,000 and that the con-
sumptive use rate were only 5 acre-feet per acre, the Tribe's
allocation of water would be 10,000,000 acre-feet per year.

And whatever the Tribe's ultimate allocation would be
determined by the Court to be, it is foolhardy in the extreme
for the Tribe to waive its rights before they are determined.
It should be remembered that use rights in water may be salable
and while the Tribe in CD-108-68 is waiving its rights, if it
established those rights in litigation first, it might be
selling, not giving away, the right to use the water.

It is impossible to estimate the dollar value of the
Tribe's potential claim, because money is not a substitute for
water.  It is interesting to note, however, that the State of
Arizona seeks a 1.3 billion dollar appropriation for Central
Arizona Project to transport 2.8 million acre-feet per year
from the Colorado River near Parker, Arizona, to the Phoenix
and Tucson areas.  Furthermore, it bears repeating, that the
Navajo Reservation is seriously underdeveloped economically,
the ground water table is dropping, and the population is
increasing at twice the national average.  All of these factors
indicate an increasing and vital need for water in the future.

Finally, the tribe in CD-108-68 has waived its
reserved water rights for 35 to 50 years, depending upon the
life of the power plant project.  It seems to us that a waiver

32

for that period is, quite likely, a waiver forever.  Long
before 35 to 50 years has passed, all of the Colorado River
water will have been put to beneficial consumptive use by the
Colorado River Basin states.  The economic and political
interests adverse to the Tribe's claim will be considerably
more powerful then than they are now and even now they are
formidable.  Moreover, the Tribe's need for additional water
even for domestic use will be acute long before that time.[50]

B.  The Consideration for the Waiver:

In view of the great potential value of the Tribe's
water claim, even assuming they could afford to waive it for
money, or immediate economic benefit, the consideration given
by Salt River Project is tenuous and comparatively meager.

Resolve section 2A requires the Salt River Project
(SRP) to prefer Navajos for employment at the power plant and
at the Black Mesa coal mines.  The employment of labor at a
modern power plant is small indeed[51] and SRP does not control

---

50 Despite an extensive ground water development program
carried on over a number of years by the Navajo Tribe, the
Tribe has not been able to discontinue its Emergency Water
Hauling Program. See, e.g., Navajo Tribal Council Resolution
CMY-66-69 (June 27, 1969), appropriating additional funds
for the program after the previously appropriated funds for
the 1969 fiscal year program had been exhausted.
51 According to officials of the Arizona Public Service Company
which is involved in the power project along with Salt River
Project and other utilities, the Page generating station and
the expansion of the Four Corners generating station will
provide new permanent employment for 200 persons. "Navajos
Approve Power Project," Gallup (New Mexico) Independent,
May 29, 1969.

the employment at the coal mine, which is operated by Peabody
Coal Company.

Section 2B obligates SRP to purchase all of its coal
at the Black Mesa Mines.  No amount of coal or money is specified.
At the time the Resolution was passed, the plans for the Page
Power Plant included three steam generating units.  In May, 1969,
Southern California Edison, the heaviest participator in WEST,
the combine of power companies financing the venture, backed out
of the project, reducing the capital available from $900 million
to about $400 million.[52]  As a result, the Page Plant will have
one, or at the most, two steam generating units.  Hence, the coal
sales revenue to the Tribe would be automatically reduced by 1/3
to 2/3.

Section 2C provides for SRP to lease land from the
Tribe for the power plant site.  No rent is specified.  The
Advisory Committee is to later negotiate the rent.[53]

---

52  Arizona Republic, May 10, 1964.
53  By Resolution CMY-45-69, entitled "Authorizing Lease with
    Arizona Public Service Company, Tucson Gas and Electric
    Company, Salt River Project Agricultrual Improvement and Power
    District, San Diego Gas and Electric Company, the Department
    of Water and Power of the City of Los Angeles and Neveda
    Power Company, or any of them, and possibly other entities;
    and other matters, "the Navajo Tribal Council authorized the
    Advisory Committee--the executive committee of the Tribal
    Council--to negotiate the lease of land for the generating
    station.  The tribe (to the time of this writing) has refused
    to make available a copy of this resolution.  Under an earlier
    draft of the Resolution, which may or not be the same as the
    version finally passed, the Advisory Committee was to lease a
    total of 1786 acres to the public utility consortium at an
    annual rental of $160,000 and for a period of 50 years, with
    an option to extend for an additional 25 years.
                                34

Section 2D provides that SRP will enter into an agreement to "provide electrical power to Navajo Tribal Utility Authority," a public utility of the Tribe. Nothing is said about the rates at which the power will be sold to the NTUA, or whether there is or can be a rate advantage. On its face, it is no consideration at all; it merely permits the tribe to buy power.[54]

Section 2E is rather peculiar. It purports to pledge the Secretary of Interior to assure the Tribe that if additional water is transported into the Upper Basin, the Tribe will "share proportionately in that water." The mystery is, in precisely what proportion will the Tribe share? How can this Resolution bind the Secretary of the Interior? And what can the pledge mean but a pure gift, in view of the fact that the Tribe has waived all of its water claims? This provision appears to mean nothing. This section also provides, conjunctively, that "the first 34,100 acre-feet of water imported yearly shall be assigned

---

54 The early draft of Navajo Tribal Council Resolution CMY-45-69, referred to in footnote 52 supra, would have authorized the Advisory Committee to approve a wholesale power supply agreement with Arizona Public Service Company. Under this agreement the Navajo Tribe would be entitled to receive 5,000 kilowatts per year plus one-eighth of the Arizona Public Service Company's entitlement in the generating station. The terms of the agreement would be substantially similar to those contained in present agreements between the tribe and the Arizona Public Service Company for the wholesale supply of power to the Tribe. Again, it is not known whether the Resolution as finally passed conforms to the earlier draft version.

to the Navajo Tribe for its exclusive use and benefit."
(Emphasis added.)  It is difficult to know exactly what the term
"assigned" means in this context.  It would appear, by contrast,
not to mean the same as "allotted" or "allocated" or "diverted"
to."  It does not give the Tribe _title_ to the water.  It would
appear to mean that the Tribe would be permitted to use 34,100
acre-feet of the imported water, if they could put it to
immediate beneficial consumptive use.[55]  If they can't, the water
will be "assigned" to some other use.  But whatever this provision
means, it depends entirely upon some transbasin diversion (most
likely from the Columbia River Basin) which may or may not mater-
ialize some time in the next 35 to 50 years.

Section 2F is the only clear and unconditional consider-
ation for the waiver.  It pledges SRP and others[56] to give the
Navajo Community College a total of $125,000 in five yearly install-
ments.[57]

---

55  Note the correspondence between the 34,100 acre-feet to be
    "assigned" in the future and the 34,100 acre-feet guaranteed
    for use at the generating station.  It is unclear whether the
    additional "assignment" is intended for use at the generating
    station or for other use by the Tribe.  If for use at the
    generating station, the "assignment" might be meaningful if
    water scarcity prevented the station from obtaining the
    necessary 34,100 acre-feet from non-imported water.  On the
    other hand, if the "assignment" is intended for other use by
    the Tribe, the clause is an implicit admission that the Navajos
    will need at least that amount of water in the future.
56  Who the "others" are is not specified.
57  Forgive the comment that it should be used to endow a chair
    in Indian water law.

5. <u>H. R. 10354 - The Antelope Point Bill</u>:

On April 21, 1969 Rep. Steiger (R-Arizona) introduced H. R. 10354, a bill providing for the transfer of 750 acres, known as Antelope Point,, to the Navajo Tribe.[58]  Before this transfer is made, however, the Tribal Council must by formal resolution make a commitment:

> To limit the Tribe's total claims to water from the drainage area of the Colorado River system above Lee Ferry for use in Arizona so that the total consumptive use, including 34,100 acre-feet for a coal-fired power plant, so long as such plant is operated, and requirements for the Glen Canyon unit of the Colorado River storage project along with its associated community and recreation development in Arizona, estimated at 3,000 acre-feet will not exceed the 50,000 acre-feet of water per year allocated for consumptive use in Arizona under Article III (a) of the Colorado River Basin Compact.[59]

The bill also guarantees that 3,000 acre-feet per year of water per year used by the facilities at Glen Canyon and Page will be charged against Arizona's share of 50,000 acre-feet per year under the Upper Basin Compact, whether or not the Navajo power project is completed within the time required by the contract

---

58  115 Cong. Rec. H2880 (daily ed., April 21, 1969).  A substantially identical bill, S. 2119, was introduced by Senator Goldwater (R-Arizona) on May 12, 1969.  115 Cong. Rec. §4981 (daily ed.) May 12, 1969).  These bills are attached as Exhibits 4 and 5.

59  The allocation of 50,000 acre-feet per year to Arizona is made by the Upper Colorado River Basin Compact, not the Colorado River Basin Compact.  This error was rectified in a star print of the Senate bill.  115 Cong. Rec. S6546 (daily ed., June 17, 1969).

between the Secretary of Interior and the Salt River Project.[60]
In other words, failure to complete the project within the required
period shall not cause the waiver by the Navajos to lapse with
regard to the 3,000 acre-feet of water to be used by the Glen
Canyon and Page facilities.

The terms of this bill significantly alter the advantages
and disadvantages of the power project to the Navajo Tribe.  Under
the bill, the Navajos would receive the additional consideration
of the Antelope Point land.[61]  In exchange for these 750 acres,
however, the Tribe must promise to reduce its claim to Upper Basin
water by the 3,000 acre-feet to be allotted to Page.  Thus, the
Tribe would be left with only 12,900 acre-feet of water for its
own use.  Yet, even now, the Tribe's use of water is estimated at
13,300 acre-feet per year and its future foreseeable use is
estimated at 17,000 acre-feet per use.  Therefore, if H. R. 10354
were to be enacted into law, the Tribe would be forced to reduce
its _present_ consumption of water.

---

60  Contract No. 14-06-400-5033, dated January 17, 1969.  It is
    unclear whether this contract was made by the Secretary of the
    Interior pursuant to his powers to manage Indian affairs and
    public business relating to Indians or to his powers under the
    federal reclamation laws and the various acts governing the
    storage dams on the Colorado River.  See Colorado River Stor-
    age Project Act §4, 43 U.S.C. §620c:  Colorado River Basin
    Project Act §304(b) (1), 43 U.S.C. §1524(b) (1); and the foll-
    owing provisions of the reclamation laws:  43 U.S.C. §§485h,
    521.  Cf.  Boulder Canyon Project Act §5, 43 U.S.C. §617d;
    Boulder Canyon Project Adjustment Act §8, 43 U.S.C. §618g.
61  This land is part of a larger parcel ceded to the federal
    government by the Navajo Tribe in 1958.  See Pub. L. 85-868,
    72 Stat. 1686 (1958).

A second significant difference between H. R. 10354 and the agreement embodied in Tribal Council Resolution CD-108-68 is that the waiver is no longer limited to 50 years or the life of the power plant, whichever shall come first.  The waiver asked for by H. R. 10354 is a _permanent waiver_.  The modifying language "so long as such plant is operated" in the House bill refers to the duration of the allocation of 34,100 acre-feet for the power plant _not to the duration of the_ waiver.

6.  _The Interpretation of the Resolution Introduced May 28, 1969 and the Resolution Introduced and Enacted June 3, 1969._

On May 28, 1969 a resolution was introduced in the Navajo Tribal Council, directly incorporating the language of H. R. 10354.[62]  The resolution was tabled the following day. Under the terms of the proposed resolution, the Tribe, in order to receive the land at Antelope Point, would agree to the premanent waiver of its water rights beyond Arizona's 50,000 acre-feet allocation as required by H. R. 10354.

On June 3, 1969 the Tribal Council enacted a resolution that attempted to preserve the Tribe's water rights and at the

---

62  Resolved Paragraph No. 1 is taken almost verbatim from the text of H. R. 10354, even including the erroneous reference to the "Colorado River Basin Compact."  _See_ note 58 supra.

same time to comply with the requirements of H. R. 10354,[63]   The

Tribe attempts to preserve its reserved water rights through the

inclusion of the following paragraphs:

> [Whereas paragraph No. 2:]  It was the intent
> and understanding of [Resolution] CD-108-68 to
> preserve all present or prospective water rights
> of the Navajo Tribe...
> [Resolve paragraph No. 2:]  The terms of Resolved
> Paragraph 1 and the terms of Resolution CD-108-68
> constitute an agreement of the Navajo Tribe with
> regard to the 50,000 acre-feet of water per year
> and does not constitute a waiver or relinquish-
> ment of the present or prospective water rights
> of the Navajo Tribe, and that Resolution is
> hereby amended by adding this paragraph to the
> same as a part thereof.[64]

     With all due respect, the Tribal Council seems to be

saying "we are not doing what we are doing."  Nowhere in the

Resolution does the Tribe repeal its promise in Resolution

CD-108-68 to limit its claim to Upper Basin water to the 50,000

acre-feet allocated to the State of Arizona.

---

63   "The bill to return the Lake Powell shoreland to the Tribe,
     introduced by Arizona's three Congressmen, is pending before
     Aspinall's Committee.  McFarland [the committee's staff
     director] said that, unless the Tribe agrees to the water
     limitation, ' I don't believe this legislation would pass'
     William Greider, "A Tribal Water Fight", Washington Post,
     June 29, 1969, at C3, col. 6.  Although by the terms of the
     bill the transfer of land cannot take place until the Tribe
     waives its water rights, so that the failure of the Tribe
     to waive its rights should not impede passage of the bill
     (as opposed to transfer of the land), Mr. McFarland's state-
     ment is useful in confirming the waiver as a sine qua non
     for the transfer.
64   The underlined passage was added to the version introduced
     by amendment from the floor.  An unofficial version provided
     by the Acting Area Director of the Bureau of Indian Affairs
     states the amendment in a somewhat different form:  "This
     resolution amends and clarifies Resolution CD-108-68 of the
     Navajo Tribal Council."

In addition, there is a serious question as to whether the waiver can be revoked at all. It is well-established law that:

> One who intentionally relinquishes a known right cannot, without consent of his adversary, reclaim it, for it is well settled that a waiver once made is irrevocable, even in the absence of consideration, or of any change in position of the party in whose favor the waiver operates. A waiver is conclusive on the party waiving and his privies.[65]

It would seem necessary, then, to prove that the waiver was not intentional and/or that the rights were not known.

> It must generally be shown by the party claiming a waiver that the person against whom the waiver is asserted had at the time knowledge, actual or constructive, of the existence of his rights or of all the material facts upon which they depended. No man can be bound by a waiver of his rights unless such waiver is distinctly made, with full knowledge of the rights which he intends to waive; and the fact that he knows his rights and intends to waive them must plainly appear. Ignorance of a material fact negatives waiver, and waiver cannot be established by a consent given under a mistake or misapprehension of fact. Waiver presupposes a full knowledge of an existing right or privilege, and something done designedly or knowingly to relinquish it.[66]

> Waiver is mainly, or essentially, a matter of intention. Thus, a prerequisite ingredient of the waiver of a right or privilege consists of an intention to relinquish it...mere negligence, oversight, or thoughtlessness does not create a waiver.[67]

In Resolve Paragraph No. 1 the Tribe agrees that:

---

65  56 AM Jur. 126, "Waiver" §24, and see cases there cited.
66  28 AM Jur. 2d 840-41, "Estoppel and Waiver" §158 and see cases there cited.
67  Ibid at 842-43 and see cases there cited.

41

> In consideration for the transfer of title to
> the [Antelope Point] lands..., the Tribe agrees
> that of the 50,000 acre-feet per year allocated
> to the State of Arizona, pursuant to Article III
> (a) of the Upper Colorado River Basin Compact, 34,100
> acre-feet shall be used for a coal-fired power plant
> to be located on the Navajo Reservation for the life-
> time of the proposed power plant or for 50 years,
> whichever occurs first, and an estimated 3,000 acre-
> feet per year that may be used for the Glen Canyon
> Unit of the Colorado River Storage Project along
> with its associated community and recreation develop-
> ments in Arizona.

So the Tribe, supposedly not relinquishing any of its

own water rights, is here agreeing that the State of Arizona's

allocation will be apportioned in a certain manner.  An agreement

such as this can only be meaningful if the Tribe is permitting

itself to be limited to the 50,000 acre-feet allocated to Arizona.

If the Tribe is not promising to limit itself to Arizona's Upper

Basin allocation, its agreement is purely gratuitous.

In Resolve paragraph No. 1, as in H. R. 10354, the only

limiting language applies to the duration of the apportionment

of 34,100 acre-feet of water for the power plant.  This apportion-

ment is to be effective for the life of the power plant or 50

years, whichever occurs first.  Whether the re-inclusion of the

50-year limitation meets the requirements of H. R. 10354 is

arguable.  It certainly does not meet the letter of the require-

ments as set forth in the House bill.  In any case the limiting

language does not apply to the waiver itself, but only to the

apportionment of water for the power plant.

It should also be noted that, according to the House bill, the Navajo Tribe must waive any claim to water from the Upper Basin in excess of the Arizona allocation in order to receive the Antelope Point lands. If the Tribe does not make this waiver, by the terms of H. R. 10354 it will not receive the lands.

7. Remedy:

An action in the nature of a suit to quiet title in the Tribe to 13,000,000 acre-feet of Colorado River Basin water should be brought. All users of Colorado River Basin water - the United States and the States of Arizona, California, Colorado, Nevada, New Mexico, Utah and Wyoming should be named as defendants. In addition, all persons and entities holding contracts with the Secretary of the Interior for the use of Colorado River water should be named as defendants. In this suit the reserved water rights of the Navajo Reservation under Winters v. United States, supra, and its progeny, should be asserted.

The Navajo Claim could be defeated by several technical considerations. First, the United States holds the title to the reserved water rights in trust for the Indians. It might be held necessary for the United States to represent the Indian interests in any court action - an obvious difficulty when the United States is, at the same time, one of the defendants. The United States might merely refuse to present the Navajo claim in

court.   This possibility is extremely unlikely, given the deci-
sions of the United States Supreme Court in such cases as
Poafpybitty v. Skelly Oil Co.,[68] and Lane v. Pueblo of Santa
Rosa,[69] and of the Courts of Appeals in Skokomish Indian Tribe v.
France,[70] Jackson v. Sims,[71] and Choctaw & Chickasaw Nations v.
Seitz.[72]   In all of those cases, the United States was held to
not be an indispensable party to the suit.   In Poafpybitty, an
action by Indian allottees to recover damages for an alleged
breach of an oil and gas lease by the lessee oil company, the
Supreme Court held:

> "...[T]hese restrictions on the Indian's control
> of his land are mere incidents of the promises
> made by the United States in various treaties
> to protect Indian land and have no effect on the
> Indian's capacity to institute the court action
> necessary to protect his property."[73]

In Jackson v. Sims the court distinguished between those
actions in which Indians were attempting to protect their rights
and those in which other parties were attempting to deprive
Indians of their rights, holding that the Secretary of the
Interior (in his official capacity) would be an indispensable
party only in the latter type of action.   In Skokomish Indian
Tribe v. France, a case very much in point, the United States

---

68   390 U. S. 365 (1968)
69   249 U. S. 110 (1919)
70   269 F. 2d 555 (9th Cir. 1959)
71   201 F. 2d 259 (10th Cir. 1953)
72   193 F. 2d 456 (10th Cir. 1951)cert.denied 343 U.S. 919(1952)
73   390 U. S. at 368-69

was held not to be an indispensable party to an action by an Indian Tribe to quiet title to lands claimed by virtue of treaty and executive order.

Secondly, the United States might be held to be an indispensable party to the suit because of its interests in navigation on the Colorado River. If this were the case, it could defeat the claim merely by refusing to give consent to be sued.[74]

Thirdly, the courts might find in the Congressional approval of the Colorado River Compact and the Upper Colorado River Basin Compact, an implicit subordination of the Indian water rights to the apportionments made by those compacts. Such a finding, however, would have to ignore the provisions of those compacts which state that they shall not affect the obligations of the United States to the Indian Tribes.[75]

Finally, the courts could find the Navajo claim to be valid, but then, in fact, defeat that claim by construing the measure of the Navajo water rights very narrowly.

---

74  See Arizona v. California, 298 U.S. 558 (1936).  43 U.S.C. §666 (a) only gives consent to join the United States as a defendant "where it appears that the United States is the owner of... water rights by appropriation under state law.."
75  A.R.S. §45-571, Article VII; A.R.S. §45-581, Article XIX.

## 8.   Conclusion:

This is a matter of inestimable importance.   Immediate remedial action should be taken to recover the extensive water rights belonging to the Navajo Indian Reservation.   Special water and soil conservation experts and water lawyers should be engaged to define, assert and affirm the Reservation's invaluable rights to the use of both Upper and Lower Colorado River Basin water resources.[76]

Prepared by:

Theodore R. Mitchell, Michael Gross and Daniel MacMeekin

Address:

DINEBEIINA NAHIILNA BE AGADITAHE, INC.
Post Office Box Number 368, Window Rock,
Arizona 86515, Telephone 602/871-4151

---

76   That these water rights are invaluable was confirmed in an
     article by William Greider in the Washington Post:
     "Curiously, one source who agrees with...[the] contention
     that the Navajos [by passing Resolution CD-108-68] gave up
     something of value is Rep. Aspinall's staff man on the
     House Interior Committee."  "A Tribal Water Fight", supra
     note 62, at col. 5.



The map on the left shows the Navajo Reservation (the shaded area) in relation to surrounding states. The ancestors of the Navajos, as part of the Athapascan group from British Columbia, may have arrived in the Southwest by migrating southward across the northwestern states through Nevada or Utah and into New Mexico and Arizona. For the location of early settlement of the Navajos, see Escalante's Map. The early Navajos ranged over an extensive area, including northern New Mexico and Arizona and southern Utah and Colorado. The map above shows their reservation in more detail, indicating the successive additions and their dates.

A—Ex. Ord. May 17, 1884
B—Ex. Ord. May 15, 1905,
   Act of Mar. 1, 1933
C—Act of May 23, 1930
D—Ex. Ord. Jan. 8, 1900
E—Ex. Ord. Dec. 16, 1882
F—Ex. Ord. Oct. 29, 1878

G—Treaty of June 1, 1868
H—Ex. Ord. Dec. 1, 1913
I—Ex. Ord. Apr. 24, 1886
J—Ex. Ord. Jan. 6, 1880
K—Ex. Ord. Jan. 19, 1918,
   Ex. Ord. May 23, 1930,
   and Act of June 14, 1934

L—Ex. Ord. Nov. 14, 1901
M—Act of June 14, 1934
N—Ex. Ord. Nov. 9, 1907,
   Ex. Ord. Jan. 28, 1908
O—Act of June 14, 1934

149

148

FIGURE 1.

FIGURE 2

LEGEND
Reservoirs

EXHIBIT 1

CD-108-68

RESOLUTION OF THE
NAVAJO TRIBAL COUNCIL

Approving the Allocation of 34,100 Acre-Feet of Water From
the Upper Colorado River Basin and Promising to Limit the
Navajo Tribe's Claim for Water from the Upper Colorado
River Basin to 50,000 Acre-Feet Per Year

WHEREAS:

1.   The Navajo Tribe, by Resolution CJY-95-66, sup-
ported the construction of a large coal-fuel power plant on the
Navajo Reservation near Page, Arizona, and

2.   By Resolution CJY-95-66, the Navajo Tribe
requested that the Secretary of the Interior take all necessary
steps, advisable and incidental, to affirm the right of the
Navajo Tribe to 50,000 acre-feet of water allocated to the State
of Arizona under the Upper Colorado River Basin Compact, and

3.   Resolution CJY-95-66 supported the proposal that a
portion of the 50,000 acre-feet of water, allocated by the Upper
Colorado River Basin Compact, be used for a power plant located
on the Navajo Reservation near Page, Arizona, and

4.   The Salt River Project Agricultural Improvement
and Power District has proposed to locate a coal-fuel power
plant on the Navajo Reservation near Page, Arizona, and to
operate said power plant for at least 35 years, and

5.   Because the establishment of such a coal-fuel
power plant requires the investment of many million dollars, the
Salt River Project Agricultural Improvement and Power District
needs to be assured of sufficient water to operate said power
plant in the amount of 34,100 acre-feet of water per year before
making such an investment, and

6.   Because the 34,100 acre-feet of water per year
must come from the 50,000 acre-feet of water allocated to the
State of Arizona by the terms of the Upper Colorado River Basin
Compact, the Salt River Project Agricultural Improvement and
Power District must be assured that the Navajo Tribe will not
assert, for the lifetime of the proposed coal-fuel power plant,
or for the next 50 years, or whichever occurs first, claims for
water in excess of 50,000 acre-feet per year, and

7.   The present water used in the Western Navajo
Reservation is estimated to be 13,300 acre-feet per year, and

8. The best estimates of the Bureau of Reclamation and the Resources Division of the Navajo Tribe is that during the foreseeable future the yearly usage of water on the Navajo Reservation will never exceed 17,000 acre-feet per year, and

9. The establishment of the coal-fuel power plant the Navajo Reservation near Page, Arizona, will provide a market for large amounts of Navajo coal from Black Mesa; and will provide a market for construction material available from the Reservation; and will provide employment opportunities for Navajos; and will provide additional source of electrical power needs for municipal, industrial and domestic developments on the Navajo Reservation, and

10. Because this proposed coal-fuel power plant on the Navajo Reservation near Page, Arizona, at the present time, appears to be the best use of the water of the Upper Colorado River Basin, it appears that approval of this resolution is in the best interest of the Navajo people.

NOW THEREFORE BE IT RESOLVED THAT:

1. In consideration of the Secretary of the Interior executing a contract between the United States and Salt River Project Agricultural Improvement and Power District, operator of the coal-fuel power plant, committing the use of approximate: 34,100 acre-feet of water per year for the power plant to be located on the Navajo Reservation near Page, Arizona, the Navajo Tribe of Indians agrees that they will not make demands upon 50,000 acre-feet of water per year allocated to the State of Arizona, pursuant to the Upper Colorado River Basin Compact, in excess of 50,000 acre-feet of water per year, of which 34,100 acre-feet of water per year shall be used by the coal-fuel power plant to be located on the Navajo Reservation near Page, Arizona.

2. In consideration of the foregoing promise, as stated in Resolved Clause 1 of this resolution, the Secretary of the Interior, his agents and officers and the Salt River Project Agricultural Improvement and Power District, and its agents, officers and assignees, make the following promises to the Navajo Tribe:

A. The Salt River Project Agricultural Improvement and Power District promises to give job preference to all resident Navajos for any position within the power plant or the mine from which the coal is brought for use in the coal-fuel power plant and in any and all facilities related to the production of power by the proposed coal-fuel power plant.

B. The Salt River Project Agricultural Improvement a Power District promises, except during interrupti and curtailment of delivery, that all coal used in the coal-fuel power plant located on the Navajo Reservati

near Page, Arizona, shall be purchased from the Black
Mesa mines or mines located on Indian lands.

C.   The Salt River Project Agricultural Improvement and
     Power District promises that it shall lease lands
     from the Navajo Tribe and locate the coal-fuel power
     plant on said lands.  The terms and conditions of the
     lease to be determined at a later date, and approved
     by the Advisory Committee of the Navajo Tribal
     Council.  If such a lease is not executed within the
     next 12 months, this resolution may be rescinded
     at the election of the Navajo Tribe of Indians.

D.   The Salt River Project Agricultural Improvement and
     Power District shall enter into an agreement with
     the Navajo Tribe of Indians to provide electrical
     power to Navajo Tribal Utility Authority to be used
     on or near the Navajo Reservation.  The terms and
     conditions of this agreement shall be approved by the
     Advisory Committee of the Navajo Tribal Council.  If
     such an agreement is not reached by the time water is
     to be used to operate the proposed power plant, this
     resolution may be rescinded at the election of the
     Navajo Tribe of Indians.

E.   The Secretary of the Interior shall take the necessary
     action to assure the Navajo Tribe of Indians that if
     any water is imported into the Upper Colorado River
     Basin that the Navajo Tribe shall share proportionately
     in that water, and that the first 34,100 acre-feet of
     water imported yearly shall be assigned to the Navajo
     Tribe for its exclusive use and benefit.

F.   The Salt River Project Agricultural Improvement and
     Power District and others shall contribute to the
     Navajo Tribe of Indians, on or before July 1st of each
     year, for the purpose of developing and assisting the
     Navaho Community College, $25,000.00 in money for five
     years, beginning July 1, 1969, for the purpose of
     establishing a professorial chair at the Navaho Com-
     munity College.

     3.   It shall be understood that the Navajo Tribe's
promise to limit its claim to 50,000 acre-feet of water per year
shall only be for the term of the lifetime of the proposed
power plant, or for 50 years, whichever shall occur first, com-
mencing with the date of enactment of this resolution and that
this promise shall not be binding on the Navajo Tribe if the
first unit of the proposed coal-fuel power plant is not in
operation by December 31, 1976.

     4.   It shall be further understood that the promise
made by the Navajo Tribe, pursuant to this resolution, shall
only be binding if the promises made by the Secretary of the
Interior and the Salt River Project Agricultural Improvement

and Power District, pursuant to this resolution, shall be kept by them.

5.   The Navajo Tribe shall have the exclusive right to waive or enforce all conditions of this resolution.  A waiver by the Navajo Tribe of any condition or promise made to the Navajo Tribe, pursuant to this resolution, shall not be deemed to be waiver of any future or past forfeitures.

6.   If, for any reason, this resolution is terminated or expires by reason of the terms and conditions contained in this resolution, the Secretary of the Interior shall take the necessary action to have the 34,100 acre-feet of water per year, allocated to the coal-fuel power plant on the Navajo Reservation near Page, Arizona, returned to the Navajo Tribe for their exclusive use and benefit.

7.   The Chairman of the Navajo Tribal Council is hereby authorized and directed to take whatever steps he deems necessary and appropriate to place this resolution into effect.

## CERTIFICATION

I hereby certify that the foregoing resolution was duly considered by the Navajo Tribal Council at a duly called meeting at Window Rock, Arizona, at which a quorum was present and that same was passed by a vote of 57 in favor and 3 opposed, this 11th day of December, 1968.

Nelson Damon

Vice Chairman
Navajo Tribal Council

EXHIBIT 2         w      C_O_P_Y

Proposed Resolution
of the Navajo Tribal Council

Approving the Allocation of 3,000 Acre-Feet of Water from the Upper
   Colorado River Basin to be used for Recreational Use in the Lake
      Powell Area and by the City of Page, Arizona

WHEREAS:

1.  The Navajo Tribe, by Resolution CD-108-68, approved the allocation of 34,100 acre-feet of water from the Upper Colorado River Basin and agreed to limit its claim for water from the Upper Colorado River Basin to 50,000 acre-feet per year, and

2.  Said action was taken by the Tribe in consideration of the Secretary of the Interior executing a contract between the United States and the Salt River Project Agricultural Improvement and Power District, and

3.  A bill has been submitted to the United States Congress providing for the transfer to the Navajo Tribe of the following lands

> "That portion of Sections 8, 9, 16, 17, and 21, T41N, R9E, G.N.S.R.N., Arizona, located above elevation 3,720 feet above mean sea level (U.S. Coast Geodetic Coast Survey Datum) and lying southerly and easterly of the Colorado River, containing approximately 750 acres, more or less, and more particularly described on maps and plats on file in the Department of Interior," and

4.  The bill referred to stipulates that the transfer of title of the lands described in Paragraph 3 above shall not be made until the Navajo Tribe makes a specific commitment by a formal resolution of its governing body, and

5.  The Navajo Tribe is desirous of receiving said transfer and willing to meet the condition precedent thereto, provided, the conditions specified in the Tribe's Resolution CD-108-68 are met.

NOW THEREFORE BE IT RESOLVED THAT:

1.  In consideration for the transfer of title to the land

described in Whereas Paragraph 3 above, the Tribe hereby agrees to limit its total claims to water from the drainage area of the Colorado River system above Lee Ferry for use in Arizona so that the total consumptive use, including 34,100 acre-feet for a coal-fired power plant, so long as such plant is operated, and requirements for the Glen Canyon Unit of the Colorado River Storage Project along with its associated community and recreation development in Arizona, estimated at 3,000 acre-feet, will not exceed the 50,000 acre-feet of water per year allocated for consumptive use in Arizona under Article III(a) of the Colorado River Basin Compact.

2.   The terms of this resolution shall not become effective until such time as the terms and conditions of Resolution CD-108-68 has been fully complied with, and the bill referred to has been duly enacted by the House and the Senate of the United States Congress, and signed into law by the President of the United States.

### CERTIFICATION

I hereby certify that the foregoing resolution was duly considered by the Navajo Tribal Council at a duly called meeting at Window Rock, Navajo Nation (Arizona) at which a quorum was present and that same was passed by a vote of _____ in favor and _____ opposed, this _____ day of _____, 1969.

Presiding Chairman

5/28/69

C_O_P_Y                    EXHIBIT 3                    C_O_P_Y

Proposed Resolution
of the Navajo Tribal Council

<u>Approving the Use of 3,000 Acre-Feet of Water from the 50,000 Acre-Feet of Water per year Allocated to the State of Arizona under Article III(a) of the Upper Colorado River Basin Compact to be used for Recreation and by the City of Page, Arizona</u>

WHEREAS:

　　　　1.　The Navajo Tribe, by Resolution CD-108-68, approved the use of 34,100 acre-feet of water from the 50,000 Acre Feet of Water per year allocated to the State of Arizona under Article III(a of the Upper Colorado River Basin Compact in a coal fuel power plant to be located on the Reservation, and

　　　　2.　It was the intent and understanding of CD-108-68 to preserve all present or prospective water rights of the Navajo Tribe and

　　　　3.　Said action was taken by the Tribe in consideration of the Secretary of the Interior executing a contract between the United States and the Salt River Project Agricultural Improvement and Power District, and

　　　　4.　A bill has been submitted to the United States Congress providing for the transfer to the Navajo Tribe of the following land

　　　　　　"That portion of Sections 8, 9, 16, 17, and 21, T41N, R9E, G.N.S.R.N., Arizona, located above elevation 3,720 feet above mean sea level (U.S. Coast Geodetic Coast Survey Datum) and lying southerly and easterly of the Colorado River, containing approximately 750 acres, more or less, and more particularly described on maps and plats on file in the Department of Interior," and

　　　　5.　The bill referred to stipulates that the transfer of title of the lands described in paragraph 3 above shall not

be made until the Navajo Tribe makes a commitment by a formal resolution of its governing body, and

     6.  The Navajo Tribe is desirous of receiving said transfer and is willing to make the commitment herein contained, provided, the conditions specified in the Tribe's Resolution CD-108-68 are met.

NOW THEREFORE BE IT RESOLVED THAT:

     1.  In consideration for the transfer of title to the lands described in Whereas Paragraph 3 above, the Tribe agrees that of the 50,000 acre feet per year allocated to the State of Arizona, pursuant to Article III(a) of the Upper Colorado River Basin Compact, 34,100 acre feet shall be used for a coal-fired power plant to be located on the Navajo Reservation for the life time of the proposed power plant or for 50 years, whichever occurs first, and an estimated 3,000 acre feet per year that may be used for the Glen Canyon Unit of the Colorado River Storage Project along with its associated community and recreation developments in Arizona.

     2.  The terms of Resolved Paragraph 1 and the terms of Resolution CD-108-68 constitute an agreement of the Navajo Tribe with regard to the 50,000 acre feet of water per year and does not constitute a waiver or relinquishment of the present or prospective water rights of the Navajo Tribe, and that Resolution is hereby amended by adding this paragraph to the same as a part thereof.

     3.  The terms of this resolution shall not become effective until such time as the terms and conditions of Resolution

CD-108-68 has been fully complied with, and the bill referred to has been duly enacted by the House and the Senate of the United States Congress, and signed into law by the President of the United States.

    4.  <u>The active support of the Salt River Project for the development of the South Shore of Lake Powell is hereby requested and enlisted.</u>

CERTIFICATION

I hereby certify that the foregoing resolution was duly considered by the Navajo Tribal Council at a duly called meeting at Window Rock Navajo Nation (Arizona) at which a quorum was present, and that same was passed by a vote of __46__ in favor and __0__ opposed, this __3rd__ day of __June__, 1969.

                                  Presiding Chairman

6/3/69

Note:  Underlined passages in Resolved Clauses 2 and 4 were added to the version introduced.

RECEIVED
JUN 9 - 1969
D.N.A., INC.
CENTRAL OFFICE

**91st CONGRESS**
**1st Session**

# H. R. 10354



## IN THE HOUSE OF REPRESENTATIVES

APRIL 21, 1969

Mr. STEIGER of Arizona (for himself, Mr. RHODES, and Mr. UDALL) introduced the following bill; which was referred to the Committee on Interior and Insular Affairs

# A BILL

To provide for the transfer of lands to the Navajo Tribe of Indians, and for other purposes.

1  *Be it enacted by the Senate and House of Representa-*
2  *tives of the United States of America in Congress assembled,*
3  That the Secretary of the Interior is hereby authorized to
4  transfer title to the following described lands to the United
5  States to be held in trust for the Navajo Tribe. Said land is
6  described as follows:
7      That portion of sections 8, 9, 16, 17, and 21, town-
8  ship 41 north, range 9 east, Gila and Salt River merid-
9  ian, Arizona, located above elevation 3,720 feet above
10  mean sea level (United States Coast and Geo-

I

2

1    detic Survey datum) and lying southerly and easterly

2    of the Colorado River, containing approximately 750

3    acres, more or less, and more particularly described on

4    maps and plats on file in the Department of the Interior.

5    The lands so transferred shall constitute a part of the Navajo

6    Reservation and shall be subject to all laws and regulations

7    applicable to that reservation.

8        SEC. 2. The transfer of title of the lands described in

9    section 1 hereof shall not be made until the Navajo Tribe

10    makes a commitment by a formal resolution of its governing

11    body that, as consideration for the transfer of title to said

12    lands, to limit the tribe's total claims to water from the drain-

13    age area of the Colorado River system above Lee Ferry for

14    use in Arizona so that the total consumptive use, including

15    34,100 acre-feet for a coal-fired powerplant, so long as such

16    plant is operated, and requirements for the Glen Canyon unit

17    of the Colorado River storage project along with its asso-

18    ciated community and recreation development in Arizona,

19    estimated at 3,000 acre-feet, will not exceed the 50,000 acre-

20    feet of water per year allocated for consumptive use in Ari-

21    zona under article III (a) of the Colorado River Basin

22    compact.

23        SEC. 3. Regardless of whether the Navajo power project

24    is constructed within the time interval set forth in contract

25    numbered 14-06-400-5033, dated January 17, 1969, be-

1  tween the United States and the Salt River Project Agricul-

2  tural Improvement and Power District, the commitment by

3  the Navajo Tribe required by section 2 hereof shall be con-

4  sidered to apply in a manner as will not adversely affect

5  water requirements for the Glen Canyon unit, its associated

6  community and recreation development in Arizona; and so

7  that such uses will always be recognized as a part of said

8  50,000 acre-feet of water allocated to the State of Arizona.

9  Sec. 4. Nothing herein is to affect or abridge the opera-

10 tion of the Glen Canyon unit, Colorado River storage project.

**Montgomery & Andrews PA Invoices from AP JRNL FY2017 thru FY2020**

**FY2017**                                                            ISC M & A Invoices

**Sum of Amount**

| Dept | Date | Supplier | | Supplier2 | Invoice | Total |
|------|------|----------|---|-----------|---------|-------|
| Grand Total | | | | | | |

**FY2018**

**Sum of Amount**

| Dept | Date | Supplier | | Supplier2 | Invoice | Total |
|------|------|----------|---|-----------|---------|-------|
| ZB0516 | 6/30/2018 | | 47304 | MONTGOMERY & ANDREWS PA | 109925 | $ 20,993.50 |
| Grand Total | | | | | | $ 20,993.50 |

**FY2019**

**Sum of Amount**

| Dept | Date | Supplier | | Supplier2 | Invoice | Total |
|------|------|----------|---|-----------|---------|-------|
| ZC5570 | 11/26/2018 | | 47304 | MONTGOMERY & ANDREWS PA | 111050 | $ 51,196.71 |
| | 1/3/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 111486 | $ 38,605.19 |
| | 1/23/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 111617 | $ 17,913.88 |
| | | | | | 989-19243 | $ 11,460.16 |
| | 1/10/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 111485 | $ 4,943.36 |
| | 3/4/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 14904-1009 | $ 26,125.00 |
| | 4/15/2019 | | 47304 | MONTGOMERY & ANDREWS PA | I/2019/00471-1971 | $ 26,978.63 |
| | | | | | 30280 | $ 16,730.00 |
| | 4/18/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 30273 | $ 7,612.50 |
| | 4/17/2019 | | 47304 | MONTGOMERY & ANDREWS PA | I/2019/00605 | $ 22,097.50 |
| | 5/1/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 112610 | $ 38,740.82 |
| | 5/9/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 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 | $ 11,326.88 |
| | | | | | 20143 | $ 4,200.00 |
| | | | | | 30285 | $ 11,830.00 |
| | 6/4/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 112616 | $ 130,162.38 |
| | 6/30/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 113180 | $ 2,168.75 |
| ZD6022 | 6/30/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 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/30291 | $ 32,592.63 |
| | | | | | 1109-20468-30294 | $ 58,917.37 |
| | | | | | 113181 | $ 14,568.40 |
| | | | | | 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 | $ 15,453.91 |
| | | | | | 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 | $ 10,789.34 |
| Grand Total | | | | | | $ 554,413.41 |

**FY2020**

**Sum of Amount**

| Dept | Date | Supplier | | Supplier2 | Invoice | Total |
|------|------|----------|---|-----------|---------|-------|
| 642100000 | 10/4/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 113182 | $ 1,534.39 |
| | 5/28/2020 | | 47304 | MONTGOMERY & ANDREWS PA | 115310 | $ 1,437.88 |
| | 6/30/2020 | | 47304 | MONTGOMERY & ANDREWS PA | 115874 | $ 3,055.23 |
| | | | | | 114706 | $ 8,492.63 |
| 647000000 | 6/30/2020 | | 47304 | MONTGOMERY & ANDREWS PA | 115879 | $ 56,464.00 |
| ZD5072 | 9/3/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 20807/US01U00011 | $ 10,521.13 |
| | 10/4/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 30316 | $ 46,930.00 |
| | | | | | US01U000200634 | $ 11,290.43 |
| | 10/23/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 1213 | $ 2,800.00 |
| | 10/31/2019 | | 47304 | MONTGOMERY & ANDREWS PA | US01U000227768 | $ 36,864.71 |
| | 11/13/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 21438 | $ 1,875.00 |
| | 11/19/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 114131 | $ 32,162.31 |
| | 12/23/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 114552 | $ 28,354.51 |
| | | | | | 114553 | $ 9,107.30 |
| | | | | | PY US01U00015572 | $ 16,783.21 |
| | 1/27/2020 | | 47304 | MONTGOMERY & ANDREWS PA | 21971 | $ 8,100.00 |
| | 12/11/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 21176 | $ 13,500.00 |
| | 12/10/2019 | | 47304 | MONTGOMERY & ANDREWS PA | 1235 | $ 2,920.00 |
| | | | | | US01U000251254 | $ 57,088.13 |
| | 12/31/2019 | | 47304 | MONTGOMERY & ANDREWS PA | US01U000283611 | $ 63,984.33 |
| | 2/10/2020 | | 47304 | MONTGOMERY & ANDREWS PA | US01U000306230 | $ 62,362.78 |
| | 2/14/2020 | | 47304 | MONTGOMERY & ANDREWS PA | 22217 | $ 900.00 |

EXHIBIT
**7**

| Dept | Date | | Supplier | Supplier2 | Invoice | Total |
|------|------|--|----------|-----------|---------|-------|
| ZD5072 | 2/24/2020 | | 47304 | MONTGOMERY & ANDREWS PA | US01U000320508 | $ 20,704.77 |
| | 3/11/2020 | | 47304 | MONTGOMERY & ANDREWS PA | 22531 | $ 42,500.00 |
| | 3/31/2020 | | 47304 | MONTGOMERY & ANDREWS PA | US01U000348704 | $ 13,538.26 |
| | 4/24/2020 | | 47304 | MONTGOMERY & ANDREWS PA | US01U000379020 | $ 7,158.38 |
| | 6/26/2020 | | 47304 | MONTGOMERY & ANDREWS PA | US01U000409158 | $ 9,830.63 |
| | 5/6/2020 | | 47304 | MONTGOMERY & ANDREWS PA | 115363 | $ 70,926.26 |
| | 5/18/2020 | | 47304 | MONTGOMERY & ANDREWS PA | 22840 | $ 21,165.00 |
| | 6/10/2020 | | 47304 | MONTGOMERY & ANDREWS PA | 23111 | $ 9,637.50 |
| | | | | | US01U000428566 | $ 8,061.38 |
| | 6/30/2020 | | 47304 | MONTGOMERY & ANDREWS PA | 23134 | $ 7,306.25 |
| | | | | | US01U000451235 | $ 8,862.00 |
| | | | | | 115879 | $ 55,084.94 |
| ZC5570 | 10/28/2019 | | 47304 | MONTGOMERY & ANDREWS PA | PY 635-682 | $ 4,072.50 |
| ZE5069 | 6/30/2020 | | 47304 | MONTGOMERY & ANDREWS PA | 115879 | $ 60,943.17 |
| **Grand Total** | | | | | | **$ 816,319.01** |

**FY2021**

**Sum of Amount**

| Dept | Date | Supplier | Supplier2 | Invoice | Total |
|------|------|----------|-----------|---------|-------|
| ZE5067A | 8/21/2020 | 0000047304 | MONTGOMERY & ANDREWS PA | 116169 | $ 1,585.90 |
| | 10/15/2020 | 0000047304 | MONTGOMERY & ANDREWS PA | 116372 | $ 3,464.58 |
| | 12/15/2020 | 0000047304 | MONTGOMERY & ANDREWS PA | 116960 | $ 6,281.24 |
| | 12/11/2020 | 0000047304 | MONTGOMERY & ANDREWS PA | 116601 | $ 3,296.50 |
| | 1/28/2021 | 0000047304 | MONTGOMERY & ANDREWS PA | 117298 | $ 10,545.55 |
| | 3/10/2021 | 0000047304 | MONTGOMERY & ANDREWS PA | 117496 | $ 20,925.73 |
| | | | | 117618 | $ 19,346.43 |
| | 4/23/2021 | 0000047304 | MONTGOMERY & ANDREWS PA | 117977 | $ 9,651.71 |
| | 5/11/2021 | 0000047304 | MONTGOMERY & ANDREWS PA | 118555 | $ 1,842.80 |
| | 6/16/2021 | 0000047304 | MONTGOMERY & ANDREWS PA | 118769 | $ 1,103.35 |
| | 6/30/2021 | 0000047304 | MONTGOMERY & ANDREWS PA | 119055 | $ 1,808.20 |
| ZE5069 | 8/7/2020 | 0000047304 | MONTGOMERY & ANDREWS PA | US01U000468781 | $ 6,342.00 |
| | 8/19/2020 | 0000047304 | MONTGOMERY & ANDREWS PA | INV-3330 | $ 8,543.75 |
| | 9/14/2020 | 0000047304 | MONTGOMERY & ANDREWS PA | 116336 | $ 63,178.29 |
| | 9/18/2020 | 0000047304 | MONTGOMERY & ANDREWS PA | 116337 | $ 61,961.19 |
| | 9/24/2020 | 0000047304 | MONTGOMERY & ANDREWS PA | INV-3701 | $ 2,381.25 |
| | 12/9/2020 | 0000047304 | MONTGOMERY & ANDREWS PA | 116907 | $ 40,711.78 |
| | | | | 116908 | $ 54,640.57 |
| | | | | 116920 | $ 56,693.84 |
| | 4/9/2021 | 0000047304 | MONTGOMERY & ANDREWS PA | 117854 | $ 23,007.73 |
| | | | | 117780R | $ 81,332.46 |
| | 4/15/2021 | 0000047304 | MONTGOMERY & ANDREWS PA | 117858 | $ 28,760.34 |
| | 5/6/2021 | 0000047304 | MONTGOMERY & ANDREWS PA | 118470 | $ 37,275.39 |
| | 5/14/2021 | 0000047304 | MONTGOMERY & ANDREWS PA | INV-4058 | $ 562.50 |
| | | | | INV-4381 | $ 425.00 |
| | | | | INV-5615 | $ 137.50 |
| | | | | INV-5973 | $ 275.00 |
| | 6/21/2021 | 0000047304 | MONTGOMERY & ANDREWS PA | 118727 | $ 750.00 |
| | 6/30/2021 | 0000047304 | MONTGOMERY & ANDREWS PA | 118896 | $ 17,103.30 |
| | | | | 118897 | $ 3,712.50 |
| | | | | 118898 | $ 11,955.23 |
| | | | | 118936 | $ 34,729.05 |
| | | | | 118937 | $ 46,688.31 |
| 0642100000 | 1/11/2021 | 0000047304 | MONTGOMERY & ANDREWS PA | PY 115803 | $ 6,251.42 |
| ZF5059 | 6/9/2021 | 0000047304 | MONTGOMERY & ANDREWS PA | PY 23089 | $ 8,281.25 |
| **Grand Total** | | | | | **$ 675,551.64** |

Office of the State Engineer/Litigation & Adjudica

P.O. Box 25102

Santa Fe, NM 87504-5102

April 25, 2017
Page #:            3

Client:        014782
Matter:        001701
Invoice #:     105020

MAY 3 1 2017

RE:  RFP #2017-01-OSE

For Professional Services Rendered Through March 31, 2017

SERVICES

| Date | Atty | Description of Services | Hours | Rate | Amount |
|------|------|------------------------|-------|------|--------|
| Total Services | | | 50.2 | | $10,040.00 |

PERSON RECAP

| Attorney | | Hours | Rate | Amount |
|----------|--|-------|------|--------|
| JJW | Jeffrey J. Wechsler | 50.2 | $200.00 | $10,040.00 |

SUBCONTRACT RECAP

| Subcontract | Amount |
|-------------|--------|
| Draper & Draper | $3,940.00 |

| | |
|--|--|
| Current Fees and Expenses | $10,040.00 |
| Subcontract Fees | $3,940.00 |
| Applicable Tax | $834.58 |
| **Current Total Charges** | **$14,814.58** |

oketo
pmy
ACS
6/2/17

TERMS PAYABLE UPON RECEIPT.   LATE CHARGES OF 1.25% PER MONTH MAY BE IMPOSED ON ACCOUNTS
NOT PAID BY THE LAST BUSINESS DAY OF THE MONTH FOLLOWING THE BILLING MONTH.

3 of 3

*Attached #1 to Motu Invoice 105026*

Invoice # 542 - 04/14/2017

## Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 542 | 05/14/2017 | $3,940.00 | $0.00 | $3,940.00 |
| | | | **Outstanding Balance** | **$37,530.50** |
| | | | **Total Amount Outstanding** | **$37,530.50** |

Please make all amounts payable to: Draper & Draper LLC

Please pay within 30 days.

RECEIVED

MAY 3 1 2017

STATE ENGINEER
LAP

Office of the State Engineer/Litiga    & Adjudica

P.O. Box 25102

Santa Fe, NM 87504-5102

February 17, 2017
Page #:                    3

Client:           014782
Matter:           001701
Invoice #:        103948

RE:  RFP #2017-01-OSE

For Professional Services Rendered Through January 31, 2017

| | |
|---|---:|
| Current Fees and Expenses | $6,220.00 |
| Applicable Tax | $517.04 |
| Late Charges | $265.33 |
| Subcontract Fees | $11,115.00 |
| **Current Total Charges** | **$18,117.37** |

**TERMS PAYABLE UPON RECEIPT.   LATE CHARGES OF 1.25% PER MONTH MAY BE IMPOSED ON ACCOUNTS
NOT PAID BY THE LAST BUSINESS DAY OF THE MONTH FOLLOWING THE BILLING MONTH.**

Montgomery & Andrews Law Firm, PA

Contract No. 20579

PO# 16615

Beginning Balance: $100,000.00   NOTE: Reduced to $70,000 in PO as of 4/12/17

| Date | Invoice No. | Invoice Amount | Balance |
|------|-------------|----------------|---------|
| 4.25.17 | 105020 | $14,814.58 | |
| 7.10.17 | 105409 | $56,096.60 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |



My Homepage

New Window | Help | Personalize Page

Regular Entry

Summary | Related Documents | Invoice Information | **Payments** | Voucher Attributes | Error Summary

Business Unit 55000

Voucher ID 00050019
Voucher Style Regular Voucher
Total Amount 130,162.38

Invoice No 112616
Invoice Date 05/20/2019

Pay Terms NOW          Pay Now

Supplier Name MONTGOMERY & ANDREWS PA

**Payment Information**

**Payment 1**

Find | View All   First ◀ 1 of 1 ▶ Last

Remit to 0000047304
Location 001
Address 1

MONTGOMERY & ANDREWS PA
POST OFFICE BOX 2307
SANTA FE, NM 87504-2307

Gross Amount   130162.38 USD
Discount        0.00 USD

Scheduled Due 06/04/2019
Net Due 05/20/2019
Discount Due
Accounting Date 06/06/2019

Action

Schedule Payments

Payment Inquiry
Discount Denied
Late Charge
Express Payment
Payment Comments(0)
Holiday/Currency

**Payment Options**

Bank WFB10
Account 0002
Method CHK      Check
Message
Message will appear on remittance advice.

Pay Group
Handling Regular Payments
Hold Reason

Netting Not Applicable
L/C ID

Actions

Supplier Bank
Messages
Hold Payment
Separate Payment

**Schedule Payment**

Action Schedule Payment
Pay

Payment Date 06/06/2019
Reference 2000960401

Save

Return to Search    Previous in List    Next in List    Notify    Refresh

New Window | Help | Personalize Page

# Regular Entry

Summary | Related Documents | Invoice Information | **Payments** | Voucher Attributes | Error Summary

**Business Unit** 55000
**Voucher ID** 00050459
**Voucher Style** Regular Voucher
**Total Amount** 58,917.37
**Supplier Name** MONTGOMERY & ANDREWS PA

**Invoice No** 1109-20468-30294
**Invoice Date** 07/02/2019
**Pay Terms** NOW        Pay Now

**Action**

Run
Schedule Payments

Find | View All                First ◄ 1 of 1 ► Last

## Payment Information

**Payment** 1

**Remit to** 0000047304 🔍
**Location** 001
**Address** 1

MONTGOMERY & ANDREWS PA
POST OFFICE BOX 2307
SANTA FE, NM 87504-2307

**Gross Amount** 58917.37 USD
**Discount** 0.00 USD

**Scheduled Due** 07/10/2019
**Net Due** 07/02/2019
**Discount Due**
**Accounting Date** 07/16/2019

Payment Inquiry
☐ **Discount Denied**
Late Charge
Express Payment
Payment Comments(0)
Holiday/Currency

## Payment Options

**Bank** WFB10
**Account** 0002
**Method** CHK        Check
**Message**
Message will appear on remittance advice.

**Pay Group**
**Handling** Regular Payments
**Hold Reason**

**Netting** Not Applicable
**L/C ID**

Actions

Supplier Bank
Messages
☐ **Hold Payment**
☐ **Separate Payment**

## Schedule Payment

**Action** Schedule Payment
**Pay**

**Payment Date** 07/16/2019
**Reference** 2000574917

Save

🔍 Return to Search    📋 Previous in List    📋 Next in List    📧 Notify    🔄 Refresh

Summary | Related Documents | Invoice Information | Payments | Voucher Attributes | Error Summary

# MONTGOMERY & ANDREWS, P.A.
### P.O. Box 2307

Accounting Department
505-982-3873

Fax:  505-982-4289
email: accounting@montand.com
FEDERAL I.D. NO. 85-0262814

*Remittance Copy*

MAKE ALL REMITTANCE PAYABLE TO
MONTGOMERY & ANDREWS, PA

MAIL TO:  POST OFFICE BOX 2307
SANTA FE, NM 87504

Office of the State Engineer
Attn: Kim Abeyta
P.O. Box 25102
Santa Fe, NM 87504-25102

July 07, 2020
Client:   014782

| Matter # | Description | Invoice # | Fees | Expenses | Tax Late Charge | Total |
|----------|-------------|-----------|------|----------|-----------------|-------|
| 001803 | Interstate Dispute (RFP #2017-01-O | 115879 | $158,579.00 | $519.54 | $13,393.57     $0.00 | $172,492.11 |

| | |
|---|---|
| *Previous Balance* | **$70,926.26** |
| *Current Charges* | **$159,098.54** |
| *Applicable Tax* | **$13,393.57** |
| *Less Payments* | **$70,926.26** |
| *Total Amount Due* | **$172,492.11** |

## PERSON RECAP

| Attorney | | Hours | Rate | Amount |
|----------|--|-------|------|--------|
| KWB | Kaleb Brooks | 104.0 | $175.00 | $18,200.00 |
| KBUR | Kristen Burby | 46.6 | $100.00 | $4,660.00 |
| RSG | Ricardo S. Gonzales | 98.9 | $100.00 | $9,890.00 |
| CJEF | Cody Jeff | 24.5 | $100.00 | $2,450.00 |
| TLAW | Troy Lawton | 50.9 | $100.00 | $5,090.00 |
| KEO | Kari Olson | 52.3 | $175.00 | $9,152.50 |
| YMS | Yolanda M. Sandoval | 41.1 | $90.00 | $3,699.00 |
| JJW | Jeffrey J. Wechsler | 419.0 | $225.00 | $94,275.00 |
| CAW | Carolyn A. Wolf | 5.2 | $225.00 | $1,170.00 |
| MAZ | Matthew Zidovsky | 57.1 | $175.00 | $9,992.50 |

Please return this page with your remittance and please reference the client/matter number on all related correspondence.

Amount Paid:  $_____

SDaigngle
7-8-20
ok to pay



## MONTGOMERY & ANDREWS, P.A.
### P.O. Box 2307

Accounting Department
505-982-3873
Fax: 505-982-4289
email: accounting@montand.com

FEDERAL I.D. NO. 85-0262814

*Remittance Copy*

MAKE ALL REMITTANCE PAYABLE TO:
MONTGOMERY & ANDREWS, P.A.

MAIL TO: POST OFFICE BOX 2307
SANTA FE, NEW MEXICO  87504-2307

Office of the State Engineer
Attn: Kim Abeyta
P.O. Box 25102
Santa Fe, NM 87504-25102

September 09, 2020
Client:   014782

| Matter # | Description | Invoice # | Fees | Expenses | Tax | Late Charge | Total |
|---|---|---|---|---|---|---|---|
| 001803 | Interstate Dispute (RFP #2017-01-O | 116336 | $57,478.50 | $783.90 | $4,915.89 | $0.00 | $63,178.29 |

|  |  |
|---|---|
| *Previous Balance* | **$172,492.11** |
| *Current Charges* | **$58,262.40** |
| *Applicable Tax* | **$4,915.89** |
| *Less Payments* | **$172,492.11** |
| *Total Amount Due* | **$63,178.29** |

Please return this page with your remittance and please reference the client/matter number on all related correspondence.

Amount Paid: $_____

PERSON RECAP

| Attorney | | Hours | Rate | Amount |
|---|---|---|---|---|
| CJEF | Cody Jeff | 31.2 | $100.00 | $3,120.00 |
| TLAW | Troy Lawton | 27.1 | $100.00 | $2,710.00 |
| KEO | Kari Olson | 24.4 | $175.00 | $4,270.00 |
| YMS | Yolanda M. Sandoval | 13.4 | $90.00 | $1,206.00 |
| JJW | Jeffrey J. Wechsler | 147.9 | $225.00 | $33,277.50 |
| MAZ | Matthew Zidovsky | 10.2 | $175.00 | $1,785.00 |

| Matter | Month | Amount Billed | Budget Balance | |
|---|---|---|---|---|
|  |  |  | $ 664,056.83 | |
| 1803 | August | $ 6,342.00 | $ 657,714.83 | Ernst & Young |
| 1803 | August | $ 8,543.75 | $ 649,171.08 | Nextpoint |
| 1803 | July | $ 63,178.29 | $ 585,992.79 | M&A |
|  |  |  | $ 585,992.79 | |
|  |  |  | $ 585,992.79 | |
|  |  |  | $ 585,992.79 | |
|  |  |  | $ 585,992.79 | |
|  |  |  |  | |
|  |  |  |  | |
|  |  |  |  | |
|  |  |  |  | |
|  |  |  |  | |
|  |  | $  78,064.04 |  | |

9-14-20
OK to pay
S Daleygule

## MONTGOMERY & ANDREWS, P.A.
### P.O. Box 2307

Accounting Department
505-982-3873
Fax: 505-982-4289
email: accounting@montand.com

FEDERAL I.D. NO. 85-0262814

**Remittance Copy**

MAKE ALL REMITTANCE PAYABLE TO:
MONTGOMERY & ANDREWS, P.A.

MAIL TO:  POST OFFICE BOX 2307
SANTA FE, NEW MEXICO  87504-2307

Office of the State Engineer
Attn: Kim Abeyta
P.O. Box 25102
Santa Fe, NM 87504-25102

April 06, 2021
Client:   014782

| Matter # | Description | Invoice # | Fees | Expenses | Tax | Late Charge | Total |
|---|---|---|---|---|---|---|---|
| 001803 | Interstate Dispute (RFP #2017-01-O | 117852 | $75,004.00 | $0.00 | $6,328.46 | $0.00 | $81,332.46 |

| | | |
|---|---|---|
| *Previous Balance* | | **$152,046.19** |
| *Current Charges* | | **$75,004.00** |
| *Applicable Tax* | | **$6,328.46** |
| *Less Payments* | | **$152,046.19** |
| | | |
| *Total Amount Due* | | **$81,332.46** |

Please return this page with your remittance and please reference the client/matter number on all related correspondence.

Amount Paid: $_____

4-8-21
OK to pay
SDalyngle

**PERSON RECAP**

| Attorney | | Hours | Rate | Amount |
|---|---|---|---|---|
| KWB | Kaleb W. Brooks | 122.8 | $175.00 | $21,490.00 |
| RSG | Ricardo S. Gonzales | 60.0 | $175.00 | $10,500.00 |
| TLAW | Troy Lawton | 17.5 | $100.00 | $1,750.00 |
| WM | William McGinnis | 1.6 | $90.00 | $144.00 |
| YMS | Yolanda M. Sandoval | 23.6 | $75.00 | $1,770.00 |
| JJW | Jeffrey J. Wechsler | 158.4 | $225.00 | $35,640.00 |
| MAZ | Matthew Zidovsky | 21.2 | $175.00 | $3,710.00 |

| Matter | Month | Amount Billed | Budget Balance | |
|---|---|---|---|---|
| | | | $ 664,056.83 | |
| 1803 | August | $   6,342.00 | $ 657,714.83 | Ernst & Young |
| 1803 | August | $   8,543.75 | $ 649,171.08 | Nextpoint |
| 1803 | July | $  63,178.29 | $ 585,992.79 | M&A |
| 1803 | August | $  61,961.19 | $ 524,031.60 | M&A |
| 1803 | August | $   2,381.25 | $ 521,650.35 | Nextpoint |
| 1803 | September | $  40,711.76 | $ 480,938.57 | M&A |
| 1803 | October | $  54,640.57 | $ 426,298.00 | M&A |
| 1803 | November | $  56,693.84 | $ 369,604.16 | M&A |
| 1803 | Apr-20 | $   8,281.25 | $ 361,322.91 | Nextpoint |
| 1803 | Sep-20 | $     562.50 | $ 360,760.41 | Nextpoint |
| 1803 | Oct-20 | $     425.00 | $ 360,335.41 | Nextpoint |
| 1803 | Dec-20 | $     137.50 | $ 360,197.91 | Nextpoint |
| 1803 | Jan-21 | $     275.00 | $ 359,922.91 | Nextpoint |
| 1803 | Dec-20 | $  81,332.46 | $ 278,590.45 | M&A |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | $ 385,466.38 | | |

Contract No. ___21998___

# NEW MEXICO INTERSTATE STREAM COMMISSION
# PRICE AGREEMENT FOR
# PROFESSIONAL LEGAL SERVICES

This Professional Services Agreement ("Agreement") is entered into between the Office of the State Engineer, New Mexico Interstate Stream Commission, an agency of the State of New Mexico ("Agency") and Montgomery & Andrews Law Firm ("Contractor"), collectively the "Parties", effective as of the date it is approved by the New Mexico Department of Finance and Administration ("DFA"), which date is shown below.

## RECITALS

THE PARTIES enter into this Agreement on the basis of the following recitals:

A.  As a result of a formal procurement solicitation (RFP #2019-04-ISC), the Agency desires to obtain professional services from the Contractor to provide Legal Services.

B.  The Contractor has represented and warranted to the Agency that the Contractor possesses the necessary skill to provide such services and is willing to do so pursuant to the terms of this Agreement.

## AGREEMENT

In consideration of the foregoing recitals and the covenants and promises contained herein, the Parties agree as follows:

1. Term.  This Agreement shall begin on the date it is approved by DFA and shall expire on April 30, 2023 unless extended by amendment pursuant to Paragraph 22 (Amendment and Waiver), or unless terminated at an earlier date, pursuant to Paragraph 3(g) (Appropriations) or Paragraph 4 (Termination). In accordance with Section 13-1-150 NMSA 1978, no contract term for a professional services contract, including extensions and renewals, shall exceed four years, except as set forth in Section 13-1-150 NMSA 1978. The services that the Contractor is to provide, however, shall not commence until the Contractor has (i) complied with the insurance requirements of this Agreement (ii) received a fully executed copy of this Agreement, and (iii) received specific instructions and an assignment from the "Contract Manager" designated by the Agency.

2. Scope of Work.

(a) *Generally.* The Contractor shall perform the following work:

The Contractor will provide legal services as specified by the Agency, including some or all of the following services:  Provide comprehensive legal advice and counsel including, but not limited to, litigation support and representation of the Agency before state administrative and federal courts in the areas of water and environmental law; Provide legal advice and counsel to the Agency regarding Office of the State Engineer water rights administration including, but not

EXHIBIT
8

Contract No._____

limited to, representation of the Agency before the Office of the State Engineer; Provide legal advice and counsel to the Agency for conducting complex negotiations on specialized and technical areas of water, environmental and general civil law; Provide legal advice and counsel regarding New Mexico's obligations under the interstate stream compacts to which it is a party, Agency obligations and functions generally, and other matters involving or affecting the Agency.

The contract manager for the Agency will assign work. Individual work projects will be assigned with identified deliverables and a time schedule. The contractor will be required to work effectively and cooperatively with personnel at all levels and with a variety of backgrounds, including other contractors, attorneys, engineers, administrative staff and clerical support staff.

The contractor will be solely and wholly responsible for performing and completing assignments to the satisfaction of the Agency. All work shall be performed in accordance with the highest professional standards and completed within the time for performance mutually agreed upon between the Agency and the contractor.

The Contractor shall advise the Agency promptly of any problems encountered in performing its duties associated with this Agreement.

　　　　　(b) *Contract Manager; Assignment of Work; Deliverables; Status Reports.* The Contract Manager will assign tasks, coordinate all communications between the Contractor and the Agency related to the tasks assigned, and recommend approval or rejection of deliverables and invoices. The Contractor shall consult with the Contract Manager concerning progress on assigned tasks and all issues related thereto. Tasks may be assigned, modified, or withdrawn in the discretion of the Contract Manager. Deliverables will be as specified by the Contract Manager, or as otherwise described in a Scope of Work. When requested by the Contract Manager, the Contractor will provide the Agency with status reports in a format and at such times as directed.

　　　　　(c) *Performance Measures.* Performance measures for the tasks assigned to the Contractor under this Agreement are (i) prompt response to assigned tasks and requests for information and status reports, (ii) completion of assigned tasks and submission of deliverables and status reports within scheduled time frames, (iii) assigned tasks, deliverables, and status reports completed in a manner and format reflecting a high quality of work and acceptable to the Contract Manager in all respects, and (iv) assigned tasks, deliverable, and status reports prepared and completed in an efficient and cost effective manner.

　　　3. Compensation and Payment.

　　　　　(a) *Cost Limitation.* The total amount payable by the Agency under this Agreement shall not exceed two hundred thousand dollars ($200,000.00) inclusive of applicable gross receipt tax ("Cost Limitation Amount"). The Cost Limitation Amount is a maximum and not a guarantee that the Contract Manager will assign the Contractor any tasks, or that the work to be performed will equal the Cost Limitation Amount. The Contractor shall be paid based upon the Cost Schedule attached as Exhibit A hereto and made part hereof.

2

Contract No._____

The Agency will encumber specific sums of money during fiscal years as necessary to pay for the work to be performed pursuant to this Agreement ("Encumbered Amount"). The Contractor is responsible for not billing in excess of the lesser of the Cost Limitation Amount or the presently Encumbered Amount, and for verifying the Encumbered Amount with the Contract Manager. The Contractor will not be compensated or reimbursed for work performed, or expenses incurred, in excess of the lesser of the Cost Limitation Amount or the Encumbered Amount.

(b) *Travel and Expense Reimbursement*.  Compensation amounts shall be limited to those specified in Paragraphs 3(a) and 3(b), in accordance with the New Mexico Per Diem and Mileage Act, NMSA 1978, Sections 10-8-1 through 10-8-8. The Contract Manager must approve all expenses in writing, and in advance, or the Contractor shall not be reimbursed for such expenses.

(c) *Invoices*.    Payment is subject to availability of funds pursuant to the Appropriations Paragraph set forth below, to any negotiations between the Parties from year to year pursuant to Article 2, Scope of Work, and to approval by DFA. The Contractor shall submit signed invoices monthly to the Contract Manager. Those invoices shall contain the contract number and a calculation of the payment due, based upon the Hourly Rate supported by a time sheet reflecting dates, tasks, and hours billed (at tenth of an hour increments).  The invoices shall also contain all travel and expense reimbursement requests for work performed prior to or during the invoiced period. The Contractor shall be entitled to receive payment only for work properly invoiced and supported by appropriate documentation. All invoices for services must be received by the Agency no later than July 15th of each year for work performed in the previous fiscal year (the State of New Mexico's fiscal year runs from July 1st to June 30th of each year). Invoices received after such date will not be paid.  Payment of the amount invoiced, or any part thereof, shall not relieve the Contractor of any unperformed obligations or foreclose the Agency's right to recover incorrect, excessive, or illegal payments.

(d) *Exception to Invoices*.  If the Agency finds that the services performed or the deliverables provided pursuant to this Agreement are unacceptable, within thirty (30) days of receipt of the Contractor's invoice for such services the Agency will send to the Contractor a letter of exception explaining the deficiency, along with details of how the Contractor may remediate the deficiency. Upon certification by the Agency that the services have been received and accepted, payment shall be tendered to the Contractor within thirty (30) days after the date of acceptance. If payment is made by mail, the payment shall be deemed tendered on the date it is postmarked. However, the Agency shall not incur late charges, interest, or penalties for failure to make payment within the time specified herein.

(e) *Property*.  The Contractor shall not be reimbursed for any property or equipment that the Contractor might acquire or store during, and related to, performance of this Agreement. If this Agreement is amended to provide for reimbursement of property or equipment acquired, the Contractor shall report such acquisition to the Agency within fifteen (15) days of acquisition, such property or equipment shall be the property of the Agency and shall be delivered to the

3

Contract No._____

Agency immediately upon this Agreement's expiration or termination or, if during the term of this Agreement, immediately upon the request for the property by the Agency.

(f) *Mistake in Compensation*.  The Contractor shall reimburse the Agency for amounts paid to it in error within thirty (30) days of written notice of such error.  The Contractor shall promptly notify the Agency if the Contractor independently becomes aware of such an error.  Interest shall accrue at the statutory rate upon any amounts not reimbursed to the Agency after the thirtieth (30th) day following the earlier of the date of such notice to the Contractor or the date the Contractor otherwise becomes aware of such error.

(g) *Appropriations*.  The terms of this Agreement are contingent upon sufficient appropriations and authorization being made by the Legislature and the State of New Mexico, and available to the Agency, for the performance of this Agreement. If sufficient appropriations and authorization are not made by the Legislature and the State of New Mexico, and made available to the Agency, this Agreement shall terminate immediately upon written notice being given by the Agency to the Contractor. The Agency's decision as to whether sufficient appropriations are available shall be accepted by the Contractor and shall be final. If the Agency proposes an amendment to the Agreement to unilaterally reduce funding, the Contractor shall have the option to terminate the Agreement or to agree to the reduced funding, within thirty (30) days of receipt of the proposed amendment.  Any amendment made under the terms of this Paragraph shall be governed by the terms of Paragraph 22(c).

4. Termination.

(a) *Grounds*. The Agency may terminate this Agreement for convenience or cause. The Contractor may only terminate this Agreement based upon the Agency's uncured, material breach of this Agreement.

(b) *Notice; Agency Opportunity to Cure*.

(1) Except as otherwise provided in Paragraph (4)(b)(3), the Agency shall give the Contractor written notice of termination at least thirty (30) days prior to the intended date of termination.

(2) The Contractor shall give the Agency written notice of termination at least thirty (30) days prior to the intended date of termination.  The Contractor's notice shall (i) identify all the Agency's material breaches of this Agreement upon which the termination is based and (ii) state what the Agency must do to cure such material breaches.  The Contractor's notice of termination shall only be effective (i) if the Agency does not cure all material breaches within the thirty (30) day notice period or (ii) in the case of material breaches that cannot be cured within thirty (30) days, if the Agency does not, within the thirty (30) day notice period, notify the Contractor of its intent to cure and begin with due diligence to cure the material breach.

(3) Notwithstanding the foregoing, this Agreement may be terminated immediately upon written notice to the Contractor (i) if the Contractor becomes unable to perform the services contracted for, as determined by the Agency; (ii) if, during the term of this

4

Contract No._____

Agreement, the Contractor is suspended or debarred by the State Purchasing Agent; or (iii) if the Agreement is terminated pursuant to Paragraph 3(g) (Appropriations) of this Agreement.

(c)    *Liability*.    Except as otherwise expressly allowed or provided under this Agreement, the Agency's sole obligation upon termination shall be to pay for acceptable work performed prior to the Contractor's receipt or issuance of a notice of termination; provided, however, that a notice of termination shall not nullify or otherwise affect either party's liability for pre-termination defaults under or breaches of this Agreement. The Contractor shall submit an invoice for such work within thirty (30) days of receiving or sending the notice of termination. *THIS PROVISION IS NOT EXCLUSIVE AND DOES NOT WAIVE THE AGENCY'S OTHER LEGAL RIGHTS AND REMEDIES CAUSED BY THE CONTRACTOR'S DEFAULT/BREACH OF THIS AGREEMENT.*

(d) *Termination Management.* Immediately upon receipt by either the Agency or the Contractor of a notice of termination of this Agreement, the Contractor shall: 1) not incur any further obligations for salaries, services or any other expenditure of funds under this Agreement without the written approval of the Agency; 2) comply with all directives issued by the Agency in the notice of termination as to the performance of work under this Agreement; and 3) take such action as the Agency shall direct for the protection, preservation, retention or transfer of all property titled to the Agency and records generated under this Agreement. Any non-expendable personal property or equipment provided to, or purchased by, the Contractor with contract funds shall become the property of the Agency upon termination of this Agreement, and shall be submitted to the Agency as soon as practicable thereafter.

5. Transfer of Files. Upon expiration or termination of this Agreement, the Contractor shall assist and cooperate with the Agency in the orderly and timely transfer to the Agency of files, documents, memoranda, notes, data, and related materials, whether provided by the Agency to the Contractor or created by the Contractor pursuant to this Agreement.

6. Transfer of Personal Property and Equipment. Any non-expendable personal property or equipment provided to or purchased by the Contractor with contract funds shall become property of the Agency upon termination of this Agreement and shall be submitted to the Agency as soon as practicable thereafter.

7. Disputes. The Contractor and the Contract Manager will attempt to informally resolve any disputes that may arise in relation to this Agreement. The Contractor, acting through the Contract Manager, shall report in writing any dispute not so resolved to the Director of the Agency within thirty (30) days of the Contractor's knowledge of the circumstances giving rise to the dispute. The Director's written decision shall be delivered to the Parties within fifteen (15) days of receipt of the written dispute and shall be final unless, within thirty (30) days from the date of the decision, the Contractor seeks appropriate legal relief pursuant to Paragraph 29. Failure to use the above procedure in a timely manner, or to file a timely appeal either to the Director, or from the Director's decision, shall be deemed acceptance of the decision and waiver of any further claim or remedy in law or equity.

Contract No._____

8.  Status of Contractor.

(a) *Independent Contractor; Costs of Business*.   The Contractor and its agents and employees are independent contractors performing professional services for the Agency and are not employees of the State of New Mexico. The Contractor and its agents and employees shall not accrue leave, retirement, insurance, bonding, use of state vehicles, or any other benefits afforded to employees of the State of New Mexico as a result of this Agreement. The Contractor acknowledges that all sums received hereunder are reportable by the Contractor for tax purposes, including without limitation, self-employment and business income tax. The Contractor agrees not to purport to bind the State of New Mexico unless the Contractor has express written authority to do so, and then only within the strict limits of that authority.

(b) *Authority of Contractor*.   The Contractor shall not purport to bind the State of New Mexico, nor its officers or employees, to any obligation not expressly authorized herein. Without the Agency's express written permission, the Contractor shall not, in any manner, reference the Agency in such a way that states or implies the Agency's endorsement of the Contractor or the Contractor's work.  The Contractor may use the Agency as a reference.

(c) *Other Contractors*.   The Agency may, for any reason, enter into other agreements for services related or identical to the services contemplated by this Agreement, whether or not this Agreement has expired or been terminated.  The Contractor shall fully cooperate with the Agency and its other contractors.

(d)  *Subcontracting*.  The Contractor shall not subcontract any portion of the services to be performed under this Agreement without the prior written approval of the Agency. No such subcontract shall relieve the primary Contractor from its obligations and liabilities under this Agreement, nor shall any subcontract obligate direct payment to any subcontractor from the Agency.

9.  Release.   By accepting payment of the amounts due under this Agreement, the Contractor releases the State of New Mexico, its officers and employees, from all liabilities and obligations whatsoever related to this Agreement or the services provided hereunder.  Payment to the Contractor by the Agency shall not, however, constitute final release of the Contractor. Should audit or inspection of the Contractor's records subsequently reveal outstanding Contractor obligations, the Contractor shall remain liable to the Agency for such obligations.  All payments by the Agency to the Contractor will be subject to any appropriate recoupment by the Agency.

10.  Records and Financial Audit.   The Contractor shall maintain detailed time and expenditure records that indicate the date, time, nature and cost of services rendered during the Agreement's term and effect.  The Contractor shall retain those records for a period of three (3) years from the date of final payment under this Agreement. The records shall be subject to inspection by the Agency, the Department of Finance and Administration and the State Auditor. The Agency shall have the right to audit billings both before and after payment. Payment under this Agreement shall not foreclose the right of the Agency to recover excessive or illegal payments

6

Contract No._____

**11.   Indemnification. The Contractor shall defend, indemnify and hold harmless the Agency and the State of New Mexico** from all actions, proceeding, claims, demands, costs, damages, attorneys' fees and all other liabilities and expenses of any kind from any source which may arise out of the performance of this Agreement, caused by the negligent act or failure to act of the Contractor, its officers, employees, servants, subcontractors or agents. In the event that any action, suit or proceeding related to the services performed by the Contractor or any officer, agent, employee, servant or subcontractor under this Agreement is brought against the Contractor, the Contractor shall, as soon as practicable but no later than two (2) days after it receives notice thereof, notify the legal counsel of the Agency and the Risk Management Division of the New Mexico General Services Department.

**12. Insurance.   The Contractor shall maintain in full force and effect during the term of this Agreement the insurance coverage set forth below, from a company authorized to write such insurance in New Mexico.** Upon request by the Agency, the Contractor shall furnish the Agency with a certificate of such policy in a form satisfactory to the Agency.  Such certificate and policy shall provide that the Agency shall be given thirty (30) days advance written notice before the policies are canceled, materially changed, or not renewed.  The Agency reserves the right to reject insurance or insurers tendered by the Contractor.  If such insurance or insurer is rejected, the Contractor will be granted reasonable additional time to obtain alternative coverage acceptable to the Agency, but performance of services under this Agreement may be suspended by the Agency during such time.

(a)   *Comprehensive General Liability Insurance.*  If the Cost Limitation Amount of this Agreement exceeds One Hundred Thousand Dollars ($100,000), comprehensive general liability insurance with liability limits of not less than One Million Dollars ($1,000,000) combined single limit of liability for bodily injury, including death, and property damage in any one occurrence.  Said general liability insurance must include coverage for all operations performed by the Contractor.  Contractual liability coverage shall specifically insure the indemnification provisions of this Agreement and the Agency shall be named as an additional insured.

(b)   *Automobile Insurance.* If the Cost Limitation Amount of this Agreement exceeds One Hundred Thousand Dollars ($100,000), automobile insurance with liability limits of not less than One Million Dollars ($1,000,000) combined single limit of liability for bodily injury, including death, and property damage in any one occurrence.  Said automobile policy of insurance must include coverage for all operations performed by the Contractor, coverage for the use of all owned, non-owned, hired automobiles, vehicles, and other equipment.   Contractual liability coverage shall specifically insure the indemnification provisions of this Agreement and the Agency shall be named as an additional insured.

(c)   *Workers' Compensation Insurance.*  The Contractor agrees to comply with state laws and rules applicable to workers compensation benefits for its employees. If the Contractor fails to comply with the Workers Compensation Act and applicable rules when required to do so, this Agreement may be terminated by the Agency.

7

Contract No._____

*(d)    Professional Liability Insurance.* If applicable and required by the Agency, the Contractor shall maintain in full force and effect during the term of this Agreement professional liability insurance, also known as malpractice insurance, with Liability limits of not less than One Hundred Thousand Dollars ($100,000), from a Company authorized to write such insurance in New Mexico.

13.   <u>Work Product; Copyright, Trademark.</u>   The Contractor warrants that nothing the Contractor produces pursuant to this Agreement will infringe upon any right to confidentiality or property right, whether intellectual or otherwise, of any third party. The Contractor shall indemnify, defend, and hold harmless the State of New Mexico, its officers and employees, from and against any and all loss, cost, liability, or expense arising out of the breach or claimed breach of the foregoing warranty. Nothing the Contractor produces or develops, in whole or in part, pursuant to this Agreement shall be the subject of an application for copyright, trademark or other property right by or on behalf of the Contractor. All things the Contractor produces, develops, or acquires pursuant to this Agreement, including files, documents, memoranda, notes, work papers, or related things, shall become the property of the State of New Mexico and shall be delivered to, or if intangible assigned to, the Agency immediately upon the expiration or termination of this Agreement, or, if during the term of the Agreement, immediately upon the request of the Agency. The Contractor shall execute, acknowledge, and deliver any documents and make any filings necessary to establish or evidence the State of New Mexico's ownership.

14.   <u>Conflict of Interest; Governmental Conduct Act.</u>

(a)    The Contractor represents and warrants that it presently has no interest and, during the term of this Agreement, shall not acquire any interest, direct or indirect, which would conflict in any manner or degree with the performance of services required under the Agreement.

(b)    The Contractor further represents and warrants that it has complied with, and, during the term of this Agreement, will continue to comply with, and that this Agreement complies with all applicable provisions of the Governmental Conduct Act, Chapter 10, Article 16 NMSA 1978. Without in any way limiting the generality of the foregoing, the Contractor specifically represents and warrants that:

1)    in accordance with Section 10-16-4.3 NMSA 1978, the Contractor does not employ, has not employed, and will not employ during the term of this Agreement any Agency employee while such employee was or is employed by the Agency and participating directly or indirectly in the Agency's contracting process;

2)    this Agreement complies with Section 10-16-7(A) NMSA 1978 because (i) the Contractor is not a public officer or employee of the State; (ii) the Contractor is not a member of the family of a public officer or employee of the State; (iii) the Contractor is not a business in which a public officer or employee or the family of a public officer or employee has a substantial interest; or (iv) if the Contractor is a public officer or employee of the State, a member of the family of a public officer or employee of the State, or a business in which a public officer or employee of the State or the family of a public officer or employee of the State has a

Contract No._____

substantial interest, public notice was given as required by Section 10-16-7(A) NMSA 1978 and this Agreement was awarded pursuant to a competitive process;

3)    in accordance with Section 10-16-8(A) NMSA 1978, (i) the Contractor is not, and has not been represented by, a person who has been a public officer or employee of the State within the preceding year and whose official act directly resulted in this Agreement and (ii) the Contractor is not, and has not been assisted in any way regarding this transaction by a former public officer or employee of the State whose official act, while in State employment, directly resulted in the Agency making this Agreement;

4)    this Agreement complies with Section 10-16-9(A) NMSA 1978 because (i) the Contractor is not a legislator; (ii) the Contractor is not a member of a legislator's family; (iii) the Contractor is not a business in which a legislator or a legislator's family has a substantial interest; or (iv) if the Contractor is a legislator, a member of a legislator's family, or a business in which a legislator or a legislator's family has a substantial interest, disclosure has been made as required by Section 10-16-9(A) NMSA 1978, this Agreement is not a sole source or small purchase contract, and this Agreement was awarded in accordance with the provisions of the Procurement Code;

5)    in accordance with Section 10-16-13 NMSA 1978, the Contractor has not directly participated in the preparation of specifications, qualifications or evaluation criteria for this Agreement or any procurement related to this Agreement; and

6)    in accordance with Sections 10-16-3 and 10-16-13.3 NMSA 1978, the Contractor has not contributed, and, during the term of this Agreement, shall not contribute, anything of value to a public officer or employee of the Agency.

(c)    The Contractor's representations and warranties in Paragraphs (a) and (b) of this Article 14 are material representations of fact upon which the Agency relied when this Agreement was entered into by the Parties.  The Contractor shall provide immediate written notice to the Agency if, at any time during the term of this Agreement, the Contractor learns that the Contractor's representations and warranties in Paragraphs (a) and (b) of this Article 14 were erroneous on the effective date of this Agreement or have become erroneous by reason of new or changed circumstances. If it is later determined that the Contractor's representations and warranties in Paragraphs (a) and (b) of this Article 14 were erroneous on the effective date of this Agreement or have become erroneous by reason of new or changed circumstances, in addition to other remedies available to the Agency, and notwithstanding anything in the Agreement to the contrary, the Agency may immediately terminate the Agreement.

(d)    All terms defined in the Governmental Conduct Act have the same meaning in this Article 14.

15.  Format of Electronic Deliverables.  Text documents and spreadsheet deliverables provided to the Agency in an electronic format pursuant to this Agreement shall be prepared, stored, and delivered in Microsoft Corporation-produced software (e.g., Word or Excel), unless the Contract Manager approves the use of an alternate software format in writing.  Database,

9

Contract No._____

spatial and geographic information system deliverables provided to the Agency in electronic format pursuant to this Agreement shall be prepared, stored, and delivered in a software format approved of in writing by the Contract Manager. The Contractor shall be responsible for requesting and obtaining the Contract Manager's written approval of the software format the Contractor proposes to use prior to beginning the preparation of such deliverables. Should the Contractor utilize a software format not approved in writing by the Contract Manager, the Contractor shall bear all costs or expenses, of any type whatsoever, incurred by the Contractor or the Agency in converting or otherwise preparing such electronic deliverables in a software format acceptable to the Agency.

16. Equal Opportunity Compliance.   The Contractor agrees to abide by all federal and state laws and rules and regulations, and executive orders of the Governor of the State of New Mexico pertaining to equal employment opportunity. In accordance with all such laws of the State of New Mexico, the Contractor assures that no person in the United States shall, on the grounds of race, religion, color, national origin, ancestry, sex, age, physical or mental handicap, or serious medical condition, spousal affiliation, sexual orientation or gender identity, be excluded from employment with or participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity performed under this Agreement. If the Contractor is found not to be in compliance with these requirements during the life of this Agreement, the Contractor agrees to take appropriate steps to correct these deficiencies.

17. Penalties for Violation of Law The Procurement Code, NMSA 1978 §§ 13-1-28 through 13-1-199, imposes civil and criminal penalties for its violation. In addition, the New Mexico criminal statutes impose felony penalties for illegal bribes, gratuities and kickbacks.

18. Confidentiality.   The Contractor shall maintain the confidentiality of all information provided by the Agency, derived from such information, or otherwise learned or developed by the Contractor pursuant to this Agreement. The Contractor shall neither use nor disclose such information without the Agency's express written permission, and shall promptly notify the Agency of any unauthorized disclosure and assist in investigating any unauthorized disclosure or preventing the recurrence thereof. The confidentiality obligations included in this Paragraph survive the expiration or termination of this Agreement, as set forth in Paragraph 30. The Contractor assumes responsibility for all liability caused by any violation of this Paragraph.

19. Excusable Delay. The Contractor and the Agency shall be excused from performance under this Agreement for any period such performance is prevented in whole or in part as a result of an act of God, war, civil disturbance, epidemic, court order, or other cause beyond their reasonable control.   Such nonperformance shall not be a ground for termination of this Agreement but shall not, by itself, extend the term of this Agreement.

20. Policies and Procedures.  The Contractor shall follow any policies and procedures that may, from time to time, be established by the Agency, and of which the Contractor is made aware.

Contract No._____

21.  Notices.   Any notice required to be given to either party by this Agreement shall be in writing and shall be delivered in person, by courier service or by U.S. mail, either first class or certified, return receipt requested, postage prepaid, as follows:

                    To OSE/ISC:  Interstate Stream Commission
                                 Hannah Riseley-White
                                 Post Office Box 25102
                                 Santa Fe, New Mexico 87504-5102
                                 Telephone:  505-827-4029


                    To Contractor: Montgomery & Andrews Law Firm
                                 Jeffrey J. Wechsler
                                 325 Paseo de Peralta
                                 Santa Fe, New Mexico 87501
                                 Telephone: 505-986-2637


22.  Amendment and Waiver.

(a).    This Agreement shall not be altered, changed or amended except by an instrument in writing executed by the Parties hereto and all other required signatories.

(b). A Party's failure to require strict performance of any provision of this Agreement shall not waive or diminish that Party's right thereafter to demand strict compliance with that or any other provision. No waiver by a Party of any of its rights under this Agreement shall be effective unless express and in writing, and no effective waiver by a Party of any of its rights shall be effective to waive any other rights.

(c).    If the Agency proposes an amendment to the Agreement to unilaterally reduce funding due to budget or other considerations, the Contractor shall, within thirty (30) days of receipt of the proposed Amendment, have the option to terminate the Agreement, pursuant to the termination provisions set forth in Article 4 herein, or to agree to the reduced funding.

23.  New Mexico Employees Health Coverage.

(a).    If the Contractor has, or grows to, six (6) or more employees who work, or who are expected to work, an average of at least 20 hours per week over a six (6) month period during the term of the contract, the Contractor certifies, by signing this Agreement, that the Contractor has in place, and agrees to maintain for the term of the contract, health insurance for those employees and offer that health insurance to those employees if the expected annual value in the aggregate of any and all contracts between the Contractor and the State exceed $250,000 dollars.

(b).    The Contractor agrees to maintain a record of the number of employees who have (a) accepted health insurance; (b) declined health insurance due to other health

11

Contract No._____

insurance coverage already in place; or (c) declined health insurance for other reasons. These records are subject to review and audit by a representative of the state.

(c).    The Contractor agrees to advise all employees of the availability of State publicly financed health care programs by providing each employee with, at a minimum, the following web site link to additional information: http://insurenewmexico.state.nm.us/.

(d)  For Indefinite Quantity, Indefinite Delivery contracts (price agreements without specific limitations on quantity and providing for an indeterminate number of orders to be placed against it) the Contractor agrees that the requirements of this Article shall apply the first day of the second month after the contractor reports combined sales (from State and, if applicable, from local public bodies if from a State price agreement) of $250,000.

24.   Employee Pay Equity Reporting. The Contractor agrees if it has ten (10) or more New Mexico employees OR eight (8) or more employees in the same job classification, at any time during the term of this contract, it will complete and submit the PE10-249 form on the annual anniversary of the initial report submittal for contracts up to one (1) year in duration. If the Contractor has two hundred and fifty (250) or more employees, the Contractor must complete and submit the PE250 form on the annual anniversary of the initial report submittal for contracts up to one (1) year in duration. For contracts that extend beyond one (1) calendar year, or are extended beyond one (1) calendar year, the Contractor also agrees to complete and submit the PE10-249 or PE250 form, whichever is applicable, within thirty (30) days of the annual contract anniversary date of the initial submittal date or, if more than 180 days has elapsed since submittal of the last report, at the completion of the contract, whichever comes first. Should the Contractor not meet the size requirement for reporting at contract award but subsequently grow to meet or exceed the size requirement for reporting, the Contractor agrees to provide the required report within ninety (90) days of meeting or exceeding the size requirement. That submittal date shall serve as the basis for submittals required thereafter. The Contractor also agrees to levy this requirement on any subcontractor(s) performing more than 10% of the dollar value of this contract if said subcontractor(s) meets, or grows to meet, the stated employee size thresholds during the term of the contract. The Contractor further agrees that, should one or more subcontractor not meet the size requirement for reporting at contract award but subsequently grow to meet or exceed the size requirement for reporting, the Contractor will submit the required report, for each such subcontractor, within ninety (90) days of that subcontractor meeting or exceeding the size requirement. Subsequent report submittals, on behalf of each such subcontractor, shall be due on the annual anniversary of the initial report submittal. The Contractor shall submit the required form(s) to the State Purchasing Division of the General Services Department, and other departments as may be determined, on behalf of the applicable subcontractor(s) in accordance with the schedule contained in this paragraph. The Contractor acknowledges that this subcontractor requirement applies even though the Contractor itself may not meet the size requirement for reporting and may not be required to report itself.

Notwithstanding the foregoing, if this contract was procured pursuant to a solicitation, and if the Contractor has already submitted the required report accompanying their response to such solicitation, the report does not need to be re-submitted with this Agreement.

Contract No._____

25.  Assignment.  The Contractor shall not assign or transfer any rights, obligations, duties, or other interest in, or claim for money due under, this Agreement without the prior written consent of the Agency, which consent may be withheld in the Agency's sole and absolute discretion.  The Agency may assign this Agreement to another governmental agency or unit, including any assignment necessitated by governmental reorganization.

26.  Legal Proceedings.  Attendance or testimony by the Contractor in any legal proceedings, including trials, hearings, depositions, arbitration, or mediation, shall be considered a part of this Agreement.  Should the Agency request attendance by the Contractor after expiration or termination of this Agreement, a new contract will be negotiated at a rate commensurate with the services. The provisions contained in this paragraph shall not apply to disputes solely between the Contractor and the Agency.

27.  Calculation of Time.  Any time period herein calculated by reference to "days" means calendar days; provided, however, that if the last day for a given act falls on a Saturday, Sunday, or a holiday observed by the State of New Mexico, the day for such act shall be first day following that is not a Saturday, Sunday, or such observed holiday.

28.  Interpretation.  The captions and paragraph headings used herein are for descriptive purposes only and do not limit, define, or enlarge the terms of this Agreement.  Unless otherwise indicated by the context, use of the singular, plural, or a gender shall include the other, and the use of the words "include" and "including" shall be construed as if "without limitation" or "but not [be] limited to" were annexed thereafter.

29.  Applicable Law.  The laws of the State of New Mexico shall govern this Agreement, without giving effect to its choice of law provisions. Venue shall be proper only in a New Mexico court of competent jurisdiction in accordance with NMSA 1978, § 38-3-1 (G). By execution of this Agreement, the Contractor acknowledges and agrees to the jurisdiction of the courts of the State of New Mexico over any and all lawsuits arising under or out of any term of this Agreement.

30.  Survival.  Terms of this Agreement that provide for rights, duties, or obligations that expressly or logically extend beyond its expiration or termination, including the Contractor's indemnity obligations, shall survive such expiration or termination.

31.  Invalid Term or Condition.  If any term or condition of this Agreement   is held invalid or unenforceable, the remainder of this Agreement shall not be affected and shall be valid and enforceable.

32.  Incorporation and Merger.  Each of the recitals set forth at the beginning of this Agreement, and any exhibits referenced herein and attached hereto, are incorporated into this Agreement by this reference. This Agreement incorporates all agreements, covenants, promises and understandings between the Parties concerning the subject matter hereof, and all prior or contemporaneous agreements and understandings are merged into this Agreement. No prior

13

Contract No._____

agreement or understanding, oral or otherwise, of the Parties or their agents shall be valid or enforceable unless embodied in this Agreement. This Agreement may be executed in multiple originals, each of which shall be deemed an original.

33. <u>Authority.</u> If the Contractor is other than a natural person, the individual(s) signing this Agreement on behalf of the Contractor represent and warrant that they have the power and authority to bind the Contractor, and that no further action, resolution, or approval from the Contractor is necessary to enter into a binding contract

*Signatures follow on page 15*

Contract No._____

IN WITNESS WHEREOF, the Parties have entered into this Agreement.

CONTRACTOR

By: _____     Date: 5/1/19
Name: Jeffrey J. Wechsler
Title: Vice President & Shareholder

AGENCY

By: _____     Date: 5/3/19
Interstate Stream Commission ~~Director~~ Chairman

Approved as to budget sufficiency:

By: _____     Date: 5/6/19
Jeff Primm, Director
Administrative Services Division

Approved by Agency CFO:

By: _____     Date: 5/5/19
CFO
Administrative Services Division

Approved as to form and sufficiency:

By: _____     Date: May 3, 2019
~~ISC   OSE~~ Legal

TAXATION AND REVENUE DEPARTMENT
The records of the Taxation and Revenue Department of the State of New Mexico reflect that
Contractor is registered with the department to pay gross receipts and compensating taxes.
ID Number: 01-867140003

By: _____     Date: 5-6-19

DEPARTMENT OF FINANCE AND ADMINISTRATION

By: _____     Date: 5/9/2019
State Contracts Officer

Taxation and Revenue is only verifying the registration and will not confirm or deny taxability statements contained in this contract.

15

Contract No. _____

# APPENDIX A
## Montgomery & Andrews Law Firm
## Hourly Rate & Expense Schedule

**Hourly Labor Rates:**

| Name | Base Rate* |
|------|-----------|
| Jeffrey J. Wechsler | $225.00 per hour |
| Louis W. Rose | $225.00 per hour |
| Sharon T. Shaheen | $225.00 per hour |
| Kari E. Olson | $175.00 per hour |
| Kaitlyn A. Luck | $175.00 per hour |

*Excluding New Mexico Gross Receipts Tax

**Direct Expenses*:**

| Item | Price Per Unit |
|------|----------------|
| Per Diem and Mileage at rates specified in the current Agency travel policy and NM Per Diem & Mileage Act, without markup. | |
| | |
| | |

*Excluding New Mexico Gross Receipts Tax

Contract No.:21998

**AMENDMENT NO. 3**
**PRICE AGREEMENT FOR**
**PROFESSIONAL LEGAL SERVICES**
**BETWEEN THE NEW MEXICO INTERSTATE STREAM COMMISSION AND**
**MONTGOMERY & ANDREWS LAW FIRM**

This Amendment to the Agreement #21998 ("Amendment No. 3"), is entered into by and between the Office of the State Engineer, Interstate Stream Commission, an agency of the State of New Mexico ("Agency"), and Montgomery & Andrews Law Firm. ("Contractor"), collectively the "Parties", effective as of the date set forth below upon which it is executed by the General Services Department/State Purchasing Division (GSD/SPD Contracts Review Bureau).

*RECITALS*

THE PARTIES HERETO enter into this Amendment No. 3 on the basis of the following facts, understandings, and intentions:

A.     The parties previously entered into that certain Professional Services Agreement dated May 9, 2019, (the "Original Contract"); and,

B.     The Original Contract was amended by the Parties pursuant to that certain Amendment Number 1 dated December 9, 2019, which increased the contract Cost Limitation from $200,000 to $900,000; and,

C.     The Original Contract was amended by the Parties pursuant to that certain Amendment Number 2 dated April 24, 2020, which increased the contract Cost Limitation from $900,000 to $1,560,000; and,

D.     Article 22, of the Original Contract allows for amendment of the contract in writing executed by both parties; and,

E.     The Contractor has been providing services to the Agency, and the Agency is satisfied with those services and is hereby requesting Article 2 – Scope of Work and Article 3(a) Cost Limitation be amended to increase the Cost Limitation from $1,560,000 to $3,060,000 to reflect the agreement term.

*AGREEMENT*

THEREFORE, in consideration of the foregoing recitals and the covenants and promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

Article 2 – Scope of Work.

The Contractor shall continue to perform additional services as detailed in the original contract.

1

Contract No.:21998

Paragraph 1 of Article 3(a) – Compensation and Payment, is hereby amended to read as follows:

(a) *Cost Limitation.* The total amount payable by the Agency under this Agreement shall not exceed Three Million and Sixty Thousand Dollars ($3,060,000.00) inclusive of applicable gross receipt tax ("Cost Limitation Amount"). The Cost Limitation Amount is a maximum and not a guarantee that the Contract Manager will assign the Contractor any tasks, or that the work to be performed will equal the Cost Limitation Amount. The Contractor shall be paid based upon the Cost Schedule attached as Exhibit A hereto and made part hereof.

All terms, covenants, and conditions contained in the Original Contract, and not modified herein shall remain in full force and effect. This Amendment shall not become effective unless and until approved by the General Services Department/State Purchasing Division (GSD/SPD) Contracts Review Bureau).

*Signatures on Page 3*

2

Contract No.:21998

IN WITNESS WHEREOF, the parties have entered into this Amendment No. 3 to the Price Agreement effective as of the date of execution by General Services Department/State Purchasing Division (GSD/SPD Contracts Review Bureau).

**CONTRACTOR:**

By: _____  Date: 7/24/20

**AGENCY**

By: _____  Date: 8/7/20
Rolf Schmidt-Petersen, P.E., Director
NM Interstate Stream Commission

Approved as to budget sufficiency:

By: _____  Date: 8/5/20
Jeff Primm, Director
Administrative Services Division

Approved by Agency CFO:

By: _____  Date: 08/05/2020
Jennifer Bada, CFO
Administrative Services Division

Approved as to legal form and sufficiency:

By: _____  Date: 8/4/2020
ISC General Counsel

**TAXATION AND REVENUE DEPARTMENT**

The records of the Taxation and Revenue Department of the State of New Mexico reflect that Contractor is registered with the Taxation and Revenue Department to pay gross receipts and compensating taxes.

Taxation and Revenue is only verifying the registration and will not confirm or deny taxability statements contained in this contract

ID Number: 01-867140003

By: Ann Marie Lucero   Date: 08/04/2020

By: _____   Date: 08/27/20
GSD/SPD Contracts Review Bureau

3

**GSD CONTRACTS REVIEW BUREAU**
Joseph Montoya Building, Rm 2016
Santa Fe, NM 87505

**PROFESSIONAL SERVICES CONTRACT BRIEF**
CRB, Revised 02/20
(CONTRACT BRIEF MUST BE TYPED)

| 2 | 1 | | 5 | 5 | 0 | | | | | | 2 | 1 | 9 | 9 | 8 | | 0 | 3 |
| FY | | | Agency Code | | | | Organization Code | | | | | Contract No. | | | | | Amend. No. | |

Contractor Name: Montgomery Andrews Law Firm
Contractor Address: 325 Paseo de Peralta Santa Fe, NM     Phone: 505-986-2637
Agency Contact: S Jerome Baros     Phone: 505-827-6177

| Single-Year Contract: | Appropriation Period: | Contract or Amendment Amount: | |
|---|---|---|---|
| $ ___ Total Contract Amount | 21 | General Fund | 1,500,000.00 |
| Multi-Year Contract: | | Other State Funds | 0.00 |
| $ 3,060,000.00 Total Contract Amount | | Federal Funds | 0.00 |
| | | Total | $ 1,500,000.00 |

Contract Term:  From: | 0 | 5 | / | 0 | 9 | / | 2 | 0 | 1 | 9 |  To: | 0 | 4 | / | 1 | 3 | 0 | / | 2 | 0 | 2 | 3 |
(GSD Approval date to be filled in by Contracts Review Bureau)   (Termination Date)

Retroactive: Y/N     Date: ___ / ___ / ___
Non-profit: Y/N     ___ / ___ / ___

( • ) Operational Budget     ( ○ ) Capital Outlay

**BRIEF DESCRIPTION OF SERVICES AND/OR REASON FOR AMENDMENT:**

Provide comprehensive legal advice and counsel including but not limited to: litigation support and representation of the Agency before state administrative and federal courts in the areas of water and environmental law, provide legal advice and counsel to the Agency regarding Office of the State Engineer water rights administration

**PROCUREMENT PROCEDURE-Check with X the applicable citation**

| | Section 13-1-125 NMSA 1978, small purchase contract (does not exceed $60,000 excluding gross receipts tax). |
|---|---|
| | Section 13-1-120 NMSA 1978, competitive proposal for architect/engineer/landscape/architect/surveyor. |
| X | Section 13-1-111 NMSA 1978, competitive sealed proposal (contract over $60,000). |
| | Section 13-1-129 NMSA 1978, contract is based upon Price Agreement # |
| | Section 13-1-129 NMSA 1978, contract is based upon GSA (please provide all required information) |
| | Section 13-1-126 NMSA 1978, sole source procurement (requires written determination and GSD approval). |
| | Section 13-1-127 NMSA 1978, emergency procurement. |

**REQUIREMENTS-Enter Y (yes) to verify the following mandatory requirements:**

| Y | The agency certifies to GSD that all relevant requirements of the Procurement Code have been followed. |
|---|---|
| Y | The agency certifies to GSD that the contractor will perform at all times as an independent contractor for the purpose of IRS tax compliance and is not performing services as an employee of the agency. |
| Y | The agency certifies to GSD that the agency has performed a legal review and the contract is in compliance with all federal and state laws, rules and regulations. |

**OTHER REQUIREMENTS-Enter Y (yes), N (no) or N/A (not applicable) to each of the following:**

| Y | The agency certifies to GSD that Performance Measures have been outlined as required (attach valid section of strategic plan). |
|---|---|
| Y | The agency certifies to GSD that the contract complies with GSD rules regarding indemnification and insurance. |
| N | The agency certifies to GSD that the requirements of the Governmental Conduct Act, Section 10-16-1 NMSA 1978 regarding conflict of interest with public officers or state employees have been followed. The agency certifies to GSD that the Attorney General's review has been obtained because: |
| | ☐ Contract with former state employee          ☐ Contract with present state employee |
| Y | The agency certifies to GSD that any required performance bonds have been obtained, Section 13-1-148 NMSA 1978 |

| | ISC Director | 08/07/2020 |
|---|---|---|
| Cabinet Secretary, Agency Head or Designee | Title | Date |

| **GSD USE ONLY** | | | | Comments: |
|---|---|---|---|---|
| Category | | Date Received CRB | | |
| Status | | Date Approved CRB | | |
| Amendment Type | | Staff | | |
| Amendment Type | | | | |

**· PURCHASE DOCUMENT**

| Number | Amount | Date to FCD | Date from FCD |
|---|---|---|---|
| | | | |

# DEPARTMENT OF FINANCE AND ADMINISTRATION

# AGENCY CERTIFICATION

OFFICE OF THE STATE ENGINEER hereby certifies the following in regard to the attached contractual agreement between the Agency and **Montgomery & Andrews Law Firm;**

1) This Contractor is NOT a **former state employee.***

2) This Contractor is NOT a **current state employee** or a **legislator** or the **family member** of a current state employee or legislator, or a **business** in which a current state employee or legislator or family member of the current state employee or legislator has an interest of greater than 20%.*

PLEASE NOTE: No contract may be awarded to a current state employee or legislator, or to a family member of a current state employee or legislator, or to a business in which any of these persons has an interest greater than 20% unless such contract is awarded pursuant to the Procurement Code, except such persons or businesses cannot be awarded a contract through a sole source or small purchase. (See Section 10-16-1 through 10-16-18 NMSA 1978 for further information.)

3) This Contractor is a (check one):   FOR PROFIT VENDOR          X
                                        NOT FOR PROFIT VENDOR

4) This PSA DOES COMPLY with the Governor's Guidelines for Contract Review and Re-Evaluation and IS an essential contract for the Agency.

_____          _____8/2/20_____
Signature of Agency Representative**        Date


I certify that the information stated in paragraphs 1-3 is true.

_____          ___7/24/20_____
Signature of Contractor                     Date


*If the Contractor is covered by one of these categories, please contact your CRB Analyst for the required procedures for processing.

**Must be an authorized signatory for the Agency.

## CAMPAIGN CONTRIBUTION DISCLOSURE FORM

Pursuant to the Procurement Code, Sections 13-1-28, et seq., NMSA 1978 and NMSA 1978, § 13-1-191.1 (2006), as amended by Laws of 2007, Chapter 234, any prospective contractor seeking to enter into a contract with any state agency or local public body **for professional services, a design and build project delivery system, or the design and installation of measures the primary purpose of which is to conserve natural resources** must file this form with that state agency or local public body. This form must be filed even if the contract qualifies as a small purchase or a sole source contract. The prospective contractor must disclose whether they, a family member or a representative of the prospective contractor has made a campaign contribution to an applicable public official of the state or a local public body during the two years prior to the date on which the contractor submits a proposal or, in the case of a sole source or small purchase contract, the two years prior to the date the contractor signs the contract, if the aggregate total of contributions given by the prospective contractor, a family member or a representative of the prospective contractor to the public official exceeds two hundred and fifty dollars ($250) over the two year period.

Furthermore, the state agency or local public body may cancel a solicitation or proposed award for a proposed contract pursuant to Section 13-1-181 NMSA 1978 or a contract that is executed may be ratified or terminated pursuant to Section 13-1-182 NMSA 1978 of the Procurement Code if: 1) a prospective contractor, a family member of the prospective contractor, or a representative of the prospective contractor gives a campaign contribution or other thing of value to an applicable public official or the applicable public official's employees during the pendency of the procurement process or 2) a prospective contractor fails to submit a fully completed disclosure statement pursuant to the law.

The state agency or local public body that procures the services or items of tangible personal property shall indicate on the form the name or names of every applicable public official, if any, for which disclosure is required by a prospective contractor.

THIS FORM MUST BE INCLUDED IN THE REQUEST FOR PROPOSALS AND MUST BE FILED BY ANY PROSPECTIVE CONTRACTOR WHETHER OR NOT THEY, THEIR FAMILY MEMBER, OR THEIR REPRESENTATIVE HAS MADE ANY CONTRIBUTIONS SUBJECT TO DISCLOSURE.

The following definitions apply:

"**Applicable public official**" means a person elected to an office or a person appointed to complete a term of an elected office, who has the authority to award or influence the award of the contract for which the prospective contractor is submitting a competitive sealed proposal or who has the authority to negotiate a sole source or small purchase contract that may be awarded without submission of a sealed competitive proposal.

"**Campaign Contribution**" means a gift, subscription, loan, advance or deposit of money or other thing of value, including the estimated value of an in-kind contribution, that is made to or received by an applicable public official or any person authorized to raise, collect or expend contributions on that official's behalf for the purpose of electing the official to statewide or local office. "Campaign Contribution" includes the payment of a debt incurred in an election campaign, but does not include the value of services provided without compensation or unreimbursed travel or other personal expenses of individuals who volunteer a portion or all of their time on behalf of a candidate or political committee, nor does it include the administrative or solicitation expenses of a political committee that are paid by an organization that sponsors the committee.

"**Family member**" means spouse, father, mother, child, father-in-law, mother-in-law, daughter-in-law or son-in-law of (a) a prospective contractor, if the prospective contractor is a natural person; or (b) an owner of a prospective contractor.

"**Pendency of the procurement process**" means the time period commencing with the public notice of the request for proposals and ending with the award of the contract or the cancellation of the request for proposals.

"**Prospective contractor**" means a person or business that is subject to the competitive sealed proposal process set forth in the Procurement Code or is not required to submit a competitive sealed proposal because that person or business qualifies for a sole source or a small purchase contract.

"**Representative of a prospective contractor**" means an officer or director of a corporation, a member or manager of a limited liability corporation, a partner of a partnership or a trustee of a trust of the prospective contractor.

Name(s) of Applicable Public Official(s) if any: _____

Michelle Lujan Grisham, Governor
Brian S. Colon, State Auditor

DISCLOSURE OF CONTRIBUTIONS BY PROSPECTIVE CONTRACTOR:

Contribution Made By: _____

Relation to Prospective Contractor: _____

Date Contribution(s) Made: _____

Amount(s) of Contribution(s) _____

Nature of Contribution(s) _____

Purpose of Contribution(s) _____

(Attach extra pages if necessary)


Signature _____     Date _____

Title (position) _____

**--OR--**

**NO CONTRIBUTIONS IN THE AGGREGATE TOTAL OVER TWO HUNDRED FIFTY DOLLARS ($250) WERE MADE** to an applicable public official by me, a family member or representative.

Signature

7/24/20
Date

VICE - PRESIDENT
Title (Position)

 **New Mexico Courts**

Joey Moya <supjdm@nmcourts.gov>

# Judge Pro Tempore

1 message

**Linda Vanzi** <coalmv@nmcourts.gov>    Thu, Feb 2, 2017 at 7:35 PM
To: "Moya, Joey" <supjdm@nmcourts.gov>
Cc: "Reynolds, Mark" <coamhr@nmcourts.gov>

Dear Mr. Moya,

This is to request that the Supreme Court appoint former United States District Court Court Judge Bruce D. Black as judge pro tempore for the New Mexico Court of Appeals to hear the following cases:

COA Case:

33437 State Engineer v. G. Horner
33439 State Engineer v. B. Square Ranch et. al.
33534 State Engineer v. McCarty Trust et al.
33535 State Engineer v. San Juan Agricultural Water Users Assocation et. al.

The above cases are related but not consolidated. Judge Black has agreed to take the cases pro bono.

Thank you for your attention to this matter. Please let me know if you have any questions.

J. Vanzi

--

Judge Linda M. Vanzi
New Mexico Court of Appeals
(505) 767-6134



**EXHIBIT**

**9**

FOR IMMEDIATE RELEASE
Santa Fe, New Mexico
February 27, 2018

ACEQUIAS FILE MOTION TO DISQUALIFY JUDGE FROM NAVAJO WATER CASE
BECAUSE HE PREVIOUSLY REPRESENTED THE NAVAJO NATION.

More than 20 acequias and community ditches on the San Juan River have filed a
motion asking the New Mexico Court of Appeals to disqualify Judge James Wechsler from
adjudicating the water claims of the Navajo Nation.

In 2013 Judge Wechsler awarded 635,729 acre-feet of water to the Navajo Nation,
without a trial.  According to the motion, that is roughly one quarter of all the river water in
New Mexico.

In 2018 an investigation revealed that Judge Wechsler had worked for the Navajo
Nation as an attorney for almost six years.  Judge Wechsler and the Navajo Nation did not
disclose their prior relationship, as required by Rule 21-211 of the Code of Judicial Conduct.

Rule 21-211 provides that "a judge shall disqualify himself or herself from any
proceeding in which the judge's impartiality might reasonably be questioned."  The motion
states that the public would reasonably doubt that Judge Wechsler could be impartial, since he
previously represented the Navajo Nation, one of the adversaries in the case.

"There can be no doubt that Mr. Wechsler acted as a zealous, effective, loyal, and
dedicated advocate for his clients – just as he was required to do by the Rules of Professional
Conduct for lawyers."

"But that is exactly why Judge Wechsler cannot sit on this case.  As a lawyer for the
Navajo Nation, he had a duty to act with zeal and undivided loyalty as a champion for the
interests of the Navajo Nation.  That is the polar opposite of the duty of impartiality which is
imposed on every judge in every case."

Because Judge Wechsler worked as a lawyer for the Navajo Nation, he has personal
knowledge about key contested issues in the case, according to the motion.  Rule 16-109
prohibits lawyers from using information against their former clients, so Judge Wechsler has a
built-in one-way bias imposed by law.

"All we have ever asked for was honesty and fairness through the judicial system," said
Mike Sullivan, chairman of the San Juan Agricultural Water Users Association. "How could
this have happened? "

The acequias filed their motion and brief in the Court of Appeals on February 26, 2018.
Copies are attached with highlighting added.

CONTACT:

Victor R. Marshall, 505-250-7718, victor@vrmarshall.com
Mike Sullivan, 505-320-3677
Jim Rogers, 505-330-0047

EXHIBIT
10